To: Hon. Jil Mazer-Marino

Re: Avon Place, LLC Bankruptcy Hearing -- Case 1-25-41368 (JMM)

Your Honor,

My name is Amy Arlin. I am a long-time resident of Avon Place Apartments and one of the founding members of the Avon Place Tenant Union. I am writing to provide context and raise urgent concerns related to the bankruptcy proceedings of Avon Place, LLC. This case affects not only our financial security as tenants but also our health, safety, and legal rights.

Summary of Prior Correspondence

Over the past year, I have written twice to Avon Place management, the Town of Avon, the fire department, the health department, and our local and state elected officials regarding urgent health and safety concerns.

In May 2024, I formally requested safety inspections of the HVAC systems, electrical infrastructure, and fire safety conditions in Buildings 47 and 48 following a serious fire in Building 44. I emphasized the need for certified professionals to evaluate the equipment, and for fire hazards such as grills on balconies to be addressed.

In September 2024, I followed up, as most of those concerns had not been addressed. I detailed a number of ongoing and serious problems, including a permanently propped-open fire door, use of grills under wooden balconies, frequent and prolonged elevator outages, widespread streetlight failures, repeated trash overflow and bear encounters, and dangerous potholes in the roadways. While one issue--the fire door--was resolved after the fire chief intervened directly, all other concerns remained unaddressed.

Since those letters were sent, several issues have only worsened, and new ones have emerged.

About the Tenant Union

The Avon Place Tenant Union is a legally recognized tenant organization under Connecticut law. We formed during an extended hot water outage in Building 44, during which tenants were left without hot water for weeks at a time. Despite repeated outreach, neither the health department nor the town intervened effectively. Eventually, the Town of Avon issued a fine to the property owner, but we do not know whether that fine was ever paid.

In light of ongoing and worsening problems at the complex, our union has remained active to support one another and advocate for basic living conditions.

I have had no contact with the lender listed in the bankruptcy filings. As a tenant union, we do not maintain sign-in sheets or meeting minutes, as these could be used to intimidate or retaliate against members. Our internal communications are considered privileged and are protected to ensure the safety and privacy of our members.

Mishandling of Tenant Funds

At the recent union meeting on April 4, 2025, tenants discussed the bankruptcy and learned that our security deposits had not been placed in escrow, as legally required. Instead, management deposited these funds into the general operating account. As a result, tenants are now unlikely to recover their deposits through the bankruptcy process.

We also discovered that Avon Place, LLC is behind on payments for water, sewer, and trash collection. Tenants are individually billed for these services each month, with costs varying depending on building-wide

usage. This billing system should have ensured that collected payments went directly toward covering those utilities. The current arrears raise serious questions about financial mismanagement.

We consulted with an attorney to better understand our legal rights in this situation. I want to clarify that I have had no contact or communication with the lender listed in the bankruptcy paperwork. During our meeting, the lender was mentioned by a member--though not by name--only in the context of their role in the proceedings and how potential outcomes might impact us as tenants. The discussion focused entirely on our rights and what options we may have.

We were told the dinner was paid for by "an anonymous donor." In fact, the donor was a tenant union member and former tenant; I personally witnessed her sign the credit card bill.

Union Suppression and Intimidation

Management actively attempted to interfere with our meeting by tearing down all posted notices, including those on the community bulletin board. They also sent a staff member to attend and monitor the meeting. These actions amount to illegal union suppression and intimidation under Connecticut's tenant union laws. Many tenants are understandably afraid of retaliation and are hesitant to speak out, especially when management surveils union activity.

Lock Change Delay After Theft

At the end of last year, my apartment keys were stolen just outside the building. Surveillance cameras should have captured the incident, but when the police requested footage, they were told none existed because "the Wi-Fi wasn't working." I suspect management had allowed the Wi-Fi to lapse, rendering the limited security cameras useless.

I reported the theft via the tenant portal and texted the on-site maintenance worker to request a lock change. This occurred on Tuesday, December 31. He said he was unavailable until Friday due to visiting family. Friday passed with no response. On Saturday, he again failed to show up.

By Monday morning, nearly a week later, I went to the office and spoke with the manager. She vaguely acknowledged the issue, and the property manager promised the lock would be changed that afternoon. No one arrived.

Out of frustration and concern for my safety, I returned to the office with my digital reader and told the office manager I would sit there until my lock was changed. She told me to leave. I remained outside the door, waiting in protest. Only then--after a full week and a sit-in--was my lock finally changed.

Outdoor Safety Hazards: Lighting and Potholes

The complex is poorly lit. Most of the streetlights do not function, making evening walks hazardous. I walk my large dog around the complex twice a day and part way around it the rest of the time. After dark, to avoid injury or being hit by a vehicle, I must wear a reflective vest and headlamp, especially on the back side of the complex where there is no sidewalk and numerous potholes.

The pavement is in a state of severe disrepair. Since my last letter, the pothole situation has grown worse. Many are now so close together that they cannot be avoided. Some are as deep as six inches. One pothole spans most of the back entrance to Building 47's parking lot, making it almost impassable. These hazards are especially concentrated in areas without sidewalks, creating real risks for drivers and pedestrians alike--including seniors, children, and residents with disabilities.

Elevator Outages and Accessibility Failures

The elevator in our building breaks down regularly--on average, every six to nine months--and remains out of service for extended periods. The most recent outage lasted six weeks.

Tenants who use wheelchairs have moved out of the building because they had to be physically carried up and down the stairs. One woman, 90 years old and using a walker, was forced to navigate the staircase without any support.

One banister in that stairwell had been ripped out of the wall after a resident with mobility issues stumbled and grabbed it to avoid falling. It has never been repaired. These outages are not isolated incidents--they're recurring and leave vulnerable residents in dangerous and undignified situations.

Additional Reports from Tenants

Many other tenants have experienced dangerous and unacceptable conditions, and I expect that many more current and former residents will be writing to the Court to share their own stories. What follows is only a small sample of the horror stories I'm aware of:

- A 70-year-old woman went without heat or air conditioning for six months, including during two summer heat waves. Our windows are incompatible with standard air conditioning units.
- A father with a small child was denied repair to his HVAC system during a freeze warning because he was behind on rent.
- Raw sewage once backed up into an apartment and management took nearly a day to respond, resulting in serious property damage.
- Building 44 endured both the extended hot water outage and a fire that condemned the structure. That fire may have been preventable had management conducted a basic HVAC inspection prior to leasing the unit. Our heating systems are enclosed in wooden closets on wooden balconies. It is believed the fire may have been caused by an animal nest in one of these closets.

- In the first summer under current ownership, management chose not to hire a lifeguard, despite previous owners having consistently done so. That same summer, a child nearly drowned in the pool but was resuscitated by an off-duty nurse who happened to be present. Later that summer, in mid-August, the health department shut the pool down after discovering that it had not been properly treated with chemicals.

Previous Communications and Fire Risk

This letter includes summaries of two previous letters I sent on May 7 and September 7, 2024. While the fire chief intervened to resolve a specific issue with a fire door, the remaining concerns--including requests for HVAC inspections and electrical assessments--went unaddressed. Since my original request, there have been two electrical fires in Building 48, one of which was fatal.

Final Thoughts

Thank you for taking the time to consider the concerns and lived experiences of the residents of Avon Place Apartments. We understand that the decisions before the Court are complex, but we hope this letter provides helpful context about the conditions we've endured under the current management. Our goal is simply to ensure that tenants' rights, safety, and dignity are taken into account as the case proceeds.

Sincerely,

Amy Arlin

47 Avonwood Rd, Apt. 314

Avon, CT 06001

aearlin@gmail.com

(860) 751-9481