Steven J. Mandelsberg, Esq.
Joseph Orbach, Esq.
**THOMPSON COBURN LLP**
488 Madison Avenue
New York, New York 10022
Telephone:    (212) 478-7200
E-mail:        smandelsberg@thompsoncoburn.com
                jorbach@thompsoncoburn.com

*Attorneys for 44 Avonwood Road Credit LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re

AVON PLACE LLC

                            Debtor.
------------------------------------------------------------X

Chapter 11

Case No. 25-41368 (JMM)

### SECURED CREDITOR 44 AVONWOOD ROAD CREDIT LLC'S OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT

Secured Creditor 44 Avonwood Road Credit LLC (the "Secured Creditor" or

"Avonwood Credit") hereby files its objection (the "Objection") to the *Disclosure Statement*

[Docket No. 19] (the "Disclosure Statement") filed by Avon Place LLC (the "Debtor"), and

respectfully represents as follows:

### PRELIMINARY STATEMENT

1.        Shortly after filing this case the Debtor filed the proposed Plan [Docket No. 18]

and a bareboned Disclosure Statement which fails to: (i) accurately describe a confirmable

plan; (ii) provide proper treatment to Avonwood Credit on account of its secured claim; (iii)

describe how the Debtor intends on funding the Plan; and (iv) provide evidence that there are

sufficient funds to implement the Plan.  Simply put, the Plan and Disclosure Statement were

likely filed so the Debtor could check a box that there is a Plan on file without addressing the

substantive requirements for a Plan under the Bankruptcy Code. As the Disclosure Statement falls well short of what is required for approval, the Court should deny the Debtor's motion. Before proceeding to solicitation of a Plan, the Court should require that the Debtor provide adequate information regarding the funding of the Plan, the timing of the Effective Date, and whether the Debtor intends to sell or refinance the Property (as defined below) including the manner and method for accomplishing such sale or refinancing. Additionally, to the extent the Debtor is relying on a sale or refinancing, the Debtor must provide the proposed terms and timing of such sale or refinancing to provide parties with adequate information with which to evaluate the Plan.

## RELEVANT BACKGROUND

### A.    The Notes, Mortgages, and Assignments

2.    On or about September 30, 2022, the Debtor became indebted to Bankwell Bank ("Bankwell"), Avonwood Credit's predecessor in interest, as evidenced by a Promissory Note of the same date in the original principal amount of Twenty-Five Million Three Hundred Twelve Thousand Five Hundred and 00/100 Dollars ($25,312,500.00), made payable, together with interest, late charges, costs and expenses, as more particularly set forth therein (the "$25,312,500 Note") related to the property located at 44, 46, 47 & 48 Avonwood Road, in the Town of Avon, County of Hartford and State of Connecticut (the "Property") owned by the Debtor.

3.    On or about October 21, 2022, the Debtor became indebted to Bankwell as evidenced by a Non-Revolving Line of Credit Note of the same date in the original principal amount of Two Million Six Hundred Eighty-Seven Thousand Five Hundred and 00/100 Dollars ($2,687,500.00), made payable, together with interest, late charges, costs and

expenses, as more particularly set forth therein (the "$2,687,500 Note", and with the $25,312,500 Note, the "Notes").

4.    As security for the $25,312,500 Note, on or about September 30, 2022, the Debtor granted an Open-End Mortgage Deed and Security Agreement of the Property in favor of Bankwell (the "$25,312,500 Mortgage"), which $25,312,500 Mortgage is conditioned upon the payment of the $25,312,500 Note according to its tenor and upon the performance of certain covenants and conditions contained in the $25,312,500 Note.

5.    As security for the $2,687,500 Note, on or about December 15, 2022, the Debtor granted an Open-End Mortgage Deed and Security Agreement of the Property in favor of Bankwell, as subsequently modified (as modified, the "$2,687,500 Mortgage", and with the $25,312,500 Mortgage, the "Mortgages"), which $2,687,500 Mortgage is conditioned upon the payment of the $2,687,500 Note according to its tenor and upon the performance of certain covenants and conditions contained in the $2,687,500 Note.  The $2,687,500 Mortgage was recorded in Volume 781 at Page 503 of the Avon, Connecticut Land Records, which $2,687,500 Mortgage was modified by a First Amendment of Note, Open-End Mortgage and Other Loan Documents dated January 31, 2023, and recorded in Volume 782 at Page 707 of the Avon, Connecticut Land Records, as modified by Second Amendment of Note, Open-End Mortgage and Other Loan Documents dated May 4, 2023, and recorded in Volume 784 at Page 736 of the Avon, Connecticut Land Records.

6.    Additional interest in the Property was provided by virtue of an Assignment of Leases and Rents dated September 30, 2022, and recorded in Volume 779 at Page 732 of the Avon, Connecticut Land Records (the "Sept. 30 Assignment"), and an Assignment of Leases and Rents dated December 15, 2022 (the "Dec. 15 Assignment", and with the Sept. 30

Assignment, the "Assignments") and recorded in Volume 781 at Page 537 of the Avon, Connecticut Land Records.

7.      Avonwood Credit succeeded Bankwell's rights in the Notes, Mortgages and Assignments, and Avonwood Credit recorded the assignment of mortgages and other instruments in Volume 800 at Pages 688-89 of the Avon, Connecticut Land Records.

**B.      The Foreclosure Action**

8.      On February 27, 2025, Avonwood Credit commenced a foreclosure action (the "Foreclosure Action") in Connecticut Superior Court, Judicial District of Hartford (the "Foreclosure Court")  (Case No. HHD-CV25-6199961-S) against the Debtor through the filing of a Summons and the Foreclosure Complaint.  On that same date, Avonwood Credit filed a *Lis Pendens* and a motion for a receiver (the "Receiver Motion") which was corrected the following day.  The Receiver Motion was set to be heard to the Court on Monday, March 24, 2025.  On Thursday, March 20, 2025, the Debtor filed a Motion for Extension (the "Extension Motion") thirty days  to respond  to the Receiver Motion.  That same day, Avonwood Credit filed an objection to the Extension Motion.

**C.      The Bankruptcy Case and Disclosure Statement Deficiencies**

9.      The Debtor then filed its bankruptcy petition in this Court on Friday, March 21, 2025 (the "Petition Date") in an effort to impede Avonwood Credit's Foreclosure Action and the Motion for a Receiver.

10.     On April 4, 2025, the Debtor filed the Disclosure Statement. It fails to accurately or adequately describe the claims that exist against the Debtor and the proposed treatment of such claims, and  to demonstrate the Debtor's ability to satisfy all claims.

11.     The Disclosure Statement states that the city of Avon, Connecticut has claims

totalling approximately $584,403.00 (the "Avon CT Claims") that make up Class 1 Claims. *See* Disclosure Statement ¶ 9.  However, the city of Avon, Connecticut has filed *five* (5) proofs of claims (the "Avon CT POCs") which total almost three times that amount, at $1,579,471.69.  *See* Proofs of Claims Nos. 4-8.

12.    The Disclosure Statement also provides that Avonwood Credit is owed approximately $28,100,785.00 as of the Petition Date (the "Avonwood Credit Claim") as a Class 2 Claim.  *See* Disclosure Statement ¶ 12.  But that amount is also incorrect as Avonwood Credit is owed $35,156,668.77 as of the Petition Date exclusive of post-petition interest and fees which it is entitled to under the terms of the Plan.  *See* Proof of Claim No. 10 (the "Avonwood Credit POC").  Despite admittedly being in default on the debt owed to Avonwood Credit through the failure to make any payments on account of the Mortgages for many months prior to the Petition Date, and despite asserting that Avonwood Credit is oversecured per the terms of the Plan, the Debtor only includes non-default interest in the Avonwood Credit Claim. *See* Disclosure Statement ¶ 12.  Moreover, the treatment listed for the Avonwood Credit Claim is both unclear and contradictory because the Disclosure Statement provides that the Debtor shall (i) cure pre-Petition Date and post-Petition Date monetary defaults and shall comply with the obligations under the applicable loan documents through maturity (which is October 1, 2025), and (ii) refinance or sell the Property and prepay amounts.  *See* Disclosure Statement ¶ 13.  Similarly, the Debtor proposes the same contradictory treatment for the allowed secured claim of Altbanq Lending LLC as Class 3. *See* Disclosure Statement ¶ 16.

13.    The Disclosure Statement provides that the Debtor shall maintain an undetermined claims distribution reserve (the "Claims Reserve") for the holders of

undetermined claims in a sum not less than the amount required to pay each claim if such claim was allowed in full.  *See* Disclosure Statement ¶ 36.

14.    Next, the Disclosure Statement provides that Interest Holders as Class 6 Interests shall be required "to contribute the funds necessary to make Effective Date payments."  *See* Disclosure Statement ¶ 25.  Yet the Disclosure Statement does not provide information regarding what contribution will be "necessary" or evidence that the Debtor's sole equity holder has sufficient funds to make this undefined contribution.

15.    The Disclosure Statement also fails to provide relevant and vital information related to (1) when the Effective Date will occur, (2) whether selling or refinancing the Property will generate sufficient funds to consummate the proposed Plan and the justification behind the valuation of the Property detailed in the Disclosure Statement; and (3) whether the Claims Reserve will be funded in an amount sufficient to pay the filed claims in the amounts as filed, to the extent such claims are not allowed on the Effective Date.

16.    In its description of the Sources and Uses attached as Exhibit B to the Disclosure Statement, although the numbers appear to demonstrate that the Debtor (not the equity holder) will be funding $6,849,010.07, such information is not included in the Disclosure Statement and not adequately explained as the reader is left to decipher what is meant by the exhibit.  Moreover, the Debtor asserts that it will be taking a credit of $474,744.98 related to insurance proceeds even though such credit has already been applied to the Avonwood Credit POC filed on May 19, 2025.  *See* Proof of Claim No. 10.  Obviously, the Debtor cannot take a credit for an amount that it already received a credit for.

17.    Finally, based on the Sources and Uses, the Debtor evidently intends to reinstate the Notes and Mortgages while at the same time paying off in full every other creditor

that is junior to Avonwood Credit.  No explanation is provided as to why the Debtor has proposed such treatment or how such treatment is "fair and equitable" to Avonwood Credit. While the "fair and equitable" standard applies to confirmation of the Plan, the Disclosure Statement is required to clearly explain what the Debtor is proposing and why such proposal is fair.  The current Disclosure Statement does neither.

## OBJECTION

### A.    The Disclosure Statement Does Not Provide Adequate Information

18.    Avonwood Credit objects to the Disclosure Statement because it is misleading and fails to provide adequate information necessary for creditors to make an informed judgment related to the Debtor's proposed Plan.

19.    One of the fundamental policies underlying the chapter 11 reorganization process is full disclosure by a debtor.  *Momentum Mfg. Corp. v. employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).  Congress intended the disclosure statement to be the primary source of information upon which creditors and shareholders rely in making an informed judgment about a plan of reorganization.  *Id.*

20.    Pursuant to section 1125(b) of the Bankruptcy Code, a proposed disclosure statement may not be approved by a court unless it provides "adequate information" to holders of claims or interests.  11 U.S.C. § 1125(b).  Section 1125(a)(1) defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . .that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

21.    The purpose of section 1125 is to assist the creditors in evaluating the plan on

its face.  *Colorado Mountain Express, Inc. v. Aspen Limousine Service, Inc. (In re Aspen Limousine Services, Inc.)*, 193 B.R. 325, 334 (D. Colo. 1996).   For this reason, the requirement that a disclosure statement contain adequate information is at the very "heart" of the chapter 11 reorganization process.   *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).   The importance of full disclosure is "underlaid by the reliance placed upon the disclosure statement by the creditors and the court."  *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *see also In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("[S]ubstantial financial information with  respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").   Accordingly, section 1125 of the Bankruptcy Code prefers more, rather than less, clear disclosure in a disclosure statement.  *In re Crowthers McCall Pattern, Inc.*, 120 B.R. at 300; *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y.).

22.    More specifically, section 1125 requires that disclosure statements contain sufficient information that would enable a "hypothetical [reasonable] investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1); *In re Momentum Mfg. Corp.*, 25 F.3d at 1136; *In re Crowthers McCall Pattern, Inc.*, 120 B.R. at 301 (holding that disclosure statement was materially in error which  precluded  confirmation).   Given  the  necessity  for  adequate  information  in  the Disclosure Statement and the paramount position section 1125 occupies in the chapter 11 process, "there is little, if any, room for harmless error."  *In re Crowthers McCall Pattern, Inc.*,

120 B.R. at 300.

23.      Courts in this circuit have identified a list of non-exhaustive factors that should be disclosed in a disclosure statement, including: (i) the anticipated future of the company; (ii) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the plan; and (iii) information relevant to the risks posed to creditors on the plan. *See, e.g., In re Avianca Holdings S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021).  Two of the most significant factors in considering the adequacy of information that should be included in a disclosure statement are the amounts of the claims and value of the property to be distributed. *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170-71(W.D. Ohio 1988)("*Scioto Valley*")(establishing 19-factor test to determine adequacy of disclosure statement, including: Factor 2 (value of assets), Factor 7 (information regarding claims against the estate) and Factor 14 (any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan); *In re Source Enterprises, Inc.*, 2007 WL 7144778 at *2 (Bankr. S.D.N.Y. July 31, 2017)(citing the *Scioto Valley* factors with approval).

24.      Here, the Disclosure Statement lacks "adequate information" to satisfy the standard under  section 1125 of the Bankruptcy Code.  The Disclosure Statement omits key material facts, underlying assumptions, and factual support sufficient to assist creditors in evaluating the Plan.  Instead,  the Disclosure Statement misleads and causes confusion as to the correct amount of filed claims, the proposed treatment of claims, and the Debtor's ability to satisfy obligations under the Plan.  These failures, as discussed herein, make it impossible for creditors to make informed decisions about whether to support or oppose the Plan.  Thus, the Disclosure Statement should not be approved for solicitation.

25.    *First,* the Disclosure Statement misleads creditors as to the accurate amounts of filed claims for Class 1 and Class 2.  While the Disclosure Statement provides that Class 1 Claims total approximately $584,403.00, the Town of Avon filed five Proofs of Claims in the following amounts, $46,504.24; $298,013.89; $749,232.96; $94,245.00; and $391,475.60, totalling $1,579,471.69, nearly triple the amount described in the Disclosure Statement. Similarly, the Disclosure Statement states that Class 2 Claims total $28,100,785.00, while Avonwood Credit filed a Proof of Claim for $35,156,668.77.  As of the date hereof, the Debtor has not disputed or objected to the amounts as filed by the Town of Avon or by Avonwood Credit.  The Debtor has not disclosed how it arrived at its estimate for the Class 1 and Class 2 Claims.    Stating that Class 1 Claims and Class 2 Claims total $584,403.00 and $28,100,785.00, respectively, in the Disclosure Statement is misleading and does not provide an accurate representation of the Debtor's claims register.  Moreover, in not representing the Debtor's claim register accurately, the Debtor has not provided assurance that it will sufficiently fund the Claims Reserve as required by the Disclosure Statement, which based on the claims filed by the Class 1 and Class 2 creditors would require an additional reserve of at least $8,050,952.46.  As Class 1 and Class 2 Claims have not been adjudicated, the Debtor must ensure the entire filed amount of the claims are reserved for in the Claims Reserve.

26.    Additionally, the Disclosure Statement does not provide any information regarding the funding of $6,849,010.07 shown on its "Sources and Uses" and does not address the fact that this number is less than half the cash needed to go effective on the Debtor's Plan based on the filed claim amounts (assuming without conceding that the Plan is confirmable). As it is currently drafted, it cannot be argued that the Disclosure Statement provides adequate information regarding the amounts owed on account of Class 1 Claims or Class 2 Claims, the

funding of the Claims Reserve or information regarding how the Plan will be funded.

27.    *Second,* the Disclosure Statement is not clear as to the treatment of Class 2 and Class 3 Claims.  For both classes, the Disclosure Statement states that (1) the Debtor shall cure pre-petition and post-petition monetary defaults and comply with the obligations under the applicable loan documents on the Effective Date, **and** (2) the Debtor intends to refinance or sell the Property and prepay all amounts on the Effective Date.  Yet these two statements are mutually exclusive because  the Debtor will either be reinstating the loans or paying them off in full on the Effective Date, although the Disclosure Statement does not explain which choice the Debtor will select or when such election will be made.

28.    Moreover, while the treatment listed is the same for both classes, the Sources and Uses attached as Exhibit B to the Disclosure Statement includes a line item for Class 3 to be paid in full on the Effective Date, but does not include a payment in full for Avonwood Credit's Class 2 Claim, which furthers the confusion surrounding the language incorporated in the Disclosure Statement.  Such inconsistencies contribute to the Disclosure Statement's failure to provide adequate information. Additionally, if the Debtor intends to pay in full all classes on the Effective Date other than the Class 2 Claim it should state so explicitly and explain to the Court and creditors why it proposes such treatment (which plainly appears to violate the "fair and equitable" standard).[1]

29.    *Third,* the Debtor has not provided any description of how it intends to implement the Plan.  The Disclosure Statement provides no information as to how the Debtor intends to fund the payment of all claims under the Plan.  While the Sources and Uses attached as Exhibit B to the Disclosure Statement states that the Debtor will fund $6,849,010

---

[1] Additionally, the financial projections of the Debtor must explain how the Notes and Mortgages, if reinstated, will be satisfied at maturity which will occur in the short-term on October 1, 2025.

(which as discussed above is woefully insufficient), the Disclosure Statement provides no additional information as to whether the Debtor has such funds or where the Debtor will be acquiring such funds from, and the recently filed April Monthly Operating Report shows the Debtor has only a negligible amount of cash on hand. The Debtor does not provide a description about the sufficiency of its funds available to satisfy all obligations under the Disclosure Statement.

30.     Moreover, in the Sources and Uses, the Debtor includes a credit of $474,744.00 for Insurance Claim Proceeds. However, such credit was already applied by Avonwood Credit in the Avonwood Credit POC and the Debtor is not entitled to benefit twice from the same credit. Based on the taking of this inappropriate credit and the discrepancy between the filed claims and the claim amounts listed in the Disclosure Statement it appears that the Debtor is at least $8.5 million short in the amount of cash it needs on the Effective Date (assuming the Plan is otherwise confirmable).

31.     Next, the Debtor provides almost no information about the valuation of the Property and the impact of any proposed sale or refinancing of the Property on the feasibility of the Plan. The Disclosure Statement states that the Debtor estimates that the current value of the Property is approximately $40,000,000.00. However, the Disclosure Statement fails to provide any other information or detail related to such valuation, including how it was valued, who conducted the valuation, and what method of valuation was used. Creditors are simply not provided with sufficient information to accept such valuation of the Property. Additionally, the Debtor does not explain if the Plan is premised on a sale or refinancing of the Property including what steps the Debtor is taking to market the Property and the timing of when a sale or refinancing may occur and on what terms. For these reasons, the failure to

describe and explain the impact of a potential sale or refinancing of the Property on the Debtor's ability to satisfy the obligations of the Debtor contained in the Plan are fatal to the Debtor's motion seeking approval of the Disclosure Statement.

32. *Finally*, the Disclosure Statement does not advise as to when the Effective Date may occur including what conditions need to be satisfied. Left unclear is whether the Debtor intends to emerge from bankruptcy this summer or intends to confirm a Plan and languish in bankruptcy for months while it pursues a sale and/or refinancing. Nonetheless, the Disclosure Statement includes a statement encouraging creditors to vote to accept the Plan when the Disclosure Statement as drafted provides that no creditors are actually entitled to vote on the Plan.

33. In short, the Disclosure Statement is riddled with contradictions and inaccuracies which ultimately leads to creditors being misled and confused, the exact opposite of the purpose of having a Disclosure Statement. A lack of information in the Disclosure Statement is incompatible with the Debtor's disclosure obligations under section 1125 of the Bankruptcy Code. The Disclosure Statement lacks vital information necessary for creditors to adequately evaluate the Plan and must be rejected as proposed since creditors are not receiving an accurate picture of the Debtor's proposed Plan.

**B.    The Plan is Patently Unconfirmable**

34. Courts will not approve a disclosure statement that describes a "patently unconfirmable" plan, that is, a plan that is incapable of confirmation as a matter of law. *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). If a Chapter 11 plan does not comply with Bankruptcy Code Section 1129, courts will not subject the estate to the expense of the vote solicitation and plan confirmation process. *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va.

1986). In such circumstances, therefore it is "incumbent upon the [c]ourt to decline approval of the disclosure statement and prevent diminution of the estate." *In re Pecht*, 57 B.R. at 139.

35.      In 1994, Congress amended the Bankruptcy Code and added  Section 1123(d). Bankruptcy Code Section 1123 states that a Chapter 11 plan "shall ... provide adequate means for the plan's implementation, such as ... curing or waiving of any default." 11 U.S.C. § 1123(a)(5)(G). Section 1123(d) provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d).

36.      Courts interpreting Section 1123(d) have held that the underlying loan agreement and state law determine whether a debtor must cure using the default rate of interest in a Chapter 11 plan. *In re New Invs.*, 840 F.3d at 1140–42. As the Eleventh Circuit found, pursuant to Bankruptcy Code Section 1123(d), "a party cannot cure its default without paying the agreed-upon default-rate interest." *JPMCC 2006–LDP7 Miami Beach Lodging, LLC v. Sagamore Partners, Ltd. (In re Sagamore Partners, Ltd.)*, 620 Fed.Appx. 864, 869 (11th Cir. 2015). Other courts are in accord. *See, e.g.*, *In re 1 Ashbury Court Partners, L.L.C.*, 2011 WL 4712010, at *5 (Bankr. D. Kan. 2011) (finding that a debtor must cure using the default interest rate in light of Bankruptcy Code Section 1123(d)); *In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 674 (Bankr. S.D. Tex. 2010) (holding that in order to cure a default and reinstate a loan, a lender is entitled to the default rate of interest in accordance with the underlying agreement and applicable state law).

37.      The Eastern District of New York Bankruptcy Court addressed a similar plan to the one proposed here *In re Yeshivah Ohel Moshe*, 567 B.R. 438 (Bankr. EDNY 2017).[2]  In

---

[2] Counsel for the debtor in that case was the same counsel to the Debtor in this case.

that case the debtor proposed "curing" its pre-petition default to its secured lender by only

paying non-default interest and expressly disclaiming liability for default interest. *Id.* at 433.

In denying approval of that disclosure statement the court held:

> that in proposing a Chapter 11 plan, a debtor cannot disregard Section 1123(d)
> and cure a default under Section 1124(2) by paying the arrears at the non-
> default rate of interest. "Because the 'denial of a mortgagee's contractual right
> to interest at a default rate does 'alter' the secured creditor's contractual rights
> within the meaning of subsection (D) of Section 1124(2) ... Section 1124(2) ...
> does not provide a statutory basis for judicial nullification of a contract right to
> default rate interest.' " *In re 139–141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y.
> 2004) (quoting *In re 139–141 Owners Corp.*, 306 B.R. 763, 768 (Bankr. S.D.N.Y.
> 2004)).

*Id.* at 446.

38.    Here, the Plan proposes only paying Avonwood Credit non-default interest.

Disclosure Statement at 12. The Plan does not contemplate paying default interest or other

fees and expenses set forth in the loan documents even though the underlying loan agreement

requires – and Connecticut law permits – the payment of default interest rate following a

default. Specifically, the Mortgages provide that upon an Event of Default, "interest shall

immediately accrue at a 'default rate' which means the rate of interest which is Eighteen (18%)

percent per annum, but in no event to exceed the maximum rate allowed by law." *See*

$25,312,500 Note at ¶7, $2,687,500 Note at 6. Under Connecticut law, "a refusal to award

the interest rate agreed to by the parties under the note upon default would amount to the

court improperly remaking the contract of the parties." *Fannie Mae v. Bridgeport Portfolio, LLC*,

2013 WL 1111954, *1 (Sup. Ct. CT Feb. 20, 2013) quoting *F.D.I.C, as Receiver v. 20 Sisson

Street Associates*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV

910395128 (August 10, 1993, Aurigemma, J.). Additionally, courts have held that a contract

term that provides for a default rate of 18 percent is enforceable under Connecticut state law.

*See Emigrant Mortg., Co. v. D'Agostino*, 94 Conn. App. 793, 896 A.2d 814, 823 (2006) (holding that default interest rate of 18% was enforceable and rejecting defense that such default rate was "unconscionable".).  Accordingly, the Plan's failure to provide Avonwood Credit with its contracted for payment terms is not confirmable and approval of the Disclosure Statement premised upon such a Plan should be denied as it was *In re Yeshivah Ohel Moshe*.

39.    Avonwood Credit expressly reserves its rights to raise these and additional arguments at any hearing regarding Plan confirmation.

## CONCLUSION

WHEREFORE, Avonwood Credit respectfully requests that this Court enter an order that (i) denies approval of the Disclosure Statement; and (2) grants Avonwood Credit such relief as this Court deems just and equitable.

Dated: New York, New York
June 4, 2025

**THOMPSON COBURN LLP**

By:  */s/ Joseph Orbach*
Steven J. Mandelsberg
Joseph Orbach
488 Madison Avenue
New York, NY  10022
Telephone: 212-478-7200
Fax: 212-478-7400
smandelsberg@thompsoncoburn.com
jorbach@thompsoncoburn.com

*Attorneys for Secured Creditor 44 Avonwood Road Credit LLC*