UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                    Chapter 11

        Avon Place, LLC                          Case no.  25-41368 (JMM)

                        Debtor.

----------------------------------------------------------x

## REPLY TO OBJECTION TO MOTION TO REDUCE
## CLAIM AND TO PLAN CONFIRMATION OBJECTION

        Avon Place LLC (the "Debtor"), as and for its reply in support of its objection to

Claim No. 10 filed by 44 Avonwood Road Credit LLC ("Avonwood") and in opposition to

Avonwood's objection to confirmation of the Debtor's proposed amended plan of reorganization

("Plan"), respectfully represents as follows:

(a)     **The Court should disallow default interest because the so-called Tax Default was
        never contractually triggered and the "Payment Default" was largely manufactured
        by the lender's own conduct in failing to apply available funds and then rushing to
        foreclose;**

(b)     **Avonwood is not entitled to default interest for the post-petition period because
        throughout this case it has enjoyed a large equity cushion, no increased risk, and
        proposed payment in full on the Plan effective date; and**

(c)     **Alternatively, under section 1124(2) it would be well within this Court's sound
        discretion to adopt the minority view and permit the Debtor to cure, reinstate and
        then payoff Avonwood in full at closing without default interest.**

## INTRODUCTION

        1.      This dispute arises from a significant disconnect between the parties'

prepetition conduct—cooperative, communicative, and responsive in the aftermath of a fire—and

the inflated claim now asserted by Avonwood, based largely on alleged defaults never noticed,

negotiated, or discussed when they occurred.

2.      Avonwood's secured claim includes millions of dollars in retroactive default interest, late charges, and penalty fees – most of which were neither accrued, demanded, nor noticed before the transfer of the loan. Yet the evidentiary record shows that Bankwell Bank ("Bankwell"), the original lender, was working with the Debtor and gave the Debtor no written notice of default before Bankwell sold the loan.

3.      This memorandum proceeds by setting out the procedural chronology, the loan's actual performance history, and Bankwell's own documented actions during this period. It then addresses why Avonwood's claim should be disallowed to the extent it seeks to recover charges that were neither accrued, nor noticed, nor preserved and why the Plan satisfies the requirements of 11 U.S.C. § 1124(2).

## BACKGROUND

4.      On March 21, 2025, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. [Dkt. 1.]

5.      The Debtor owns a 164-unit residential complex in Avon, Connecticut, consisting of 164 out of 188 units in the Avonwood Condominiums. The property was financed through a senior secured loan originally made by Bankwell, consisting of a $25,312,500 term loan and a $2,687,500 non-revolving line of credit.

6.      On June 10, 2025, the Debtor filed its formal objection to Claim No. 10, asserting that Avonwood's claim included unenforceable default interest, late fees, and penalty charges that were neither noticed nor accrued before Bankwell's loan transfer. [Dkt. 72.]

7.      On June 12, 2025, the Debtor filed its amended Plan and Disclosure Statement. The Plan proposes three alternative paths: (i) reinstatement of the loan under 11 U.S.C.

2

§ 1124(2), (ii) refinancing through a commitment from Trevian Capital, or (iii) marketing and sale of the property if refinancing proved unavailable. [Dkts. 77, 78]  The Debtor has since entered a proposed sale contract (Exhibit A) to fund the Plan.

    8.  On June 16, 2025, the Court approved the Disclosure Statement and scheduled a combined confirmation and claim objection hearing for August 18, 2025. [Dkt. 80.].

    9.  On July 11, 2025, Avonwood filed both a reply in further support of its proof of claim [Dkt. 90] and a limited objection to Plan confirmation [Dkt. 93], asserting that the Plan does not satisfy the requirements of 11 U.S.C. §§ 1123 and 1129 and could not cure the alleged defaults.

## LOAN HISTORY AND BANKWELL'S ASSERTED DEFAULTS

    10.  The Debtor's loan relationship with Bankwell originated in 2022 and included two facilities: (a) a $25,312,500 Term Loan, evidenced by a promissory note dated September 30, 2022; and (b) a $2,687,500 Non-Revolving Line of Credit, evidenced by a separate note dated October 21, 2022. The Notes have a fixed contract interest rate of 4.95% per year. They provide for monthly payments: interest-only payments were due beginning November 1, 2022, and starting November 1, 2023 the Debtor had to pay combined principal and interest installments each month. The $25,312,500 Note called for monthly principal-and-interest payments of about $136,233.42 after the first year.

    11.  Both loans were secured by open-end mortgages and assignments of leases recorded in the Avon Land Records, and both were guaranteed by Ahron Rudich, the Debtor's managing member.

12.     The Term Loan and Line of Credit each included provisions for default interest at a contractual rate of 18% per year, but only upon a defined Event of Default, and subject to any notice and cure periods provided under the documents. [See Term Loan Note § 5.1; Term Loan Mortgage § 8.1(d); Line of Credit Note § 5.1.]

13.     Section 4.1(c) of both mortgages provide that defaults on obligations other than those owed to the mortgagee require written notice and a 30-day opportunity to cure, unless waived by specific agreement.

14.     From origination through at least June 2024, the Debtor made regular monthly interest payments, and Bankwell never asserted or reserved any claim for default interest.

15.     On April 21, 2024, a fire severely damaged one of the condominium buildings (Building #44), displacing tenants and disrupting rental income from 62 units. The Debtor undertook immediate repairs using its own funds and began coordinating with the property insurer (Lexington Insurance) and Bankwell.

16.     In a May 24, 2024 email, Bankwell acknowledged the situation and sought documentation related to both the insurance claim and 2024 property tax payments.  On June 4, 2024, the Debtor's counsel (Pullman & Comley) confirmed that the 2024 taxes had been paid via two wire transfers on May 31 and June 4.

17.     Bankwell sent no default notices for unpaid taxes. Nor did Bankwell send any notice of default or demand to cure the unpaid debt service before transferring the loan. Nor did Bankwell issue a notice of acceleration or begin a foreclosure action.  Instead, the parties were engaged in discussions over a forbearance agreement.

4

18.     Meanwhile, the Debtor's ability to service the monthly debt had become strained because of the fire. After making the June 1, 2024 payments, the Debtor did not pay the July 1, 2024 installments due on the Notes. Instead, the Debtor engaged in settlement discussions with Bankwell over a forbearance agreement providing for interest only payments for a period of time to recover from the disruption caused by the fire.

19.     In or about December 2024, the Debtor endorsed and turned over a $474,744 insurance check to Bankwell, intending it to be applied toward repair costs or debt service. Bankwell received the funds on December 5, 2024 and placed them in a restricted account (escrow) associated with the loan.

### ASSIGNMENT TO AVONWOOD AND POST-TRANSFER CONDUCT

20.     On January 30, 2025, Bankwell assigned the loan to Avonwood, an entity seemingly controlled by Kyle O'Hehir.

21.     The assignment occurred without communication from Bankwell or Avonwood to the Debtor, and without any updated demand, notice of default, accounting or statement that forbearance agreement discussions were to be terminated.

22.     Unbeknownst to the Debtor, a Bankwell officer advised Mr. O'Hehir of Avonwood that Bankwell would place the insurance money into a suspense escrow account and let Avonwood apply it after the closing. Mr. O'Hehir confirmed that Bankwell said it "felt better if I applied it" post-closing. As part of the loan purchase on January 30, 2025, Avonwood took control of the escrowed insurance funds.

23.     Right after the transfer, Avonwood recharacterized the loan history and applied more than $474,000 in insurance proceeds only to accrued default interest rather than

principal reduction. By Avonwood's own admission, applying the insurance proceeds in this manner "covered perhaps one month of the default interest" that had accrued up to that point. Had those funds instead been applied to the missed monthly installments at the non-default rate, they would have covered roughly three months of payments, significantly reducing the arrears.

24.    Avonwood then promptly accelerated the loan by commencing a foreclosure action against the Debtor in Connecticut Superior Court. The foreclosure complaint declared the loan in default and sought the appointment of a receiver, immediate payment in full of the debt, and a deficiency judgment against the Debtor. The Debtor received no prior notice of default or acceleration from either Bankwell or Avonwood before the foreclosure action was filed. Bankwell had never formally declared a default, and Avonwood's sudden foreclosure came with no warning to the Debtor.

25.    Nor did Bankwell ever assert that the Debtor was in continuing default for 2023 real estate taxes. The first mention of a purported 2023 delinquency appeared in Avonwood's response to the Debtor's claim objection and Plan Confirmation objection.  But Bankwell continued to accept monthly interest payments through May 2024. On September 11, 2024, Bankwell's EVP, Christine Chivily, emailed Kyle O'Hehir stating: "[h]ate to be a nudge, but we need to get back to the borrower about whether we're willing to give a short term forbearance so if you're not interested or your timing is different than we had discussed, please let me know." Exhibit B.

26.    This confirms that as late as mid-September 2024, Bankwell was awaiting direction from Avonwood as to how to proceed with its forebearance negotiations with the Debtor. Instead of giving the Debtor full disclosure of the fact that it was at risk of losing its 4.95% loan by a sale to Avonwood, Bankwell was ensuring the Debtor's exposure to 18% default rate interest

should Avonwood acquire the loan. To further the Debtor's false sense of security, Bankwell sent regular invoices to the Debtor demanding payment at the non-default 4.95% rate to bring the obligations current.

27.     Facing the imminent foreclosure and loss of its property following Bankwell's sale of the loan to Avonwood, the Debtor filed its Chapter 11 petition on March 21, 2025, which stayed the foreclosure.

28.     Avonwood filed proof of claim (Claim No. 10) setting forth what it believes is owed on the loan as of the March 21, 2025 petition date. Avonwood's Claim No. 10, filed May 19, 2025, asserts a total claim of $35,156,668.77 (after crediting the insurance proceeds). The claim consists of five categories of charges: (a) principal of $27,100,784.73; (b) "Tax Default Interest" of $2,830,377.34 (default interest purportedly accruing from the Debtor's tax payment defaults); (c) "Payment Default Interest" of $4,454,031.25 (default interest purportedly on the missed loan installments from July 2024 forward); (d) a Prepayment Penalty of $840,000.00; and (e) Late Fees of $406,220.43.

29.     Avonwood also asserts that it is entitled to recover its attorneys' fees and enforcement costs under the loan documents (in an amount to be determined). The Debtor does not dispute the principal balance owed on the loans, nor the lender's entitlement to reasonable fees and costs. The focus of this dispute is on the roughly $7.7 million of add-on charges (default interest, penalties, and late fees) that Avonwood has included in its claim.

## THE DEBTOR'S CHAPTER 11 PLAN AND CLAIM OBJECTION

30.     The Debtor's reorganization strategy is to reinstate and then payoff the Bankwell loans (now held by Avonwood) by curing all defaults and then paying off the balance from a property sale.

31.     On June 12, 2025, the Debtor filed an Amended Chapter 11 Plan which classifies Avonwood's secured claim in Class 2 and proposes to treat it as "unimpaired" under 11 U.S.C. § 1124(2). In the Plan, the Debtor estimated that, after curing arrears at the contract interest rate, the amount outstanding on the loans would be about $28,100,785 as of the effective date. This amount includes all principal and interest at the non-default rate, plus any advances and standard charges, but excludes Avonwood's claimed default interest and penalties.  By comparison, Avonwood's Claim No. 10 asserts $35.16 million, reflecting the inclusion of default interest, late charges, and the prepayment fee.

32.     The Debtor also separately classified a $3,000,000 junior mortgage claim (held by Altbanq Lending LLC ["Altbanq"]) in Class 3.  The Debtor proposes to satisfy that obligation at the closing of the sale as well

## I.     AVONWOOD'S DEFAULT INTEREST CLAIM SHOULD BE DISALLOWED

33.     Avonwood demands over $7.28 million in default-rate interest as part of its claim. This purports to represent interest calculated at a 18% per year default rate for two periods: (1) roughly 303 days of alleged "tax non-payment default" (resulting in $2.83 million) and (2) from July 2024 through the bankruptcy on the missed loan payments (about $4.45 million).

34.     The Court should disallow these charges in their entirety because: (a) the "Tax Default Interest" was never contractually triggered because the tax default was cured with no

8

required notice of default from the lender; (b) the "Payment Default Interest" was largely manufactured by the lender's own conduct in failing to apply available funds and rushing to accelerate – conduct that breaches the duty of good faith and justifies equitable relief under Connecticut law; and (c) even aside from contract notice issues or misconduct, the Court has discretion under 11 U.S.C. §§ 506(b) and 1124(2) to deny default interest where it functions as a windfall or penalty.

### (a) THE DEFAULT INTEREST CLAIMS ARE BARRED AS TO NON-MONETARY OBLIGATIONS UNDER § 4.1(c)

35.     Under the Loan Documents, Bankwell's ability to declare an Event of Default—and to impose default interest—is governed by specific contractual provisions. These include Section 4.1(a) and Section 4.1(c) of the Term Loan Mortgage and Line of Credit Mortgage. Section 4.1(a) governs payment defaults. It states that a default occurs upon the borrower's failure to failure to pay within ten (10) days of when due any installment of principal, interest or other amount due with respect to any and all Indebtedness. The term "Indebtedness" is defined in Article I.2 of the Mortgage as: "All amounts due to Mortgagee under the Note, this Mortgage, on account of the Advance or any of the Loan Documents shall be secured by the lien of this Mortgage and shall hereinafter be referred to as the "Indebtedness."

36.     Section 4.1(c) governs other monetary and non-monetary obligations that are not "Indebtedness" owed to the Mortgagee and secured by the Mortgage as defined in Article I. This includes the borrower's obligation to pay taxes. It provides:

> If Borrower fails to perform any of its other obligations under this Mortgage (other than those set forth in subsections (a) and (b)), and such failure continues for a period of thirty (30) days after written notice from Lender to Borrower, then an Event of Default shall exist.

37.     The distinction is critical. Only failure to pay principal, interest, or fees when due to the mortgagee --are actionable under § 4.1(a) without notice.  All other alleged defaults – e.g., failure to deliver tax returns, maintain insurance, or notify the lender of the fire— fall under § 4.1(c) and require written notice and an opportunity to cure.

38.     In summary, failure to pay property taxes when due constitutes a default under the mortgages. However, such a default is treated as a non-monetary default under the loan documents – it falls under the category of failing to perform "any other material obligation" of the borrower.

39.     Avonwood's claim includes millions in default interest allegedly triggered by failures to pay taxes (including 2023 taxes), and possibly other non-monetary events. However, there is no written notice in the record that triggered § 4.1(c) before the claim's assertion. Courts strictly enforce such notice provisions.  See *In re 139-141 Owners Corp.*, 306 B.R. 763, 775 (Bankr. S.D.N.Y. 2004) (Where a default requires notice and cure rights, the creditor cannot collect default interest until those conditions are met.).

40.     Even if Bankwell could be deemed to have "declared" a default by certain October 24, 2023 and April 24, 2024 emails (which were at most informal notices), Bankwell acknowledged the default was cured in June 2024 and continued to accept regular loan payments. By the time Avonwood stepped into Bankwell's shoes in January 2025, the property taxes were *current*. It is telling that Avonwood's foreclosure complaint in February 2025 did not allege any ongoing tax default – instead, it focused on the Debtor's failure to pay monthly debt service and other issues. There is no factual or legal basis to impose an 18% default interest rate for the period of the cured tax delinquency.

10

41.    Since the lender did not give notice of a curable default, no Event of Default can be said to have existed under the contract—and default interest may not be imposed based on defaults except for those involving nonpayment of obligations due to the Mortgagee.

**(b) THE DEFAULT INTEREST CLAIMS ARE BARRED AS TO MONETARY OBLIGATIONS ON EQUITABLE GROUNDS**

42.    As for default interest arising from nonpayment, Courts have routinely held that default interest is not automatically enforceable, even-where allowed by contract. Connecticut law permits courts to withhold default interest on equitable grounds, even when contractually authorized. See *Fannie Mae v. Bridgeport Portfolio, LLC*, 2013 Conn. Super. LEXIS 414, at *2–3 (Feb. 20, 2013). There, the court declined to disallow default interest, but only after finding no "equitable reason for doing so." *See In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012) (Even if the note allows default interest, the Court may exercise its equitable powers to disallow it.)

43.    Here, equitable factors support withholding default interest. The original lender (Bankwell) never noticed or demanded default interest, and engaged in months of forbearance discussions, noticing no default. The Debtor was transparent in its communications, and acted in good faith during the fire recovery period.  As discussed above, the record shows that: (a) Bankwell accepted regular payments through May 2024 with no reservation of rights, (b) Bankwell entered into active forbearance negotiations rather than declaring a default, and (c) and consistent therewith, during the time the parties were discussing settlement, Bankwell sent the Debtor regular invoices seeking non-default 4.95% contract rate interest.

44.      Indeed, Bankwell's own communications suggest that the Debtor was cooperating. Its EVP Christine Chivily wrote on September 11, 2024: "[h]ate to be a nudge, but we need to get back to the borrower about whether we're willing to give a short term forbearance so if you're not interested or your timing is different than we had discussed, please let me know." Exhibit B.

45.      This was not the posture of a lender preparing to impose a multimillion-dollar default interest charge. Rather, Bankwell treated the situation as negotiable, not adversarial. It ostensibly engaged the Debtor in good faith and made no suggestion that the rights Avonwood now asserts had been triggered.

46.      The lion's share of default interest in Claim No. 10 – about $4.454 million – is attributed to the Debtor's failure to make monthly loan payments from July 2024 through the bankruptcy filing. In a typical case, a lender might be entitled to some default interest for a missed-payment default. This case, however, is far from typical.

47.      Bankwell had in hand nearly $474,744 of the Debtor's money (the insurance proceeds) in late 2024 that could have been applied to cure or reduce the ongoing payment default. The Debtor transferred this large sum to Bankwell in December 2024 believing it would be applied to debt service or property restoration. Had Bankwell applied those funds to the missed monthly payments, it would have covered roughly three months' worth of installments, which could have brought the loan current or nearly current by the end of 2024.

48.      Instead of applying the money to the overdue payments, Bankwell locked the funds in a suspense account to benefit the loan purchaser, Avonwood. Bankwell's officer told Avonwood's principal (O'Hehir) that "they would be putting it into a suspense account and that it

12

would be [Avonwood's] responsibility… post-closing to apply it." This was a deliberate decision: Bankwell "felt better" letting the buyer handle the application of the insurance money. The result was that the Debtor's loan remained in default (with no payments made) for more months, accumulating ever-increasing interest at the default rate.

49.     When Avonwood took over on January 30, 2025, it immediately applied the insurance proceeds to default interest – not to the Debtor's regular interest payments, but purely to interest at the 18% rate that had accrued because the payments were behind.  And the payments were behind because the forbearance agreement discussions were terminated with no warning.

50.     At a minimum, had Bankwell done the fair and commercially reasonable thing – applied the insurance funds to the amounts unpaid when received instead of placing them in suspense for Avonwood to apply – the loan might have been brought nearly current, leaving little to no default interest owing. Instead, the default was prolonged and exacerbated: Avonwood stepped in and exacted the maximum contractual penalty from those funds.

51.     This sequence of conduct reflects lender misconduct and bad faith. Bankwell and Avonwood effectively set a trap for the Debtor as follows: (a) Bankwell waited until right after receiving a large sum from the Debtor (the insurance check), (b) then transferred the loan to Avonwood; and (c) Avonwood applied that sum to charges it would not have been entitled to had the sum been applied earlier. Avonwood then accelerated and foreclosed without giving the Debtor any chance to cure. The implied covenant of good faith and fair dealing is inherent in every contract under Connecticut (and New York) law. A creditor breaches that covenant by exercising contract rights in a way that is oppressive or intended to harm the borrower. Here, Avonwood's rush to foreclosure and refusal to let the insurance funds cover the defaults can only be described as

opportunistic. Mr. O'Hehir, Avonwood's principal, has publicly described his business model as capitalizing on technical defaults and being the "bad guy" willing to enforce harsh remedies where traditional banks would not. The Court should not permit Avonwood to reap a windfall of millions in default interest that accrued largely due to its sharp practice.

52.     The retroactive imposition of default interest by Avonwood—months after the alleged default events, and with no supporting notice or declaration—is inequitable. The Debtor had no opportunity to cure, dispute, or negotiate the alleged defaults.

53.     In addition to equitable principles under Connecticut law, equitable principles under the Bankruptcy Code support denying the payment default interest. Section 506(b) of the Code allows an oversecured creditor to receive post-petition interest "provided for under the agreement" if it is reasonable.

54.     Although *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959) favors honoring the contract rate in solvent cases, *Ruskin* is a pre-Code case, and § 506(b) expressly limits oversecured add-ons to what is "reasonable." Bankruptcy Courts, therefore, have discretion to reduce or deny default-rate components where they are punitive, disproportionate, or unrelated to risk, particularly when the creditor is fully protected and being paid promptly in full at the non-default rate. *See, e.g. In re 975 Walton Bronx LLC*, 2022 Bankr. LEXIS 2832, 2022 WL 5265041 (Bankr. E.D.N.Y. 2022); *In re Vest Assocs.*, 217 B.R. 696, 701–02 (Bankr. S.D.N.Y. 1998); *In re P.G. Realty Co.*, 220 B.R. 773, 782 (Bankr. E.D.N.Y. 1998).

55.     Here, Avonwood is oversecured and will be paid in full at closing. The Property sale for about $40 million creates a substantial equity cushion against approximately $28

million of principal plus non-default interest, and provides a short runway to full cash payoff on the Effective Date. There is no incremental post-petition risk that justifies an 18% rate.

56.     Since Avonwood will be paid at closing, Only monetary defaults remain; no surviving nonmonetary default. Unlike *975 Walton*, there is no incurable covenant default preventing reinstatement; indeed, the Plan does not functionally reinstate at all—it pays off.

57.     And it bears reiterating that the $474,744 of insurance proceeds were transferred to Bankwell and applied by Avonwood in its sole discretion to default interest rather than to current installments. That choice increased arrears without reducing risk, underscoring why the incremental default-rate component functions as a penalty rather than compensation.

58.     The bankruptcy has caused no collateral harm to the lender.  To the contrary, the Plan gives Avonwood a certain, imminent payoff. Operations and collateral value have remained stable and the sale contract provides a binding, near-term exit. Default-rate interest here is not compensatory.

59.     Here, allowing Avonwood default interest would confer an unjust windfall on a creditor who bought the loan at a discount knowing that it was in default, and who then exacerbated the default. The original loan agreement was made with a reputable bank (Bankwell) and was never intended to yield an 18% return without a truly intractable default. Default interest would simultaneously wipe out the Debtor's equity and jeopardize its otherwise feasible reorganization – essentially transferring value from the Debtor's principal (who invested $36 million in the Property) to a distress investor. Bankruptcy is not meant to be a vehicle for such a forfeiture, especially when the underlying debt can be cured and satisfied at the contract rate.

60.     In summary, the Court should allow interest at the non-default contract rate through the Effective Date and disallow the 18% default-rate component as unreasonable under § 506(b) given the equity cushion, sale certainty, lack of increased risk, and the prepetition insurance-proceeds application that inflated arrears without any compensatory basis.  The approximately $7.284 million of default interest in Claim No. 10 should be disallowed in full.

## II.     THE PLAN PROPERLY REINSTATES UNDER 11 U.S.C. § 1124(2)

61.     In the alternative, if the Court determines that the lender is entitled to default interest under Connecticut law and under section 506(c), the Debtor's Plan proposes to cure all asserted monetary defaults and reinstate the loan's original maturity under § 1124(2) for a moment in time, and then to payoff Avonwood's notes in full on the Plan effective date with sale proceeds from the property sale.

62.     But even assuming that the asserted default interest charges were allowed under the Loan Documents, they are not recoverable upon reinstatement under § 1124(2).

63.     Section 1124(2) permits a debtor to restore the loan to its pre-default state, so long as the debtor cures any arrears and provides ongoing compliance. Section 1124(2) provides, in relevant part, that a claim is unimpaired if the plan: "(A) cures any default ... other than a default of a kind specified in section 365(b)(2) ...; (B) reinstates the maturity of the claim ... as it existed before the default; (C) compensates the holder for any actual pecuniary loss incurred as a result of the default; and (D) does not otherwise alter the legal, equitable or contractual rights" of the claim holder.

64.     Importantly, § 1124(2)(A) incorporates by reference § 365(b)(2), which excuses certain types of defaults from the cure requirement. Among those are defaults relating to

16

the debtor's insolvency or bankruptcy filing, and defaults consisting of "any penalty rate or penalty provision relating to a default" (other than a default in payment of nonmonetary obligations).

65.     Courts have grappled with whether a default interest rate qualifies as a "penalty rate" that can be ignored in a cure. The majority view in recent cases is that default interest must be paid as part of a cure, largely due to the 1994 enactment of § 1123(d) which directs that cure amounts be determined according to the underlying agreement and nonbankruptcy law. But there is no binding precedent in the Second Circuit. The Debtor submits that this Court should follow the guidance in *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir. 1982) holding that cure means "returning to pre-default conditions" and recognize that the point of reinstatement is to reverse the legal consequences of the default.  That means restoring the contract as though the default never occurred and as though default interest was never triggered.

66.     And with specific reference to post-*Taddeo* enactment of section 1123(d), nothing in the loan documents or Connecticut law overrides or changes § 1124(2).

67.     For example, the loan documents do not state that default interest becomes irrevocably due upon occurrence of a default, despite cure and reinstatement under the Bankruptcy Code.  Section 5.1 of the Notes merely provides that default interest "shall accrue" upon an Event of Default, not that it becomes a fixed, non-waivable charge. Connecticut has no statute requiring payment of default interest to reinstate a loan in default because Connecticut does not even permit a loan in default to be reinstated.

68.     Either way, consistent with *Taddeo,* where a plan proposes to reinstate the loan and cure the defaults, default interest evaporates. That is because reinstatement voids the effect of the default, including any triggered penalty rate.  See *In re Phoenix Business Park Ltd. P'ship*,

17

257 B.R. 517, 520–21 (Bankr. D. Ariz. 2001) (reinstatement nullifies default interest and late fees); *In re Southeast Co., Inc.*, 868 F.2d 335, 338 (9th Cir. 1989).

69.    The most thorough decision analyzing whether default interest must be paid as part of a reinstatement under § 1124(2) is *In re Golden Seahorse LLC*, 652 B.R. 593 (Bankr. S.D.N.Y. 2023). There, Judge Bentley undertook a meticulous parsing of §§ 1123(d), 1124(2)(A), and 365(b)(2)(D), concluding that when the debtor's default arises from its failure to perform monetary obligations, the debtor must pay default interest to the extent provided by its agreement and permitted by non-bankruptcy law to reinstate its defaulted debt under § 1124(2)."

70.    However, the opinion concedes this outcome is not compelled by the plain text alone. The court recognized "the issue… has divided courts across the country for decades" and that "[n]o court has conducted a comprehensive analysis of the three interrelated Bankruptcy Code provisions… that bear directly on the issue" until that case. Judge Bentley further observed that "the statutory and historical context complicates, rather than clarifies, the picture," noting that Congress's 1994 and 2005 amendments to the Bankruptcy Code were "not always discernable" in purpose.

71.    Ultimately, Judge Bentley ruled against the debtor not because the statute compelled it, but because of his interpretation that § 365(b)(2)(D)'s carve-out from cure requirements "extends only to penalty rates triggered by non-monetary defaults". The court rejected broader readings that would treat default interest on monetary defaults as excluded from cure obligations.

72.    But the opinion also candidly acknowledged that its interpretation was not the only plausible one. The court reviewed decisions and scholarship taking the contrary view,

18

including *Phoenix Business Park*, *In re Zamani* 390 B.R. 680 (Bankr. N.D. Ca. 2008), and the

dissent in *New Investments (cited below)*, and conceded that "this issue is not simple," requiring "a

thorough analysis" of text, legislative history, and purpose.

73.    Three reasons support a different conclusion in this case.

74.    First, there is no controlling authority in this Circuit. *Golden Seahorse* is a

single bankruptcy court decision interpreting ambiguous statutory text. The decision itself

distinguishes prior Second Circuit precedent (*Taddeo*) as having been legislatively overruled, and

Judge Bentley carefully noted that "[t]he Second Circuit in Taddeo… did not address default

interest… [and] could not have addressed… how to construe § 1123(d)." Thus, this Court may

reach a different conclusion based on a different statutory construction.

75.    Second, the carve-out of § 365(b)(2)(D) can be read differently. As Judge

Bentley explained, the controversy centers on whether the "relating to" clause modifies only the

"penalty provision" or also "penalty rate." Courts favoring a broader carve-out have found that

"[b]y its terms, [§] 365(b)(2)(D)… can be read to excuse the debtor's satisfaction of any penalty

rate or provision relating to any pre-petition default." As Judge Bentley admitted, "[t]his issue is

not simple," and the statutory language "is not a model of clarity."

76.    Third, Connecticut law offers an equitable path. Even if § 1123(d) governs

and incorporates non-bankruptcy law, Connecticut courts permit disallowance of default interest on

equitable grounds. In *Fannie Mae v. Bridgeport Portfolio, LLC*, the court noted that enforcing

default interest depends on whether there is "equitable reason for doing so" — i.e., whether the

circumstances justify withholding it despite contractual authorization. That principle, left open in

*Golden Seahorse*, is fully preserved in this case.

77.      This case presents compelling facts absent in *Golden Seahorse* and *975 Walton*. Unlike in those cases – where the default was undisputed and followed by swift lender action – here, the lender (Bankwell) never issued a written notice of default, and remained silent while the borrower made out-of-pocket fire repairs and pursued reinstatement. Bankwell never invoiced or collected default interest and never demanded payment of that amount before selling the loan. The assignee (Avonwood) then inflated the claim retroactively, asserting default interest for unbilled charges the original lender (Bankwell) had never pursued.

78.      Given this record, even under Judge Bentley's framework, the equities weigh decisively against awarding default interest here.

**(a) THIS COURT SHOULD FOLLOW THE REASONING IN THE *NEW INVESTMENTS* DISSENT AND ALLOW REINSTATEMENT WITHOUT DEFAULT INTEREST**

79.      In *In re New Investments, Inc.*, 840 F.3d 1137 (9th Cir. 2016), the Ninth Circuit held in a split decision that a debtor reinstating a loan under § 1124(2) must pay all default interest if it is provided for in the contract. The majority reasoned that § 1123(d) requires that the "amount necessary to cure" be determined strictly according to the underlying agreement and state law.

80.      But the Ninth Circuit's reliance on section 1123(d) to require default interest to reinstate is misplaced. Section 1123(d) of the Code states that to cure a default, "the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law." 11 U.S.C. §1123(d).  Although the *New Investments* Court acknowledged that the section 1123(d) was enacted primarily to overrule *Rake v*

*Wade,* 508 U.S. 464 (1993), which allowed creditors to charge interest on interest, the court concluded that the text of the statute does not limit itself to that purpose. *Id.* at 1141.

81.    Thus, the dissenting judge wrote a convincing dissent.  The dissent explains that although section 1123(d) states that a cure "shall be determined in accordance with the underlying agreement," section 1123(d) "offers no guidance on which of the note's provisions governs." *Id.* at 1144.

82.    The dissent further explained that such guidance must, in the Ninth Circuit, come from *Entz White,* and its holding that "that a "cure" permits the debtor to "avoid all consequences of the default."" *Id.* at 1145. Since *Entz-White* adopted the Second Circuit *Taddeo* definition of cure, the dissent's logic applies equally in the Second Circuit.

83.    Accordingly, "the relevant provisions of the 'underlying agreement' for a 'cure' are those that would have applied 'if the default had never occurred.'" *Id*.  And had a default never occurred, the debtor only owes non-default interest.

84.    In reviewing the legislative history, the dissent found more support for its analysis in the following passage from the House Report: "[i]t is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred."  The dissent found that "[l]ike the text of the statute, the legislative history in no way suggests that *Entz-White*'s definition of "cure" is incorrect or was overruled."  *Id*.

85.    The dissent concluded that:

> Here, the underlying agreement provides both pre- and post-default interest rates. As the statute requires, we look to that agreement in determining which rates may apply. And in selecting which provision of the contract governs, we rely on our precedent and use the pre-default rate. New Investments therefore could cure the default by paying interest on the debt at the pre-default rate.

*Id.*

86.    The Debtor argues that the dissent in *New Investments* is more convincing than the majority and this Court should hold, consistent with *Taddeo,* that the Debtor may reinstate the loan at the non-default contract rate of interest.

**(b) Connecticut Law Does Not Compel Payment of Default Interest in a Bankruptcy Reinstatement so § 1123(d) Does Not Apply**

87.    Even if the Court adopts the New Investments majority holding, this case is distinguishable because unlike Washington State law, nothing in Connecticut law governs a borrower's obligation upon reinstatement to pay default interest. Nor does Connecticut law address the mechanics of curing and reinstating a defaulted debt under 11 U.S.C. § 1124(2).  There is no statutory right under Connecticut law to "cure and reinstate" a commercial mortgage at all—much less a rule requiring full payment of default interest to do so.  This is an issue *Golden Seahorse* may have overlooked.

88.    In contrast to *New Investments*, where the Ninth Circuit relied on Washington's deed-of-trust foreclosure law—which allowed reinstatement at post-default rates— Connecticut law has no such analogue.  See *New Investments*, 840 F.3d at 1141 (citing Wash. Rev. Code Ann. § 61.24.090(1)(a)).

89.    Because Connecticut law does not define or govern reinstatement, it cannot serve as the "applicable nonbankruptcy law" for § 1123(d). That provision applies only where there is applicable state law.  Here, § 1124(2) already defines the cure process.  There is nothing in the loan documents or Connecticut law that changes the Bankruptcy Code cure process.

90.     Accordingly, Avonwood's reliance on § 1123(d) is misplaced. Its claim for default interest is not supported by Connecticut law, and it is not required under the Bankruptcy Code's reinstatement framework.

### III.     THE LATE FEES ARE VASTLY OVERSTATED

91.     Avonwood's Claim No. 10 includes $406,220.43 in "Late Fees." This exceeds any late charges contemplated by the loan documents for missed installment payments. Under the section 5 of the Notes, the Debtor agreed to a late charge of 5% of any monthly installment not paid within 10 days of its due date..

92.     For example, if a $136,000 monthly payment was over 10 days late, a late charge of about $6,800 would accrue for that month – and no more for that payment thereafter. Even assuming the Debtor missed 9 monthly payments (July 2024 through March 2025), the total contractually-permitted late fees would be on the order of $60,000–$70,000 (across both loans). Yet Avonwood demands over $406,000 in late fees. This discrepancy strongly suggests that Avonwood is trying to impose some additional charge beyond the permitted 5% per installment – likely a 5% charge on the entire accelerated debt or other improper calculation. But even at 5% of the total amount due, the arithmetic does not compute.  Nothing in the Notes or Mortgages allows a 5% fee on the full debt balance due at acceleration.

93.     The late charge provisions apply only to individual monthly installments that are not timely paid. A late charge by definition compensates for the extra processing of a late payment, not for the loan being in default generally. Here, once Avonwood accelerated the loans in February 2025, there were no "monthly payments" being handled at all – acceleration made the entire debt immediately due. Courts have consistently disallowed attempts by lenders to collect a

percentage "late fee" on the entire accelerated amount, as that is not a "reasonable fee" under § 506(b) and is often double-counting in light of default interest.

94.     Here, Avonwood is already seeking default interest at 18% for the period of the Debtor's non-payment. To then add a 5% late fee on top of those same missed payments is an impermissible double recovery.  For example, in *In re 785 Partners LLC*, 470 B.R. 126 (Bankr. S.D.N.Y. 2012), Judge Bernstein approved the contract default interest but denied recovery of a 5% late fee that had been triggered by a maturity default, finding that the two charges were mutually exclusive, and the late fee would never actually be incurred under the plan. He noted that the loan documents in that case specified that the late fee was payable at the time of a late payment and was meant to cover handling costs – if the debt was being paid under a plan (not under the original schedule), there would be no "late payment" to handle, hence no late fee due on restructuring.

95.     In summary, the late fee was intended to cover the lender's administrative costs in handling a delinquent payment. To the extent late charges are sought post-acceleration or on amounts already compensated by interest, they are unreasonable and duplicative under § 506(b) and should be disallowed.

### IV.     ANY OTHER PURPORTED DEFAULTS HAVE BEEN OR WILL BE CURED

96.     Aside from payment and tax defaults, Avonwood points to various other prepetition defaults by the Debtor – for example, obtaining a junior loan without the first mortgagee's consent, and the Debtor's failure to maintain its operating accounts and security deposits with Bankwell. The Debtor does not dispute that these events occurred: in November 2024, the Debtor took a $3 million subordinate loan from Altbanq to raise needed capital, and the

Debtor kept its rent and security deposit accounts at a different bank, contrary to a covenant requiring those accounts at Bankwell. These were technical defaults under the loan documents.

97.     Critically, none of these defaults caused any monetary loss to the lender, nor do they form a basis for any additional claim amount beyond what has been discussed. Avonwood t did not, for example, advance any money or incur any specific damages due to the Debtor's Altbanq loan or bank account location. The remedy for such defaults would be the option to accelerate the debt (which Avonwood did) – but once the Debtor cures, reinstates and pays the balance due from sale proceeds, those defaults are effectively overcome.

98.     Under 11 U.S.C. § 1124(2)(A) and (D), the Debtor's cure need not address "a default arising from any failure to perform a nonmonetary obligation" if it falls under the ambit of § 365(b)(2) or if cure is otherwise impossible. Any alleged default that is not capable of being cured (because it is historical) is excused by § 1124(2) so long as it falls into the 365(b)(2) exceptions or does not impair the creditor going forward.

99.     The Plan here proposes to pay off the $3 million Altbanq loan on the Effective Date which will result in a release of that junior mortgage. Thus, the spirit of § 1124(2) is satisfied – Avonwood's legal rights are restored to pre-default conditions. Under these circumstances, courts have found that strict enforcement of ipso facto clauses or covenants broken pre-petition are not required. *See, e.g., In re Taddeo,* 685 F.2d at 27 (cure restores status quo "as though the default had never occurred").

100.     Finally, to the extent that Avonwood argues that the Debtor's prepetition defaults (monetary or nonmonetary) were so egregious that equity should not allow reinstatement without default interest, the Debtor repeats that it has addressed the substance of those defaults. All

past due amounts (taxes, insurance, etc.) have been paid or will be paid by the Effective Date. The property has been maintained (the fire damage is being repaired – much of it was already repaired using insurance funds and ongoing work). Tenant issues raised by Avonwood are not loan defaults *per se*, and in any event Avonwood's involvement with the Tenant Union was inappropriate as a post-petition matter (though Avonwood denies orchestrating it). The Debtor is not asking the Court to overlook any continuing default. Every default is cured by monetary payment or rendered moot by payment in full under the Plan. That is the essence of what § 1124(2) requires. Once the Debtor does so, Avonwood Credit will be unimpaired – it will receive payment in full.

### V. NO PREPAYMENT PENALTY IS DUE

101.    Lastly, Claim No. 10 includes an $840,000 "Prepayment Penalty." This seems to correspond to a fee of 3% of the principal balance. The loan documents include a prepayment fee clause, but its terms do not support the amount or timing of Avonwood claims. Under the $25,312,500 Note, prepayments made on or before the first "Anniversary Date" (defined as October 1, 2022) carried a 3% fee; thereafter (year 2 through maturity), the fee was only 1%, and in the final 90 days of the loan term, no fee would be due. The only way Avonwood gets $840,000 is by applying the maximum 3% as if the prepayment occurred in the first year of the loan.  But as with the asserted late charges, the arithmetic does not compute.

102.    Even setting aside that objection, the Debtor's Plan proposes to reinstate the maturity date as permitted under section 1124, so no prepayment premium is due.

103.    Thus, the $840,000 prepayment penalty in Claim No. 10 is unjustified and should be disallowed.

### CONCLUSION

26

104.    By stripping away the unsupported default charges, the Court will restore Claim No. 10 to its fair value and make sure that Avonwood receives what it is owed – nothing more, nothing less. The Bankruptcy Code balances the creditor's right to be made whole against the debtor's right to cure and avoid forfeiture. The Debtor's claim objection and Plan honor that balance.

WHEREFORE, the Debtor respectfully asks this Court to grant the Claim objection, disallow the contested parts of Claim No. 10, find that the Debtor may cure and reinstate the Avonwood debt under 11 U.S.C. § 1124(2) without payment of default interest, late fees, or a prepayment penalty, confirm the Debtor's amended Plan, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
        August 9, 2025

                        BACKENROTH, FRANKEL & KRINSKY, LLP
                        Attorneys for the Debtor

                        By: s/Mark Frankel
                             488 Madison Avenue
                             New York, New York 10022
                             (212) 593-1100

Exhibit A

1              **<u>AGREEMENT OF SALE</u>**

2          **THIS AGREEMENT OF SALE** (this "Agreement")**,** made as of the _____ day of July,
3    2025, ("Effective Date") by and between Avon Place LLC, a Connecticut limited liability
4    company, having an address at 710 Avenue L, Brooklyn, New York, 11230 (hereinafter referred
5    to as "Seller"), and UP Realty, LLC having an address at 619 Eastern Parkway, Brooklyn, New
6    York 11213, or its assigns (hereinafter referred to as "Purchaser"), sometimes referred to herein
7    collectively as the "Parties".

8                      **W I T N E S S E T H :**

9          **WHEREAS,** Seller is desirous of selling the Property (as hereinafter defined in
10   Paragraph 2 hereof) and Purchaser is desirous of purchasing the Property on the terms and
11   conditions hereinafter set forth.

12         **NOW, THEREFORE,** in consideration of the mutual promises herein made, it is agreed
13   as follows:

14   1.    **<u>RECITALS</u>.**  The recitals set forth above are incorporated by reference as if fully set
15   forth at length herein.

16   2.    **<u>SALE</u>.**  Seller agrees to sell, and Purchaser agrees to purchase, for the Purchase Price (as
17   hereinafter defined in Paragraph 3 hereof), subject to the terms and conditions of this Agreement,
18   all of the right, title and interest, if any, of Seller in and to the following (hereinafter collectively
19   referred to as the "Property"):

20   (a)    <u>Real Property</u>.  That certain real property consisting of one hundred eighty eight (188)
21   condominium units in the condominium commonly known as the "Avon Place Apartments" (the
22   "Condominium") and located in the Town of Avon, County of Hartford, Stated of Connecticut
23   ("State"), with an address at 44 Avonwood Road, Avon, CT 06001, that were created pursuant to
24   that certain Declaration of Condominium dated November 12, 1977 and recorded in Volume 115
25   at Page 505 (as subsequently amended, collectively, the "Declaration"), of which Seller is
26   currently the owner of 183 units in the Condominium, which units are more particularly
27   described in <u>Exhibit "A"</u> attached hereto and made a part hereof, together with all rights,
28   benefits, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances
29   thereon or in any way appertaining thereto as further set forth in the Declaration (collectively, the
30   "Real Property");

31   (b)    <u>Leases</u>.  All of the landlord's right, title and interest in and to all of the Leases (as defined
32   in Paragraph 4(a) hereof) of all or any portion of the Real Property and all security deposits
33   thereunder, any guaranties thereof, and all amendments and modifications thereof, including
34   Leases entered into after the date of this Agreement;

35   (c)    <u>Tangible Personal Property</u>.  All of the equipment, machinery, fixtures, furniture,
36   furnishings, supplies and other tangible personal property, and now or hereafter located on and
37   used exclusively in the operation, ownership or maintenance of the Real Property, and any
38   replacements or substitutions therefor (collectively, the "Tangible Personal Property"), but

specifically excluding:  (1) any items of personal property owned or leased by tenants of the Property; (2) any items of personal property in Seller's property management office of the Condominium; (3) any items of personal property owned by third parties and leased to Seller; and (4) any items of personal property owned by the Condominium; and

(d)    Intangible Personal Property.  To the extent assignable at no cost to Seller, all intangible personal property related to the Real Property, including, without limitation: any trade names and trademarks associated with the Real Property (but specifically excluding the names owned or used by the Condominium and not owned by the Seller, for which there are none); any plans and specifications and other architectural and engineering drawings for the Real Property; any warranties; any Contracts (as defined in Paragraph 19(g) hereof) and other contract rights related to the Real Property; and any governmental permits, approvals and licenses (including any pending applications) (collectively, the "Intangible Personal Property").  Notwithstanding the foregoing to the contrary, Seller shall not convey to Purchaser any (a) claims relating to any real property tax refunds or rebates, (b) existing insurance claims and/or (c) existing claims against any tenants of the Real Property that are applicable to the period prior to Closing (as hereinafter defined), all of which claims are reserved by Seller.

3.    **PURCHASE PRICE.**  A) The Purchase Price of the Property shall be Forty Million Seven Hundred Thousand and 00/100 ($40,700,000.00) (herein referred to as the "Purchase Price") payable as follows:

B) Upon execution and delivery of this Agreement, Purchaser shall deposit with Landmark Abstract Agency, LLC (the "Title Insurance Company") as "Escrow Agent," the sum of $1,000,000.00 (hereinafter referred to as the "Initial Deposit"), which shall be maintained by Escrow Agent in an interest bearing account pursuant to the provisions of Paragraph 18 hereof. C) As this Agreement is conditioned on the Bankruptcy Court approval ("Bankruptcy Court Approval"), within 3 business days written notification from Seller accompanied with a copy of the Bankruptcy Court Approval and Seller's bankruptcy proceedings in Bankruptcy Court being discharged, Purchaser shall deposit, by federal wire transfer, the additional sum of $1,000,000.00 (the "Additional Deposit") with Escrow Agent.

D) TIME IS OF THE ESSENCE for the delivery of the Purchaser's Deposit (as to both the Initial Deposit and Additional Deposit).  The failure of Purchaser to the Deposit when due hereunder shall be an automatic default of Purchaser.

F) Upon making the Deposit, the Deposit shall be non-refundable and Purchaser shall have no further rights thereto, except as otherwise expressly set forth in this Agreement.

G) Concurrently herewith, each Party shall notify Escrow Agent of its Federal Tax Identification number to the extent the same is required by the Escrow Agent.

H) At Closing the balance of the Purchase Price shall be paid in immediately available funds by wire transferring such balance into an account designated by Seller, subject to the adjustments and prorations described in Paragraph 15 hereof.

4.    **CLOSING DOCUMENTS**.

(a)    At Closing, Seller shall execute and/or deliver to Purchaser:

(i)    A special warranty deed  ("Deed") conveying the Real Property subject to no exceptions other than the Permitted Exceptions (as defined in Paragraph 5(a) hereof) on the basis that as of Closing, the Title Company (as defined in Paragraph 5(a) hereof), shall insure title as set forth in this Agreement;

(ii)    Any required local or state transfer tax forms that require the signature of Seller, along with payment of transfer taxes due;

(iii)    an affidavit of title, the form and substance of which shall be subject to the reasonable approval of the Title Company (as defined in Paragraph 5A hereof);

(iv)    the original (or copies) of the Leases, subleases and other occupancy agreements relating to the Real Property (collectively the "Leases"), together with all security deposits delivered thereunder and all guarantees (if any) delivered in connection therewith, in effect on the Closing Date (which may be left in any a management office if there is an on-site management office);

(v)    an assignment and assumption of the Leases and security deposits and guarantees in the form attached hereto as Exhibit "C" ("Assignment of Leases");

(vi)    an updated rent roll certified to be true, complete and correct in all material respects;

(vii)    a bill of sale, if applicable, conveying all of Seller's right, title and interest in and to the Tangible and Intangible Personal Property, free and clear of liens or encumbrances, in the form attached hereto as Exhibit "D" ("Bill of Sale");

(viii)    the joint closing statement;

(ix)    an affidavit of Seller certifying that Seller is not a "foreign person", as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended;

(x)    an assignment and assumption of Contracts in the form attached hereto as Exhibit "E" ("Assignment of Contracts");

(xi)    notices to all tenants of the Property in the form attached hereto as <u>Exhibit "F"</u> (the "Tenant Notices");

(xii)    such organizational and authorizing documents of Seller as reasonably shall be required by the Title Company to evidence Seller's authority to execute this Agreement and any documents to be executed by Seller at Closing and to consummate the transaction contemplated by this Agreement;

(xiii)    signed certification reaffirming that all representations contained herein are true and accurate in all material respects as of the Closing Date (with such updates that are permitted pursuant to the terms of this Agreement);

(xiv)    written resignations of Seller and its designees as director(s) and/or officer(s) of the Condominium association of unit owners, as may be requested and required by Purchaser;

(xv)    A certificate issued by the Condominium association of unit owners stating the current amount of common charges payable by each Unit, the amount of any special assessments owed by such Unit and the status of payments of common charges and special assessments of each Unit and that all have been paid in full through the end of the month in which Closing occurs; and

(xv)    such other instruments as reasonably may be required by Purchaser's attorney or the Title Company to effectuate the within transaction.

(b)    At Closing, Purchaser shall execute and/or deliver to Seller:

(i)    the balance of the Purchase Price;

(ii)    Any required  local or state transfer tax forms that require the signature of Seller;

(iii)    the Assignment of Leases;

(iv)    the Assignment of Contracts;

(v)    the joint closing statement;

(vi)    such organizational and authorizing documents of Purchaser as reasonably shall be required by Seller and/or the Title Company to evidence Purchaser's authority to execute this Agreement and any documents to be executed by Purchaser at Closing and to consummate the transaction contemplated by this Agreement; and

(vii)    such other instruments as reasonably may be required by Seller's attorney or the Title Company to effectuate the within transaction.

(viii)    payment to the Title Company of any "mansion", "development" or other fees or charges not identified as Seller's obligations by statute.

1 5.   **TITLE**.

2 (a)     Purchaser, at its expense, shall obtain a title insurance commitment ("Title
3 Commitment") from a recognized title insurance company ("Title Company") doing business in
4 the state in which the Real Property is located ("State") insuring marketable title (as hereinafter
5 defined) to the Real Property.  For the purposes of this Agreement, "marketable title" shall be
6 deemed to be such title as any recognized title insurance company doing business in the State
7 shall insure at standard rates and subject only to the usual printed exceptions and to the title
8 exceptions set forth on <u>Exhibit "G"</u> attached hereto and made a part hereof and such other
9 exceptions as may be approved in writing by Purchaser or not objected to by Purchaser as
10 hereinafter provided, all provided same do not render title uninsurable (collectively, the
11 "Permitted Exceptions").  Purchaser, within five (5) business days prior to the end of the Due
12 Diligence  Period, shall forward to Seller a true copy of its Title Commitment and all underlying
13 title documents and shall specify any alleged defects as set forth in said Commitment (other than
14 Permitted Exceptions) ("Title Defect(s)"), failing which Purchaser shall be deemed to have
15 waived all title objections, time being of the essence of Purchaser's obligation to so notify Seller.
16 Email of a title report to Seller's attorney shall be deemed satisfactory notice of Title Defect(s).
17 Seller shall have the right, but shall not be obligated nor required, to commence litigation or to
18 incur any expenditure of monies in excess of $1,000,000.00:  (i) to cause any such Defect(s) to
19 be removed as a Title Defect; or (ii) to cause a similarly recognized title insurance company to
20 insure marketable title in accordance herewith; and Purchaser shall not have any claim, cause or
21 right of action against Seller, at law or in equity, whether for damages, specific performance or
22 otherwise, by reason of Seller's failure to clear any such Title Defects; provided, however,
23 notwithstanding the foregoing, Seller will satisfy at Closing all indebtedness secured by
24 voluntary liens on the Property (e.g., mortgages) ("Monetary Liens").  If Seller causes
25 marketable title to be insured for the Real Property, by a nationally recognized underwriter such
26 as First American, Old Republic, or Fidelity, Purchaser shall be required to complete the
27 purchase of the Property as herein provided.

28 (b)     If Seller shall be unable to cause marketable title to be insured, Seller shall so notify
29 Purchaser within three (3) business days of receipt of Title Defects ("Seller Title Notice").  If
30 Seller shall fail to timely send the Seller Title Notice, Seller shall be deemed to elect not to cure
31 the Title Defects raised by Purchaser. Purchaser shall have the right to accept such title as Seller
32 shall be able to convey or to terminate this Agreement, by notice delivered to Seller prior to the
33 end of the Due Diligence Period.  If Purchaser shall fail to so notify Seller, then Purchaser shall
34 be deemed to have elected to accept title without any abatement or reduction in the Purchase
35 Price or in any of the other terms and conditions herein set forth.  Seller agrees to convey such
36 title as is described herein or as Purchaser shall be willing or shall be deemed to accept in
37 accordance with the provisions hereof.  If Purchaser elects to terminate, the sole remaining
38 obligations hereunder shall be upon Escrow Agent to return the Deposit pursuant to the
39 provisions of Paragraph 18 hereof, except for Surviving Obligations, as defined in Paragraph 21
40 hereof).

41 (c)     If, at Closing there are liens or encumbrances against the Property that are removable by
42 the payment of monies that Seller is required to remove, then Seller, at its option, may allow
43 Purchaser a credit against the Purchase Price or may use any portion of the Purchase Price to
44 satisfy the same, in which event Seller either shall: (i) deliver to Purchaser instruments in

recordable form sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments; or (ii) deposit or cause to be deposited with the Title Company sufficient monies reasonably acceptable to the Title Company to insure obtaining and recording of such satisfactions and the issuance of title insurance to Purchaser free of any such liens or encumbrances.  In neither event shall such lien or encumbrance constitute a Title Defect permitting Purchaser to terminate this Agreement.

6.      **POSSESSION.**  Seller shall deliver to Purchaser, and Purchaser shall accept possession of the Property from Seller at the time of Closing, and thereafter, Purchaser shall be entitled to take any rents, issues and profits of the Property to its own use.

7.      **RISK OF LOSS AND CONDEMNATION**.

(a)      Seller assumes the risk of any loss or damage to the Property beyond ordinary wear and tear until the Closing Date.  In the event of any insured casualty to the Property, beyond ordinary wear and tear prior to the delivery of the Deed, Seller, at its sole option, either shall repair the damage to the Property out of any insurance proceeds actually received by Seller as a result of the damage caused by such occurrence, or assign the entire insurance proceeds actually received or to be received by Seller as a result of the damage caused by such occurrence to Purchaser at Closing without any change in the Purchase Price or in any other terms and conditions hereof and allow as a credit against the Purchase Price, an amount equal to the amount of the deductible of any such insurance policy. If, however, there is any damage or injury caused to the Property, beyond normal wear and tear prior to the delivery of the Deed, for which there is no insurance coverage, Seller or Purchaser may elect to terminate this Agreement by notice to the other party (the "Termination Notice"), delivered within twenty (20) days of the casualty occurrence, unless Purchaser, within five (5) days after receipt of Seller's Termination Notice, by notice to Seller, elects to assume the cost of repair or restoration, in which event the Parties shall proceed to Closing without any change in the Purchase Price or in any of the other terms or conditions hereof.  If this Agreement is so terminated, there shall be no further obligations hereunder except that Escrow Agent shall return the Deposit to Purchaser in accordance with the provisions of Paragraph 18 hereof, and except for Surviving Obligations.  If both parties agree that Seller shall repair and/or restore the Property pursuant to this Paragraph 7(a), then Closing shall be postponed for a time sufficient to allow Seller to obtain insurance proceeds and repair and/or restore the Property.

(b)      If, prior to Closing, all or substantially all of the Real Property shall be condemned or taken as the result of the exercise of the power of eminent domain, then the Deposit promptly shall be returned to Purchaser and this Agreement shall be null and void and of no further force and effect, except that Escrow Agent shall release the Deposit in accordance with the provisions of Paragraph 18 hereof, and except for Surviving Obligations.  If prior to Closing, less than all or substantially all of the Real Property shall be so condemned or taken, and Purchaser, in its reasonable judgment, shall determine that: (i) the remaining portion of the Real Property is not suitable for its intended business operations on the Real Property, then Purchaser may terminate this Agreement without further liability hereunder on the part of either Party except that Escrow Agent shall return the Deposit to Purchaser in accordance with the provisions of Paragraph 18 hereof, and except for Surviving Obligations; or (ii) the remaining portion of the Real Property is suitable for its intended business operations on the Property, then Purchaser and Seller shall

1   proceed to Closing, without any change in the Purchase Price, shall have the right to participate
2   jointly in the condemnation proceedings and the proceeds thereof shall belong to Seller, but
3   Purchaser shall be entitled to a credit against the Purchase Price in an amount equal to said
4   proceeds unless such condemnation proceedings shall be pending on the Closing Date, in which
5   event there shall be no such credit and, at Closing, subject to the rights of any Purchaser
6   mortgagee, Seller shall assign all of its rights and interest in said proceedings to Purchaser.
7   Purchaser shall make its election either to terminate this Agreement or proceed to Closing within
8   ten (10) days after receipt of Seller's notice to Purchaser of any such proceedings.  If Purchaser
9   shall fail to so notify Seller within said ten (10) day period, then Purchaser shall be deemed
10  conclusively to have elected to proceed to Closing.

11  8.    **REPRESENTATIONS**.

12  (a)      In order to induce Purchaser to enter into this Agreement, Seller warrants and represents
13  the following, **all of which representations are conditioned upon and subject to approval by**
14  **the Bankruptcy Court in the Eastern District of New York**:

15        (i)      Seller is a limited liability company duly organized and in good standing under
16  the laws of the State  of Connecticut;

17        (ii)     Subject to the terms of this Agreement, it has the right, power and authority,
18  without the joinder of any other person or entity, to enter into, execute and deliver this
19  Agreement, and to perform all duties and obligations imposed on it under this Agreement;

20        (iii)    This Agreement is a valid obligation of Seller and is binding upon it in
21  accordance with the terms hereof; the persons or parties executing this Agreement on its behalf
22  have been duly authorized and empowered to bind it to this Agreement;

23        (iv)     Subject to the terms of this Agreement, neither the execution nor the delivery of
24  this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the
25  compliance with the terms and conditions of this Agreement conflict with or will result in the
26  breach of any of the terms, conditions or provisions of any agreement to which it is a party or by
27  which it is bound;

28        (v)      It has made no agreements or commitments affecting the Property which would
29  be binding upon Purchaser except as expressly set forth herein;

30        (vi)     It has received no written notice of any pending condemnation or municipal
31  improvement assessments affecting the Property,

32        (vii)    Exhibit "H" attached hereto and made a part hereof sets forth a list of all
33  Contracts affecting the Property ("Contract List"), true and complete copies of which have been
34  made available to Purchaser, but Seller represents that Purchaser shall not be obligated to take
35  over any service contracts;

36        (viii)   The rent roll attached hereto and made a part hereof as Exhibit "B", is and the
37  updated rent roll delivered at the Closing, will be true, complete and accurate in all material

respects ("Rent Roll"); provided, however, that the Rent Roll is being made as of the date hereof only and Seller shall have no liability for any change in the Rent Roll prior to the Closing if a tenant vacates voluntarily or is evicted by summary proceedings and no liability with respect to any default by a tenant under any Lease (and no such change shall provide Purchaser the ability to terminate this Agreement or delay or adjourn the Closing); and

(ix)    Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code") and any related regulations.

(b)    In order to induce Seller to enter into this Agreement, Purchaser warrants and represents the following:

(i)    It has the full power and authority to perform all of its obligations under this Agreement, and has been duly organized, is validly existing and is in good standing under the laws of the State in which it was formed, and, if required to do so, is qualified to do business in the State in which the Property is located;

(ii)    Subject to the terms of this Agreement, it has the right, power and authority, without the joinder of any other person or entity, to enter into, execute and deliver this Agreement and to perform all duties and obligations imposed on it under this Agreement;

(iii)    This Agreement is a valid obligation of Purchaser and is binding upon it in accordance with the terms hereof; the persons or parties executing this Agreement on its behalf have been duly authorized and empowered to bind it to this Agreement;

(iv)    It has not:  (a) made a general assignment for the benefit of creditors; (b) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by its creditors; (c) suffered the appointment of a receiver to take possession of all, or substantially all, of its assets; (d) suffered the attachment or other judicial seizure of all, or substantially all, of its assets; (e) admitted in writing its inability to pay its debts as they come due; or (f) made an offer of settlement, extension or composition to its creditors generally;

(v)    Subject to the terms of this Agreement, neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions or provisions of any agreement to which it is a party or by which it is bound;

(vi)    It has the financial capacity, along with obtaining a mortgage, to pay the Purchase Price and all other costs and expenses in connection with the purchase of the Property; and

(vii)    Purchaser currently is in compliance with and at all times during the term of this Agreement (including any extension thereof) shall remain in compliance with the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including those named on OFAC's specially Designated Nationals and Blocked Persons List) and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and

Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or other governmental action relating thereto.

(c)    Except as otherwise set forth herein, the above stated representations and warranties of Seller will not survive Closing.

(d)    As used herein, the terms "best of Seller's knowledge", "Seller's actual knowledge" "Seller's knowledge", and any similar phrase shall mean the current actual knowledge of Ahron Rudich, who is the individual having primary responsibility for the management of the Property on behalf of Seller, as of the date hereof; provided, however, that Ahron Rudich shall not have any personal liability in connection with, or arising out of, any representation made by Seller in this Agreement.

**The Purchaser acknowledges that the Seller has a pending Chapter 11 Voluntary Bankruptcy Petition in the Eastern District of New York, Case No. 25-41368 and that both parties' obligations to close shall be contingent upon the Seller securing the requisite approvals of the sale herein contemplated, free and clear of liens and encumbrances, from the Bankruptcy  Court overseeing said Petition, pursuant to 11 U.S.C. §363, with all appeal periods having passed.**

9.    <u>**CONDITION OF PROPERTY**</u>.

(a)    Purchaser acknowledges and agrees that Seller has not made, does not make and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether expressed or implied, oral or written, past, present or future (other than as otherwise represented pursuant to and as limited by this Agreement or the documents delivered at Closing), of, as to, concerning or with respect to: (i) the value, nature, quality or condition of the Property, including, without limitation, the water, soil and geology; (ii) the income to be derived from the Property; (iii) the suitability of the Property for any and all activities and uses which Purchaser or any tenant may conduct thereon; (iv) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body; (v) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property; (vi) the manner or quality of the construction or materials incorporated into the Property, except as provided herein; (vii) the manner, quality, state of repair or lack of repair of the Property, except as provided herein; (viii) compliance with any environmental protection, pollution, safety or land use laws, rules, regulations, orders or requirements, including the existence in or on the Property of Hazardous Materials (as hereinafter defined); or (ix) in matter relating to the Condominium, Declaration or any matter thereto; (x) any other matter with respect to the Property.  Additionally, no person acting on behalf of Seller is authorized to make, and by execution hereof Purchaser acknowledges that no person has made, except as set forth in this Agreement or in the documents to be delivered at Closing, any representation, agreement, statement, warranty, guaranty or promise regarding Seller and/or the Property or the transaction contemplated herein; and no such representation, warranty, agreement, guaranty, statement or promise if any, made by any person acting on behalf of Seller shall be valid or binding upon Seller unless expressly set forth herein or in the documents to be delivered at Closing.  Purchaser

9

1   further acknowledges and agrees that having been given the opportunity to inspect the Property,
2   Purchaser is relying and shall rely solely on its own investigation of the Property and not on any
3   information provided or to be provided by Seller except as otherwise set forth herein, and agrees
4   to accept the Property at Closing and waive all objections or claims against Seller arising from or
5   related to the Property or to any Hazardous Materials on the Property, except with respect to a
6   breach of any representation or warranty set forth herein.  Except as otherwise set forth herein,
7   Purchaser further acknowledges and agrees that any information provided or to be provided with
8   respect to the Property was obtained from a variety of sources and that Seller has not made any
9   independent investigation or verification of such information and makes no representations as to
10  the accuracy, truthfulness or completeness of such information except with respect to a breach of
11  any representation or warranty set forth herein.  Seller is not liable or bound in any manner by
12  any verbal or written statement, representation or information pertaining to the Property, or the
13  operation thereof, furnished by any real estate broker, contractor, agent, employee, servant or
14  other person except with respect to a breach of any representation or warranty set forth herein.
15  The provisions of this Paragraph 9 shall survive Closing or any termination hereof.

16  (b)     "Hazardous Materials" shall mean any substance which is or contains: (i) any "hazardous
17  substance" as now or hereafter defined in §101(14) of the Comprehensive Environmental
18  Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) or
19  any regulations promulgated thereunder, "CERCLA"; (ii) any "hazardous waste" as now or
20  hereafter defined in the Resource Conservation and Recovery Act (42 U.S.C. §6901, et seq.) or
21  regulations promulgated thereunder, "RCRA" or in any other applicable state or local law,
22  ordinance, rule or regulation; (iii) any substance regulated by the Toxic Substances Control Act
23  (15 U.S.C. §2601 et seq.) or in any other applicable state or local law, ordinance, rule or
24  regulation; (iv) any gasoline, diesel fuel, or other petroleum hydrocarbons; (v) any asbestos and
25  asbestos containing materials, in any form, whether friable or non friable; (vi) any
26  polychlorinated biphenyls; (vii) any radon gas; or (viii) any additional substances or materials
27  which now are or hereafter shall be classified or considered to be hazardous or toxic under
28  Environmental Requirements (as defined in Paragraph 9(c) hereof), or the common law, or any
29  other applicable laws relating to the Property.  Hazardous Materials shall include, without
30  limitation, any substance, the presence of which on the Property: (A) requires reporting,
31  investigation or remediation under Environmental Requirements; (B) causes or threatens to cause
32  a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the
33  health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or
34  migrated from the Property, could constitute a trespass.

35  (c)     "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules,
36  regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated,
37  or amended, of the United States, the states, the counties, the cities, or any other political
38  subdivisions in which the Property is located, and any other political subdivision, agency or
39  instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of
40  the Property, relating to pollution, the protection or regulation of human health, natural
41  resources, or the environment, or the emission, discharge, release or threatened release of
42  pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or
43  Hazardous Materials into the environment (including, without limitation, ambient air, surface
44  water, ground water or land or soil).

(d)      By proceeding with this transaction following the expiration of the Due Diligence Period, Purchaser shall be deemed to have made its own independent investigation of the Property, the Property Documents (as defined in Paragraph 9(c) hereof) and the presence of Hazardous Materials on the Property as Purchaser deems appropriate.  Accordingly, subject to a claim for the breach of any of the representations and warranties of Seller, whether set forth herein or in any document delivered in connection with Closing, or any other breach of this Agreement or any other agreement to be delivered in connection with Closing, which claim(s) (subject to Seller's limitation of liability hereunder) is expressly reserved to Purchaser, Purchaser, on behalf of itself and all of its officers, directors, shareholders, employees, members, partners, representatives and affiliated entities (collectively, the "Releasors"), hereby expressly waives and relinquishes any and all rights and remedies Releasors now or hereafter may have against Seller, Seller's affiliates, Seller's investment advisors, the partners, trustees, beneficiaries, shareholders, members, managers, directors, officers, employees, agents and representatives of each of them, and their respective heirs, successors, personal representatives and assigns (the "Seller Parties"), whether known or unknown, which may arise from or be related to: (a) the physical condition, quality, quantity and state of repair of the Property and the prior management and operation of the Property; (b) the Property Documents; (c) the Property's compliance or lack of compliance with any federal, state or local laws or regulations; (d) any matters, obligations or responsibilities related to the Condominium, Declaration or any matters related thereto; and (e) any past, present or future presence or existence of Hazardous Materials on, under or about the Property or with respect to any past, present or future violation of any Environmental Requirements now or hereafter enacted, regulating or governing the use, handling, storage or disposal of Hazardous Materials, including, without limitation, (i) any and all rights and remedies Releasors now or hereafter may have pursuant to any Environmental Requirements and (ii) any and all claims, whether known or unknown, now or hereafter existing, with respect to the Property under any Environmental Requirements, provided, however (subject to Seller's limitation of liability hereunder), Seller is not released by the foregoing for any claim based upon a breach of any of Seller's warranties, breach of any covenant or indemnity which survives Closing, whether set forth herein or in any document delivered in connection with Closing, or any other breach of this Agreement or any other agreement to be delivered in connection with Closing.

Without limiting the generality of the foregoing, subject to claims for the breach of any of Seller's warranties, a breach of any covenant or indemnity or any other agreement to be delivered in connection with Closing, Purchaser, on behalf of itself and the other Releasors, hereby assumes all risk and liability resulting or arising from, or relating to the ownership, use, condition, location, maintenance, repair, or operation of, the Property from and after Closing and Seller Parties shall not be liable for any special, direct or indirect, consequential, punitive or other damages resulting or arising from or relating to the ownership, use, condition, location, maintenance, repair or operation of the Property.

The foregoing waivers, releases and agreements by Purchaser, on behalf of itself and Releasors, shall survive Closing and the recordation of the Deed and shall not be deemed merged into the Deed upon its recordation.

(e)      Seller shall not be responsible for closing any open permits, curing any governmental violations, notice of which hereafter is received, either prior to or subsequent to Closing, nor shall Purchaser be entitled to any abatement, reduction or other modification in the Purchase

Price or in any of the other terms and conditions hereunder in the event of the occurrence and/or the receipt of notice of any such governmental violation.  Notwithstanding the foregoing, Seller shall pay directly at Closing any violation(s) that can be cured by payment of a fixed fine to the applicable governmental authority ("Monetary Violation"), which Monetary Violation affects the marketability of title, as well as any other open monetary amounts due in relation to any violation that is due of record and is reduced to a sum certain.

(f)    Notwithstanding paragraph 9(a) herein, the Seller shall be required to perform the following work prior to Closing:

(i)    With respect to the down units which are "lightly damaged" (the " Lightly Damaged Units"), as well as any other currently vacant units (as listed on the Rent Roll, attached hereto), the Seller shall be required to deliver said units in rent-ready condition and shall pull any applicable permits and have same signed off of record. Said Lightly Damaged Units are listed on Exhibit J, attached hereto and made a part hereof;

(ii)    With respect to the Lightly Damaged Units, as well as any other currently vacant units (as listed on the Rent Roll, attached hereto), the Purchaser shall be permitted to assist Seller in renovating and building out said units, which renovations shall be performed pursuant to State and local code and regulations by licensed and insured contractors and Seller shall cooperate in accomplishing same, including but not limited to, signing any documents to file plans and pull permits; and

(iii)    Upon entering into this Agreement, the Purchaser, as Purchaser and Broker, shall be permitted to enter into leases for the vacant units at the Property at market rate, for a term of one (1) year or less.   The Seller shall pay a broker fee to the Purchaser and/or Purchaser's Broker, as applicable, in the amount of $850.00 per unit. The Seller shall NOT enter into any leases or occupancy agreements with any unit or space at the Property without Purchaser's written consent. Seller shall NOT renovate nor lease or allow occupancy in the 13 fire damaged units which are located in the fire wing of the Building (the "13 Down/Gutted Units") and are listed in Exhibit L, attached hereto and made a part hereof.

10.    **ASSESSMENTS.**  If at the time for the delivery of the Deed, the Property or any part thereof shall be or shall have been affected by an assessment or assessments which are or may become payable in annual installments of which the first installment is then due or has been paid, then for the purposes of this Agreement all the unpaid installments of any such assessment, including those which are to become due and payable after the delivery of the Deed, shall be deemed to be due and payable and to be liens upon the Property affected thereby and shall be paid and discharged or allowed as a credit against the Purchase Price by Seller upon the delivery of the Deed, as same shall be paid by Seller.  Unconfirmed improvements or assessments, if any, shall be paid or allowed by Seller on account of the Purchase Price if the improvement or work has been completed on or before the date hereof.  If there are any municipal improvements approved,

12

commenced and/or completed following the date hereof, the cost of such municipal improvements will be borne by Seller.

11.    **CLOSING OF TITLE.**  The closing of title herein sometimes referred to as the "Closing") shall take place on or before September 15, 2025; provided, however, if such date is not a business day or if such date is a Jewish holiday, then the first business day thereafter (hereinafter referred to as the "Closing Date"), at the offices of Potok Law LLC (or at such other location and/or time as mutually may be agreed upon by Seller and Purchaser); provided, however, that at either party's election, the Closing may occur in escrow through the Title Company with all required deliveries and funds sent thereto and without the actual presence of Purchaser or Seller. TIME SHALL BE EXPRESSLY OF THE ESSENCE with respect to both parties herein obligation to close on the Closing Date.

Purchaser shall have the right to extend the Closing Date on one occasion for a period of fifteen (15) days by providing written notice to the Seller on or before the Closing DateTIME SHALL BE OF THE ESSENCE AS TO THE EXTENDED CLOSING DATE.

12.    **FUTURE OPERATIONS**.  From the Effective Date until Closing or earlier termination of this Agreement:

(a)    Seller shall maintain its existing or comparable casualty and liability insurance with respect to the Property;

(b)    Seller shall operate, and maintain the Property substantially in accordance with its past practices, but shall not lease or allow any occupancy without Purchaser's written consent, which may be withheld for any reason or no reason whatsoever;

(c)    Purchaser shall assume the obligations (including payment) arising from and after the Closing Date under any Contracts which Purchaser must assume, as herein elsewhere provided [Please provide the Contracts so we know what Purchaser has to assume], and any Contracts designated by Purchaser or deemed designated by Purchaser, including any work for tenant improvements and/or other capital expenditures except as specifically provided herein.   In particular, with respect to Avonwood Road, the private roadway from which the Real Property is accessed, the Purchaser shall assume all obligations and comply with the Stipulated Court Judgment which requires that the existing five owners of property on Avonwood Road maintain said roadway.   Notwithstanding, the Seller shall credit the Purchaser at the time of Closing in an amount equal to the Seller's percentage share of repaving Avonwood Road pursuant to the Stipulated Court Judgment, which Stipulated Court Judgment is attached hereto and made a part hereof.  This provision shall survive Closing.

Notwithstanding the foregoing, in the event the Stipulated Court Judgment is not yet ordered as of the Effective Date, then Seller shall have a duty to settle any and all court cases regarding said private roadway prior to Closing, with prejudice, and pay any and all costs associated with said litigation and any fees that may be due by Seller as a result of said litigation and Stipulated Court Judgment. Seller shall tender the Stipulated Court Order to Purchaser prior to or at Closing.

13.   **ASSIGNMENT**.  This Agreement may not be assigned (direct or indirectly, including by the transfer of any direct or indirect interests in the Purchaser), pledged or otherwise transferred by Purchaser without the prior consent of Seller, which consent may be withheld in Seller's sole discretion; provided, however that that  this Agreement may be assigned by Purchaser to entities part of which will be owned and controlled by the members of Purchaser, which assignment shall only be effective as of the date of the Closing and provided that concurrently with any such assignment, Purchaser notifies Seller thereof and of the name and address of the assignee and sends to Seller a true copy of such executed assignment, together with a written agreement by the assignee to assume all of the terms, promises and conditions of this Agreement on the part of Purchaser (along with evidence that the ownership of such transferee complies with the requirements of this Section), and an agreement by Purchaser (in form satisfactory to Seller) that it shall remain liable for all of the terms, promises and conditions of this Agreement on Purchaser's part to be performed hereunder.

14.   **BROKERAGE.**  Seller shall pay all brokerage commissions as may be due to Tzvee Rotberg and Marcus & Millichap, pursuant to a separate agreement.  Said commission in no event shall be earned, due or payable unless and until the transaction contemplated hereby is closed in accordance with the terms of this Agreement; if such transaction is not closed for any reason, including, without limitation, failure of title or default by Seller or Purchaser or termination of this Agreement pursuant to the terms hereof, then such commission will be deemed not to have been earned and shall not be due or payable.  Purchaser represents that it has not authorized any broker or finder to act on Seller's or Purchaser's behalf in connection with the sale and purchase hereunder and neither Seller nor Purchaser has dealt with any broker or finder purporting to act on behalf of any other Party other than Tzvee Rotberg.  Purchaser agrees to indemnify and hold harmless Seller from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by Purchaser or on Purchaser's behalf with Consultant or any broker or finder (other than Tzvee Rotberg) in connection with this Agreement or the transaction contemplated hereby, together with any and all losses, damages, costs and expenses, including reasonable attorneys' fees and disbursements and expert fees, relating to such claims or arising therefrom or incurred by Seller in connection with this indemnification provision.  Seller agrees to indemnify and hold harmless Purchaser from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by Seller or on Seller's behalf with Tzvee Rotberg or any other broker or finder in connection with this Agreement or the transaction contemplated hereby, together with any and all losses, damages, costs and expenses, including reasonable attorneys' fees and disbursements and expert fees, relating to such claims or arising therefrom or incurred by Purchaser in connection with this indemnification provision.  In the event that by settlement or otherwise any monies or other consideration is awarded to or turned over  as a result of a commission claim, it is the intention of the Parties hereto that the indemnifying Party shall be solely responsible therefor.

15.   **COSTS AND PRORATIONS**.

(a)      Purchaser will pay the following costs of Closing this transaction:

(i)     All Deed recordation fees and expenses or any other fees or taxes due in connection with the recordation of the Deed and which are not required by statute to be paid by Seller;

(ii)    Half of the settlement fees, escrow fees, for Purchaser escrows, and other charges of the Title Company due in connection with this transaction and the closing of this transaction, that are standard Purchaser costs;

(iii)   The premiums, title search fees and all other costs relating to the issuance of the title policy, and any and all special endorsements issued in connection with this transaction, whether pursuant to the title commitment or otherwise;

(iv)   The cost of any survey obtained by Purchaser;

(v)    The fees and disbursements of Purchaser's counsel and any other expenses(s) incurred by Purchaser or its representative(s) in inspecting or evaluating the Property or closing of this transaction;

(vi)   Any and all charges, fees, costs and expenses in connection with Purchaser obtaining or recording any financing for the purchase of the Property;

(vii)  Intentionally deleted.

(b)    Seller will pay the following costs of closing this transaction:

(i)     All realty transfer fees and taxes due in connection with the recordation of the Deed;

(ii)    The fees and disbursements of Seller's counsel;

(iii)   Any fees due or payable to Broker; and

(iv)   The Seller's pro-rata portion of the expense related to the repaving of Avonwood Road in accordance with the Stipulated Court Judgment.

(v)    Half of the settlement fees, escrow fees, for Seller escrows, and other charges of the Title Company due in connection with this transaction and the closing of this transaction, that are standard Seller costs.

(vi) Costs of making the 12 Lightly Damaged Units rent ready and any brokerage fees to Purchaser as applicable.

(c)    All revenues and expenses, including, but not limited to rents and any other amounts paid or payable by tenants, personal property taxes, installment payments of special assessment liens, sewer charges, utility charges and other normally prorated operating expenses paid as of Closing shall be prorated as of 12:01 a.m. on the Closing Date on an "as and when collected or paid basis" and shall be adjusted against the Purchase Price due at Closing; provided that within sixty (60) days after Closing Purchaser and Seller will make a further adjustment for such rents, taxes or charges which may have accrued or been incurred prior to Closing, but not received or paid at

15

1   that date.  If, after Closing, it is determined that any item of income or expense was prorated at
2   Closing in error or on the basis of an estimate, or if it is determined that the Parties failed to
3   prorate an item at Closing which should have been prorated, Purchaser and Seller promptly upon
4   (but in no event later than fifteen (15) days after) discovery of such error, agree to calculate in
5   good faith the proper proration of such item that should have been made, and, if it is determined
6   that either Party is required to pay the other a sum based on such post-Closing adjustment, the
7   Party owing such sum shall pay the same to the other within fifteen (15) days after such amount
8   has been determined.  Notwithstanding the foregoing, all adjustments and prorations hereunder
9   shall be deemed final on the first (1st) anniversary of Closing.

10  (d)    At Closing, Seller shall:  (a) either (i) deliver to Purchaser the unapplied balance of all
11  cash (or cash equivalent) security or other deposits paid by any of the tenants to secure their
12  respective obligations under the Leases (collectively, the "Security Deposits"), or (ii) credit
13  against the Purchase Price an amount equal to the unapplied balance of all cash Security
14  Deposits; and (b) assign to Purchaser all of Seller's interests in and to any letters of credit, bonds,
15  notes or other instruments constituting non-cash Security Deposits under any of the Leases;
16  provided, however, that nothing herein shall limit Seller's ability to apply any Security Deposits
17  per court order only.

18  (e)    General real estate taxes and special assessments relating to the Property payable during
19  the year in which Closing occurs shall be prorated as of the Closing Date.  If Closing shall occur
20  before the actual taxes and special assessments payable during such year are known, the
21  apportionment of taxes shall be upon the basis of taxes for the Property payable during the
22  immediately preceding year; provided that, if the taxes and special assessments payable during
23  the year in which Closing occurs thereafter are determined to be more or less than the taxes
24  payable during the preceding year (after any appeal of the assessed valuation thereof is
25  concluded), Seller and Purchaser promptly shall adjust the proration of such taxes and special
26  assessments, and Seller or Purchaser, as the case may be, shall pay to the other any amount
27  required as a result of such adjustment.  This covenant shall not merge with the Deed delivered
28  hereunder but shall survive Closing.  If, as the result of an appeal of the assessed valuation of the
29  Property for any real estate tax year prior to (or including) the year of Closing, there is issued
30  after Closing an administrative ruling, judicial decision or settlement by which the assessed value
31  of the Property for such tax year is reduced, and a real estate tax refund or credit is issued, Seller
32  shall be entitled to all such refunds; credits or reductions relating to the period prior to Closing,
33  except to the extent that prior or then existing tenants in the Property are entitled to a portion of
34  same under the express provisions of their Lease(s).  To the extent any tax appeals or protests
35  have been instituted or are pending at and as of Closing, Seller and Purchaser shall execute such
36  documents as reasonably are necessary for Purchaser to assume any such tax appeal or protest
37  and the prosecution thereof with attorneys or consultants reasonably acceptable to Seller;
38  provided, however, that Purchaser agrees to remit to Seller, within ten (10) days after receipt by
39  Purchaser, all refunds or an amount equal to all credits or reductions of real estate taxes obtained
40  in connection with such tax appeal to the extent such refunds, credits or reductions relate to the
41  period prior to Closing, and after deducting therefrom Seller's pro rata share of attorneys' fees
42  and collection costs incurred in connection with obtaining such refunds, credits or reductions,
43  calculated on the basis of the number of days during the period for which such refund, credit or
44  reduction, was issued that Seller and Purchaser, respectively, owned the Property.  Purchaser
45  acknowledges that if the real estate taxes are generally payable in for an upcoming year

16

consistent with local practice, based on the bills, in the normal course, that the taxes shall be prorated consistent with local practice.

(f)    Amounts due or paid, if any, under all Contracts assumed by Purchaser shall be prorated as of Closing in accordance with the purposes and intent of this Agreement.

(g)    Seller shall be entitled to the return of any deposit(s) posted by it with any utility company and Seller shall notify each utility company serving the Property to terminate Seller's account, effective at noon on the Closing Date.

(h)    Upon Closing, Seller shall retain all rights in and to any rents or other amounts due for any period prior to Closing, but shall have no right to commence any legal proceedings which would, or could, result in the eviction or dispossession of a tenant from the Property.  Seller shall retain and shall have the right to seek monetary damages against any Tenant in arrears.  All rents received for the month of Closing shall be prorated as of the Closing Date.  Purchaser shall apply all rents or other amounts received by Purchaser, first, to the month of Closing (apportioned between Purchaser and Seller) with respect to any rents not received as of the Closing Date; second, for the account of Purchaser for any and all amounts due to Purchaser for the month in which such amounts were received for the month following the Closing; third, for the account of Seller for any and all amounts due Seller for periods prior to Closing; and the balance shall be retained by Purchaser.

(i)    Condominium fees and assessments shall be prorated as of the Date of Closing and adjusted against the Purchase Price; provided, however, that any transfer fees or costs related thereto shall be the requirement of Seller to pay the same;

(j)    Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom in the commercial real estate market in which the Property is located.

(k)    Except as expressly provided herein, the purpose and intent of the provisions for prorations and apportionments set forth in this Paragraph 15 and elsewhere in this Agreement are for Seller to bear all expenses of ownership and operation of the Property and to receive all income therefrom accruing through midnight of the day preceding Closing and for Purchaser to bear all expenses and receive all such income accruing thereafter.  All of the provisions contained in this Paragraph 15 shall survive Closing.

16.    **NOTICES.**  All notices, requests, consents, approvals, responses, waivers or other communications ("notice(s)") required or permitted to be given hereunder shall be given in writing and shall be delivered (a) by certified mail, postage prepaid, return receipt requested or (b) by a commercial overnight courier that guarantees next business day delivery and provides a receipt, and such notices shall be addressed as follows:

To Seller:            Avon Place LLC
                      c/o Ahron Rudich
                      710 Avenue L
                      Brooklyn, NY 11230

17

|    |                     |                              |
|----|---------------------|------------------------------|
| 1  | with a copy to:     | Potok Law, LLC               |
| 2  |                     | ATTN: Benjamin Potok, Esq.   |
| 3  |                     | 747 Farmington Ave., Ste 9   |
| 4  |                     | New Britain, CT 06053        |
| 5  |                     | ben@potoklaw.com             |
| 6  |                     |                              |
| 7  | To Purchaser:       |                              |
| 8  |                     |                              |
| 9  |                     |                              |
| 10 |                     |                              |
| 11 |                     |                              |
| 12 | with a copy to:     |                              |
| 13 |                     | Neil H. Kupferman, Esq., P.C.|
| 14 |                     | 459 Sixth Avenue             |
| 15 |                     | Brooklyn, NY 11215           |
| 16 |                     | 718-768-3046 (T)             |
| 17 |                     | 718-768-7645 (F)             |
| 18 |                     | nhk@nhklaw.comog@nhklaw.com  |
| 19 |                     |                              |
| 20 | To Escrow Agent:    |                              |

or to such other address as any party from time to time may specify in writing to the other Parties.  Any notice sent as hereinabove provided shall be deemed effectively given (a) on the date mailed if sent by certified mail, postage prepaid, return receipt requested or by a commercial overnight courier.  Such notices shall be deemed received (a) on the date of delivery, if delivered by overnight express delivery service; or (b) on the date indicated on the return receipt if mailed. If any notice mailed is properly addressed but returned for any reason, such notice shall be deemed to be effective notice and to be given on the date of mailing.  Any notice sent by the attorney representing a Party, shall qualify as notice under this Agreement.

17.    **DEFAULT; REMEDIES**.

(a)    If Purchaser shall default in any manner under this Agreement, then Purchaser shall forfeit to Seller all of its right, title and interest in and to the Deposit paid hereunder; and Purchaser shall have no further liability to Seller (except for the Surviving Obligations).  The Parties have agreed that the actual damages suffered by Seller would be extremely difficult or impracticable to ascertain.  After negotiation, the Parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the Deposit is a reasonable estimate of the damages that Seller would incur in such an event and that the aforesaid payment of the Deposit is liquidated damages hereunder and not a penalty.  The provisions of this

1    Paragraph 17(a) shall not limit or affect any of Purchaser's indemnities as provided in
2    Paragraphs 14 and 19 of this Agreement.

3    (b)      If Seller shall refuse or fail to convey the Property to Purchaser in violation of Seller's
4    obligations hereunder, for any reason other than a default by Purchaser under this Agreement, or
5    otherwise shall be in default of its obligations hereunder, Purchaser, as its sole remedies
6    hereunder, shall have the right to:  (i) terminate this Agreement and receive a return of the
7    Deposit; or (ii) seek specific performance; or (iii) waive such breach or default and proceed to
8    Closing.

9    (c)      In no event shall Seller be liable to Purchaser for any punitive, speculative or
10    consequential damages.

11    18.    **ESCROW AGENT**.  The Deposit shall be held in escrow by Escrow Agent pursuant to
12    the terms of the Escrow Agreement attached herein as Exhibit I.

13    19.    **INSPECTIONS AND APPROVALS.**  Intentionally omitted.  This Agreement is not
14    contingent upon Inspections or Due Diligence Review.

15    20.    **CONFIDENTIALITY**.  Purchaser agrees that, unless Seller specifically and expressly
16    otherwise agrees in writing, all of the Proprietary Information is and shall be deemed and treated
17    by Purchaser and all of the Releasors as proprietary, privileged and confidential and neither
18    Purchaser nor any Releasor shall disclose same to any other person except those Releasors
19    assisting Purchaser with the transaction contemplated herein, or Purchaser's lender, if any, and
20    then only on a need-to-know basis, and upon Purchaser or Releasor making each such person
21    aware of the confidentiality restrictions set forth herein and procuring such person's agreement
22    to be bound thereby.  Notwithstanding the foregoing, Purchaser shall not be deemed to have
23    violated the provisions of this Paragraph 20 if Purchaser or any Releasor is required to disclose
24    any Proprietary Information pursuant to a judicial order validly issued and served upon
25    Purchaser or any Releasor by a court with competent jurisdiction over the Property and the
26    Proprietary Information which is the subject of such order and Purchaser:  (i) promptly, and in no
27    event less than five (5) business days after Purchaser's or any Releasor's receipt of such court
28    order, delivers a copy of same, together with any notices or other documents which were served
29    on Purchaser or any Releasor with such court order, to Seller; and (ii) cooperates in any effort
30    (provided that neither Purchaser nor any Releasor thereby is placed in breach of such court
31    order) instituted by Seller to prevent such disclosure.  In the event the purchase and sale
32    contemplated hereby fails to close for any reason whatsoever, Purchaser agrees to deliver to
33    Seller, or cause to be delivered to Seller, all Proprietary Information in the possession of
34    Purchaser and/or any Releasor(s) and any Proprietary Information for any purpose other than to
35    determine whether Purchaser shall proceed with the contemplated purchase, or if the purchase
36    and sale is consummated, in connection with the operation of the Property post-Closing.
37    Purchaser, on behalf of itself and the Releasors, agrees to indemnify Seller and each of the Seller
38    Parties against all costs, claims and damages, including attorneys' fees, suffered or sustained as
39    the result of a breach by Purchaser or any of the Releasors of the covenants contained in this
40    Paragraph 20.  All obligations of Purchaser and Releasors under this Paragraph 20 shall be
41    referred to as the "Confidential Obligations".  Notwithstanding any other term of this

Agreement, the provisions of this Paragraph 20 shall survive Closing or the termination of this Agreement for any reason.

21.    **SURVIVING OBLIGATIONS**.  The term "Surviving Obligations" as used herein shall mean, collectively, the Indemnity Obligations, the Confidentiality Obligations and the indemnities set forth in Paragraphs 14 and 19 hereof, together with other obligations of the Parties which expressly survive the termination of this Agreement for any reason.

22.    **ENTIRE AGREEMENT**.  This Agreement constitutes the final and entire agreement between the Parties and neither Party shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not contained herein.  All understandings and agreements heretofore made between the Parties are merged in this Agreement, which alone fully and completely expresses the agreement of the Parties and may not be changed, modified, varied or terminated except by a written instrument signed by the Parties or their respective counsel. The Parties agree that, except as and to the extent expressly provided herein, the Parties agree that none of the terms and provisions of this Agreement shall survive the delivery of the Deed and all such terms and provisions of this Agreement shall be merged into the Deed.

23.    **BINDING EFFECT.**  This Agreement shall be binding upon and shall inure to the benefit of Seller and Purchaser and their respective successors and assigns, except as otherwise provided herein.

24.    **CONSTRUCTION**.  The interpretation, construction and performance of this Agreement shall be governed by the laws of the State, without regard to principles of conflict of laws.

25.    **FURTHER ASSURANCES.**  Each Party, at any time and from time to time, shall execute, acknowledge when appropriate, and deliver such further instruments and documents and take such other action as reasonably may be requested by the other Party in order to carry out the intent and purpose of this Agreement; provided, however, that the requested modifications shall be ministerial in scope and, without limitation, shall not: (i) modify or alter in any form or manner the monetary obligation of either Party hereto; or (ii) materially increase any non-monetary obligations or materially and adversely affect the rights (monetary or non-monetary) of either Party under this Agreement, as determined by the affected Party in its reasonable judgment.  Further, Seller:  (i) shall not be obligated to agree in any form or manner, to any additional indemnity agreements or any representations, warranties or guaranties which are not already expressly agreed upon in this Agreement; (ii) shall not be obligated to agree to any changes to the environmental agreements set forth herein or in any other document; and (iii) shall not allow others to act as attorney-in-fact for Seller.  The provisions of this Paragraph 25 shall survive Closing or the termination of this Agreement for any reason.

26.    **CAPTIONS.**  The captions preceding the paragraphs of this Agreement are intended only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

27. **WAIVER OF CONDITIONS**.

(a)     Purchaser and Seller each shall have the right, in the sole and absolute exercise of its discretion, to waive any of the terms or conditions of this Agreement which are strictly for its respective benefits and to complete Closing in accordance with the terms and conditions of this Agreement which have not been so waived.  Unless otherwise specifically provided herein, any such waiver shall be effective and binding only if made and delivered at or prior to Closing.

(b)     No waiver by either Party of any failure or refusal by the other Party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal by the other Party so to comply.

28. **SEVERABILITY.**  The terms, conditions, covenants and provisions of this Agreement shall be deemed to be severable.  If any clause or provision herein contained shall be adjudged to be invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, the same shall be deemed to be severable and shall not affect the validity of any other clause or provision herein, but such other clauses or provisions shall remain in full force and effect, unless such provisions shall relate to the Purchase Price or other monies to be paid hereunder.

29. **GENDER.**  As used in this Agreement, the masculine gender shall include the feminine or neuter genders and the neuter gender shall include the masculine or feminine genders, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

30. **NO PUBLIC DISCLOSURE.**  Prior to Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior consent of both Parties hereto.  After Closing, this covenant shall terminate and no longer be binding on either Party.

31. **NO PARTNERSHIP.**  Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the Parties or their successors in interest.

32. **TIME OF ESSENCE.**  Time is of the essence in this Agreement for all purposes and in all instances, whether or not specifically set forth herein.

33. **RECORDATION.**  Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

34. **PROPER EXECUTION**.  The submission by Seller to Purchaser of this Agreement in an unsigned form shall be deemed to be a submission solely for Purchaser's consideration and not for acceptance and execution. Such submission shall have no binding force and effect, shall not constitute an option or an offer, and shall not confer any rights upon Purchaser or impose any obligations upon Seller irrespective of any reliance thereon, change of position or partial performance. The submission by Seller to Purchaser of this Agreement for execution by Purchaser and the actual execution thereof and delivery to Seller by Purchaser similarly shall

1  have no binding force and effect on Seller unless and until Seller shall have executed this
2  Agreement and the Deposit shall have been received by Escrow Agent.

3  35.  **BUSINESS DAYS.** If any date herein set forth for the performance of any obligations by
4  Seller or Purchaser or for the delivery of any instrument or notice as herein provided should fall
5  on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such
6  obligations or delivery shall be deemed acceptable on the next business day following such
7  Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any
8  local or federal holiday on which post offices are closed in the jurisdiction in which the Property
9  is located.

10  36.  **LIKE-KIND EXCHANGE**.

11  (a)  Purchaser, at the request of Seller, agrees to cooperate reasonably with Seller so
12  that Seller may dispose of the Property in a transaction intended to qualify in whole or in part as
13  a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as
14  amended (the "Tax Code").  In order to implement such exchange:  (i) Seller, upon notice to
15  Purchaser, shall assign its rights, but not its obligations, under this Agreement to a third party
16  designated by Seller to act as a qualified intermediary (as such phrase is defined in applicable
17  regulations issued under the Tax Code); (ii) Purchaser shall, and hereby agrees to, acknowledge
18  such assignment and make all payments due hereunder to or as may be directed by such
19  intermediary; and (iii) at Closing, Seller shall convey the Property directly to Purchaser;
20  provided, however, that:  (w) Purchaser's cooperation shall be limited to the actions specifically
21  contemplated by the foregoing sentence; (x) none of Purchaser's rights or obligations hereunder
22  shall be affected or modified in any way, nor shall any time periods contained herein be affected
23  in any way; (y) Purchaser shall have no responsibility or liability to Seller or any other person for
24  the qualification of Seller's purported exchange transaction under Section 1031 of the Tax Code
25  other than as a result of Purchaser's failure to perform the actions specifically contemplated in
26  this Paragraph; and (z) Purchaser shall not be required to incur any additional expense (unless
27  reimbursed by Seller) or liability (other than to a de minimis extent) as a result of such
28  cooperation, exchange or assignment.  Seller hereby agrees to and shall save, defend, indemnify
29  and hold Purchaser harmless from and against any and all liability incurred by Purchaser as a
30  result of any such cooperation, exchange or assignment.

31  (b)  Seller, at the request of Purchaser, agrees to cooperate reasonably with Purchaser
32  so that Purchaser may acquire the Property as "replacement property" in a transaction intended to
33  qualify in whole or in part as a tax-deferred exchange pursuant to Section 1031 of the Tax Code.
34  In order to implement such exchange:  (i) Purchaser, upon notice to Seller, shall assign its rights,
35  but not its obligations, under this Agreement to a third party designated by Purchaser to act as a
36  qualified intermediary; (ii) Seller shall, and hereby agrees to, acknowledge such assignment and
37  to accept payment of all or a portion of the Purchase Price from the intermediary; and (iii) at
38  Closing, Seller shall convey the Property directly to Purchaser; provided, however, that:  (w)
39  Seller's cooperation shall be limited to the actions specifically contemplated by the foregoing;
40  (x) none of Seller's rights or obligations hereunder shall be affected or modified in any way, nor
41  shall any time periods contained herein be affected in any way; (y) Seller shall have no
42  responsibility or liability to Purchaser or any other person for the qualification of Purchaser's
43  purported exchange transaction under Section 1031 of the Tax Code, other than solely as a result

of Seller's failure to perform the actions specifically contemplated in this Paragraph; and (z) Seller shall not be required to incur any additional expense (unless reimbursed by Purchaser) or liability (other than to a de minimis extent) as a result of such cooperation, exchange or assignment. Purchaser hereby agrees to and shall save, defend, indemnify and hold Seller harmless from and against any and all liability incurred by Seller as a result of any such cooperation, exchange or assignment.

      (c)    The provisions of this Paragraph 36 shall survive Closing.

37.   **NO FINANCING CONTINGENCY/SELLER FINANCING**

Purchaser acknowledges and agrees that the transaction is not subject to or contingent on the Purchaser's ability to obtaining financing to purchase the Property (and any inability to obtain financing shall not be a cause to delay or adjourn the Closing). Notwithstanding the foregoing, Seller acknowledges that Purchaser is obtaining financing and Seller shall cooperate with Purchaser's lender, including but not limited to, allowing access for appraisals and the like. Furthermore, Seller shall be obligated to provide Purchaser will the list of items as per Exhibit "K", attached hereto and made a part hereof.

38.   **LIMITED LIABILITY**. The obligations of Seller under this Agreement or any documents executed pursuant hereto or in connection herewith, including, without limitation, the Deed, the Bill of Sale, and the Assignment of Leases, are intended to be binding only on the Property of Seller and shall not be personally binding upon, nor shall any resort be had to any other property of Seller or any properties of the Seller Parties. The provisions of this Paragraph shall survive Closing or termination of this Agreement, for any reason.

39.   **APPROVALS**. Seller hereby appoints Purchaser as its attorney-in-fact to apply for a building permits, zoning changes, variance changes or other governmental approvals, building's department, and like agencies prior to the Closing for plans and work on the 13 Down/Gutted Units that were damaged by fire.

40.   **CONDOMINIUM**. Seller and acknowledges and agrees that this Agreement and the transfer is subject to any requirements of the Condominium or Declaration. Seller shall tender written resignations of Seller and/or its designees as director(s) and/or officer(s) of the Condominium association of unit owners, as may be requested and required by Purchaser at Closing which resignations shall be in accordance with the Condominium Declaration and By-Laws. Furthermore, at the Closing, Seller shall facilitate the resignation of Seller and any related entities or individuals from any officer or director positions of "Avon Place Apartments" and/or the Condominium, and Purchaser shall nominate and approve of replacement officers and directors. The Purchaser and Seller shall execute all documents necessary to accomplish same including, but not limited to, notification to the State of Connecticut Office of the Secretary of State. In addition, Purchaser shall designate a professional management company to assume any management duties in connection with the operation of the Condominium from and after the date of Closing. The parties agree to cooperate with each other in connection with the transition of the operation of "Avon Place Apartments" and/or the Condominium and the management of the Condominium. The sale shall be subject to the Condominium's written approval of Purchaser.

As to any units at the Condominium that are owned by third parties, Seller represents and
warrants that neither said unit owners nor any other third party have rights of first refusal over
the Real Property. Said representation to survive Closing.

41.    **NO ELECTION BY SELLER**.  Each right of Seller provided for in this Agreement
shall be cumulative and shall be in addition to every other right provided for in this Agreement
or now or hereafter existing at law or in equity, by statute or otherwise, and the exercise or
beginning of the exercise by Seller of any one or more of such rights shall not preclude the
simultaneous or later exercise by Seller of any or all other rights provided for in this Agreement
or now or hereafter existing at law or in equity, by statute or otherwise.

42.    **NO THIRD PARTY BENEFICIARY.**  The provisions of this Agreement are not
intended to benefit any third parties.

43.    **EQUITABLE OWNERSHIP**.  Prior to the conveyance of the Property hereunder,
Purchaser shall not acquire, obtain or assume any equitable ownership of or title to the Property
by reason of this Agreement.

44.    **PREPARATION OF AGREEMENT**.  This Agreement shall not be construed more
strongly against either Party regardless of who is responsible for its preparation.

45.    **JOINT OBLIGATIONS**.  All obligations and liabilities of Seller and Purchaser set forth
herein shall be joint and several if more than one Seller or Purchaser is named herein.

46.    **COUNTERPARTS.**  This Agreement may be executed and delivered in any number of
counterparts, each of which when so executed and delivered shall be deemed to be an original
and all of which shall constitute one and the same instrument. PDF/electronic signatures shall be
deemed originals

47.    **EXHIBITS**:  All Exhibits referred to herein are a part of the Agreement.

48. Notwithstanding anything herein to the contrary, all litigation, including but not limited to
fire, insurance claims of Seller, and/or any claims of tenants/occupants related to the fire
at the Real Property shall all be settled and discontinued with prejudice on or before
Closing, with all fees and expenses due by Seller to be paid in full.

1    **IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be
2    executed and delivered by duly authorized persons on the day and year first above written.

SELLER:

AVON PLACE LLC

By:_____
Name: Ahron Rudich
Title:   Member

PURCHASER:
UP Realty, LLC

_____
Gershon Eichorn, Member

3

1       **IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be
2    executed and delivered by duly authorized persons on the day and year first above written.

SELLER:

AVON PLACE LLC

By:_____
Name: Ahron Rudich
Title:   Member


PURCHASER:
UP Realty, LLC

_____
Gershon Eichorn, Member

3

25

**LIST OF EXHIBITS**

EXHIBIT "A" Legal Description

EXHIBIT "B" Rent Roll

EXHIBIT "C" Assignment of Leases and Security Deposits

EXHIBIT "D" Bill of Sale

EXHIBIT "E" Assignment of Contracts and Intangible Property

EXHIBIT "F" Tenant Notices

EXHIBIT "G" Permitted Exceptions

EXHIBIT "H" Contract List

EXHIBIT "I"        Escrow Agreement

EXHIBIT "J"        List of Lightly Damaged Units

EXHIBIT "K" List of Items for Purchaser Financing

EXHIBIT "L" List of 13 Down/Gutted Units

1    **EXHIBIT "A"**

2    **Legal Description**

3    EXHIBIT A

4    DESCRIPTION OF THE REAL ESTATE

5    All that certain real property, situated in the Town of Avon, County of Hartford and State
6    of Connecticut, being part of a Condominium known as AVON PLACE CONDOMINIUM and
7    designated as Unit Nos. 101A, 102A, 103A, 104A, 105A, 106A, 107A, 108A, 109A, 110A, 111A,
8    112A, 113A, 114A, 115A, 116A, 117A, 118A, 119A, 120A, 121A, 202A, 203A, 204A, 205A,
9    206A, 207A, 208A, 209A, 210A, 211A, 212A, 213A, 214A, 215A, 216A, 217A, 218A, 219A,
10   220A, 221A, 301A, 302A, 303A, 304A, 305A, 306A, 307A, 308A, 309A, 310A, 311A, 312A,
11   313A, 314A, 315A, 316A, 317A, 318A, 319A, 320A, 101B, 102B, 103B, 104B, 105B, 106B,
12   107B, 108B, 109B, 110B, 111B, 112B, 113B, 114B, 115B, 116B, 117B, 118B, 119B, 120B,
13   121B, 201B, 202B, 203B, 204B, 205B, 206B, 207B, 208B, 209B, 210B, 211B, 212B, 213B,
14   214B, 215B, 216B, 217B, 218B, 219B, 220B, 221B, 301B, 302B, 303B, 304B, 305B, 306B,
15   307B, 308B, 309B, 310B, 311B, 312B, 313B, 314B, 315B, 316B, 317B, 318B, 319B, 320B,
16   101C, 102C, 103C, 104C, 105C, 106C, 107C, 108C, 109C, 110C, 111C, 112C, 113C, 114C,
17   115C, 116C, 117C, 118C, 119C, 120C, 121C, 201C, 202C, 204C, 205C, 206C, 207C, 208C,
18   209C, 210C, 211C, 212C, 213C, 214C, 215C, 216C, 217C, 218C, 219C, 220C, 221C, 301C,
19   303C, 304C, 305C, 306C, 307C, 308C, 309C, 310C, 311C, 313C, 314C, 316C, 317C, 318C,
20   319C, 320C, 101D and 102D.
21
22   TOGETHER WITH all appurtenances thereto, being more particularly set forth and
23   described in a Declaration of Condominium dated November 12, 1979 and recorded in Volume
24   115 at Page 505; as amended by Amendment dated April 19, 1989 and recorded in Volume 221 at
25   Page 144; as further amended by Amendment dated October 22, 1992 and recorded in Volume
26   267 at Page 726; as further amended by Amendment dated October 13, 1994 and recorded in
27   Volume 301 at Page 446, all of the Avon Land Records.
28
29   Said Units are shown on a map entitled "Property of Arnold C. Greenberg, Trustee
30   Waterville Road also known as Connecticut Route #10 Avon, Connecticut Scale 1" = 100'
31   January 1974 Office of Sanderson and Washburn Simsbury, Connecticut" which map is on file in
32   the Town Clerk's Office in Avon.
33
34   Said Units are also shown on a certain map entitled "Avonplace Associates Limited
35   Partnership (A Connecticut Limited Parternship) Waterville Road – Conn. Route #10 Avon,
36   Connecticut Scale 1" = 100' October 1992 Office of Sanderson and Washburn Simsbury,
37   Connecticut", which map is on file in the Town Clerk's Office of Avon.
38
39
40   **END OF LEGAL DESCRIPTION**

58464/0003-43382861v5

1                              **<u>EXHIBIT "B"</u>**

2                                **<u>Rent Roll</u>**



# Rent Roll
# Avon Place
# 07/25/2025

| Unit | Occupancy Status | Latest Occupant | Move In Date | Bed/Bath | Recurring Charges |
|------|------------------|-----------------|--------------|----------|-------------------|
| Avon Place | | | | | |
| 44-101 | Occupied | Zhen Zhang | 10/1/2022 | 2 Bed/2 Bath | $1,850.00 |
| 44-102 | Occupied | Kalyan Rachabattula | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-103 | Vacant | Jasmin Flowers | 1/1/2024 | 3 Bed/2 Bath | $2,400.00 |
| 44-104* | Vacant | David Ossorio | 2/1/2023 | 1 Bed/1 Bath | $2,000.00 |
| 44-105 | Occupied | Ashish Sinha | 6/1/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-106 | Vacant | Senthil Chidambaram | 6/1/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-107 | Vacant | Hannah Gitman | 10/1/2022 | 1 Bed/1 Bath | $1,850.00 |
| 44-108 | Occupied | Seung Hyun Seo | 10/1/2022 | 1 Bed/1 Bath | $2,000.00 |
| 44-109 | Occupied | Mubulayi Diyoka | 11/1/2024 | 2 Bed/2 Bath | $2,000.00 |
| 44-110 | Vacant | Maribeth Haningan | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-111 | Vacant | Nicole Golino | 8/1/2023 | 1 Bed/1 Bath | $1,825.00 |
| 44-112 | Vacant | Jiji Puthanpurayil | 2/1/2024 | 2 Bed/2 Bath | $2,250.00 |
| 44-113 | Vacant | Michelle Traub | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-114 | Vacant | Sumesh Kumar | 10/1/2022 | 2 Bed/2 Bath | $1,880.00 |
| 44-115 | Down/Gutted | Naveen Arya | 11/1/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-116 | Down/Gutted | Derek Bee | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-117 | Vacant | Katherine Hinderer | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-118 | Vacant | Dania Dejuste | 4/1/2024 | 1 Bed/1.5 Bath | $2,000.00 |
| 44-119 | Vacant | Kezzey Jean-Pierre | 10/1/2022 | 3 Bed/2 Bath | $2,400.00 |
| 44-120 | Down/Gutted | Madalyn Ugolik | 12/23/2022 | 2 Bed/2 Bath | $2,000.00 |
| 44-121 | Down/Gutted | Sean Steben | 10/1/2022 | 2 Bed/2 Bath | $1,900.00 |
| 44-201 | Vacant | Venkata Miriyala, Diyana Miriyala | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-202 | Vacant | Adarsh Vasudevan | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-203* | NOT OWNED | Condo | | 3 Bed/2 Bath | $2,600.00 |
| 44-204 | Vacant | Jill Cushman | 10/1/2022 | 1 Bed/1.5 Bath | $1,775.00 |
| 44-205 | Vacant | Jesse Silberstein, Linda Silberstein | 10/1/2022 | 2 Bed/2 Bath | $2,075.00 |
| 44-206 | Occupied | Martin Garcia, Marie Garcia | 10/1/2022 | 2 Bed/2 Bath | $1,800.00 |
| 44-207 | Vacant | Tracy Rodean, Rich Soto | 1/23/2023 | 1 Bed/1.5 Bath | $2,000.00 |
| 44-208 | Vacant | Parth Bhardwaj | 10/1/2022 | 1 Bed/1.5 Bath | $2,000.00 |
| 44-209 | Vacant | Pallaswamy Kannan | 10/1/2022 | 2 Bed/2 Bath | $1,800.00 |
| 44-210 | Vacant | Ralph Jackson | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-211 | Vacant | Benjamin Gross | 10/1/2022 | 1 Bed/1.5 Bath | $2,000.00 |
| 44-212 | Vacant | Ravishanker Unnikrshnamenon | 10/1/2022 | 2 Bed/2 Bath | $1,900.00 |
| 44-213* | Occupied | John Barisano | 10/17/2024 | 2 Bed/2 Bath | $2,250.00 |
| 44-214 | Vacant | Dinesh Kumar | 11/1/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-215* | Down/Gutted | Sombath Orn | 10/2/2014 | 2 Bed/2 Bath | $2,250.00 |
| 44-216 | Down/Gutted | Mukund Palsikar | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-217 | Down/Gutted | Arvindbhai Patel | 6/1/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-218 | Down/Gutted | Justin Skrzyniarz | 2/1/2024 | 1 Bed/1.5 Bath | $2,000.00 |
| 44-219 | Vacant | Wayne Deroy | 10/1/2022 | 3 Bed/2 Bath | $2,500.00 |
| 44-220 | Down/Gutted | William Steinberg | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-221 | Down/Gutted | Raghavendra Manisayya | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-301 | Vacant | Saurabh Kant | 6/1/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-302* | NOT OWNED | Condo | | 2 Bed/2 Bath | $2,250.00 |

| Unit | Occupancy Status | Latest Occupant | Move In Date | Bed/Bath | Recurring Charges |
|------|------------------|-----------------|--------------|----------|-------------------|
| 44-303 | Vacant | Neeraj Gupta | 10/1/2022 | 3 Bed/2 Bath | $2,400.00 |
| 44-304* | Vacant | Rohitkumar Patel | 10/1/2022 | 1 Bed/1.5 Bath | $1,600.00 |
| 44-305 | Occupied | Lawrence Friel | 10/1/2022 | 2 Bed/2 Bath | $1,950.00 |
| 44-306 | Vacant | Christina Clavette | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-307 | Vacant | Pre Leased | | 1 Bed/1.5 Bath | $2,000.00 |
| 44-308* | Vacant | Taylor O'Connor, Frank Mansueto | 2/1/2023 | 1 Bed/1.5 Bath | $1,800.00 |
| 44-309* | Vacant | Jeff DeManche | 5/4/2023 | 2 Bed/2 Bath | $1,750.00 |
| 44-310* | Vacant | Debra Goldstein | 4/14/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-311 | Vacant | Tashema Mathis | 10/1/2022 | 3 Bed/2 Bath | $2,756.00 |
| 44-312* | NOT OWNED | Condo | | 2 Bed/2 Bath | $2,250.00 |
| 44-313 | Vacant | Divya Pravin Kumar, Pravin Kumar | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-314* | Down/Gutted | Giango Gudimetta | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 44-315* | NOT OWNED | Condo | | 2 Bed/2 Bath | $2,250.00 |
| 44-316 | Vacant | Ganesan Thirupathi | 5/1/2023 | 2 Bed/2 Bath | $2,250.00 |
| 44-317 | Vacant | James Milne | 10/1/2022 | 1 Bed/1.5 Bath | $2,000.00 |
| 44-318 | Vacant | Elizabeth Graves | 9/1/2023 | 3 Bed/2 Bath | $2,150.00 |
| 44-319 | Down/Gutted | Debra Morris | 4/1/2024 | 2 Bed/2 Bath | $2,050.00 |
| 44-320 | Down/Gutted | Cameron Martone, Kerri Bouchard | 12/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 46-A | Occupied | Karen Cosgrove | 10/1/2022 | 1 Bed/1 Bath | $1,475.00 |
| 46-B | Occupied | Tammy Samperi | 10/1/2022 | 2 Bed/1 Bath | $1,750.00 |
| 47-101 | Occupied | Venkata Simharaja | 10/1/2022 | 2 Bed/2 Bath | $1,950.00 |
| 47-102 | Occupied | Yamileth Norberto | 10/11/2023 | 2 Bed/2 Bath | $2,000.00 |
| 47-103 | Occupied | Mercy Nyaata | 6/1/2023 | 3 Bed/2 Bath | $2,500.00 |
| 47-104 | Occupied | Devon Root | 12/28/2022 | 1 Bed/1 Bath | $1,800.00 |
| 47-105 | Occupied | Julian Cipriani | 6/1/2025 | 2 Bed/2 Bath | $2,050.00 |
| 47-106 | Occupied | Zachary Ryding | 10/1/2022 | 2 Bed/2 Bath | $2,250.00 |
| 47-107 | Occupied | Tom Preston | 10/1/2022 | 1 Bed/1 Bath | $1,800.00 |
| 47-108 | Occupied | Sandy Knight | 10/1/2022 | 1 Bed/1 Bath | $1,800.00 |
| 47-109 | Occupied | Alexander Nguyen | 10/1/2022 | 2 Bed/2 Bath | $2,050.00 |
| 47-110* | Occupied | Frank Moynihan | 4/1/2024 | 2 Bed/2 Bath | $1,950.00 |
| 47-111 | Occupied | Johsua Popielarczyk | 7/13/2023 | 1 Bed/1 Bath | $1,875.00 |
| 47-112 | Occupied | Idrissa Thioune | 10/1/2022 | 2 Bed/2 Bath | $1,900.00 |
| 47-113* | Occupied | Michelle Lundigan | 9/1/2023 | 2 Bed/2 Bath | $2,050.00 |
| 47-114 | Occupied | Laura Fern | 10/1/2022 | 2 Bed/2 Bath | $1,900.00 |
| 47-115 | Occupied | Karissa Kudile | 8/1/2024 | 2 Bed/2 Bath | $2,125.00 |
| 47-116 | Occupied | Ravinder Rishi | 10/1/2022 | 2 Bed/2 Bath | $2,150.00 |
| 47-117 | Occupied | Michael Sullivan | 10/1/2022 | 2 Bed/2 Bath | $2,000.00 |
| 47-118 | Occupied | Sara Thanh | 1/1/2024 | 1 Bed/1 Bath | $1,800.00 |
| 47-119* | Occupied | Amanda Ortiz | 11/1/2023 | 3 Bed/2 Bath | $2,600.00 |
| 47-120 | Occupied | Vijay Krishna | 2/5/2023 | 2 Bed/2 Bath | $2,000.00 |
| 47-121 | Occupied | Sugeiry Medina | 2/1/2024 | 3 Bed/2 Bath | $2,600.00 |
| 47-201 | Occupied | Rajesh Kumar | 10/1/2022 | 2 Bed/2 Bath | $2,275.00 |
| 47-202 | Occupied | Nityanand Handa | 10/1/2022 | 2 Bed/2 Bath | $2,065.00 |
| 47-203* | Occupied | Carmen Baig | 5/1/2024 | 3 Bed/1 Bath | $2,600.00 |
| 47-204 | Occupied | Barbara Paine | 11/4/2022 | 1 Bed/1.5 Bath | $1,950.00 |
| 47-205 | Occupied | Makayla Hodder | 5/1/2025 | 2 Bed/2 Bath | $2,200.00 |
| 47-206 | Occupied | Vittal Jadhav | 10/1/2022 | 2 Bed/2 Bath | $1,925.00 |
| 47-207 | Occupied | Kathleen Ramano | 12/1/2023 | 1 Bed/1 Bath | $1,850.00 |
| 47-208 | Occupied | Sriram Suresh | 12/21/2022 | 1 Bed/1 Bath | $1,800.00 |
| 47-209 | Occupied | Karthik Jayaraman | 10/1/2022 | 2 Bed/2 Bath | $1,800.00 |

| Unit | Occupancy Status | Latest Occupant | Move In Date | Bed/Bath | Recurring Charges |
|------|------------------|-----------------|--------------|----------|-------------------|
| 47-210 | Occupied | Felipe Rodriguez | 3/1/2024 | 2 Bed/2 Bath | $2,050.00 |
| 47-211* | Occupied | Elizabeth Soker | 12/16/2022 | 1 Bed/1.5 Bath | $1,750.00 |
| 47-212 | Occupied | Cole Haymond | 10/1/2022 | 2 Bed/2 Bath | $2,100.00 |
| 47-213 | Occupied | Damaris Carmona | 2/1/2024 | 2 Bed/2 Bath | $2,600.00 |
| 47-214 | Occupied | Siji John | 10/1/2023 | 2 Bed/2 Bath | $1,850.00 |
| 47-215 | Occupied | Employment Options LLC | 10/1/2022 | 2 Bed/2 Bath | $1,950.00 |
| 47-216 | Occupied | Lindsey Smith | 4/1/2024 | 2 Bed/2 Bath | $1,850.00 |
| 47-217 | Occupied | Devon Wynn | 8/1/2023 | 2 Bed/2 Bath | $2,000.00 |
| 47-218 | Occupied | Kyle Pisko | 5/1/2023 | 1 Bed/1 Bath | $1,950.00 |
| 47-219 | Occupied | Josefina Tolo | 10/1/2022 | 3 Bed/2 Bath | $2,700.00 |
| 47-220 | Occupied | Quincy Buggs | 9/1/2022 | 2 Bed/2 Bath | $2,125.00 |
| 47-221 | Occupied | Rajagopal Narashiman | 10/1/2022 | 2 Bed/2 Bath | $1,975.00 |
| 47-301 | Occupied | Noelle Hill | 5/1/2025 | 2 Bed/2 Bath | $2,000.00 |
| 47-302 | Occupied | Bhavana Thakur, Vishal Singh Thakur | 4/1/2023 | 2 Bed/2 Bath | $1,975.00 |
| 47-303 | Occupied | Dorcas Mensah | 10/1/2022 | 3 Bed/2 Bath | $2,500.00 |
| 47-304 | Occupied | Akia Freeman | 7/1/2025 | 1 Bed/1 Bath | $2,000.00 |
| 47-305 | Occupied | Linda March | 10/1/2022 | 2 Bed/2 Bath | $1,950.00 |
| 47-306 | Occupied | Adam Arakelian | 3/20/2023 | 2 Bed/2 Bath | $1,925.00 |
| 47-307 | Occupied | Joseph Kadima | 4/1/2025 | 1 Bed/1 Bath | $2,000.00 |
| 47-308 | Occupied | Samantha Levy | 7/1/2025 | 1 Bed/1 Bath | $1,850.00 |
| 47-309 | Occupied | Kwame Appiah, Love Amoah | 3/30/2023 | 2 Bed/2 Bath | $2,100.00 |
| 47-310* | Occupied | Tara Dean | 5/1/2024 | 2 Bed/2 Bath | $2,000.00 |
| 47-311 | Occupied | Ismael Rivera | 8/1/2024 | 1 Bed/1 Bath | $1,750.00 |
| 47-312 | Occupied | Rick Thomas | 10/1/2022 | 2 Bed/2 Bath | $2,000.00 |
| 47-313 | Occupied | Lora Anderson | 2/1/2025 | 2 Bed/2 Bath | $1,925.00 |
| 47-314 | Occupied | Amy Arlin | 10/1/2022 | 1 Bed/1 Bath | $2,150.00 |
| 47-315 | Occupied | Douglas Brown | 10/1/2022 | 2 Bed/2 Bath | $2,150.00 |
| 47-316 | Occupied | Miguel Espada | 1/1/2024 | 2 Bed/2 Bath | $2,250.00 |
| 47-317 | Occupied | Bwana Yusuf | 6/1/2023 | 4 Bed/2 Bath | $3,300.00 |
| 47-318 | Occupied | Rachel Kennedy | 3/10/2023 | 3 Bed/2 Bath | $2,450.00 |
| 47-319* | Occupied | Dianna Miryla | 10/1/2022 | 2 Bed/2 Bath | $2,150.00 |
| 47-320 | Occupied | Travis Schoen | 8/1/2024 | 2 Bed/2 Bath | $1,925.00 |
| 48-101 | Occupied | Isadora Tabachnick, Samantha Rubin | 12/1/2022 | 2 Bed/2 Bath | $1,800.00 |
| 48-102 | Occupied | Conor Keleher | 10/1/2022 | 2 Bed/2 Bath | $1,850.00 |
| 48-103 | Occupied | Rohit Kumar | 10/1/2022 | 3 Bed/2 Bath | $2,350.00 |
| 48-104 | Occupied | Kenneth Heyne | 10/1/2022 | 1 Bed/1 Bath | $1,725.00 |
| 48-105 | Occupied | Sheryl Duby | 10/1/2022 | 2 Bed/2 Bath | $1,800.00 |
| 48-106 | Occupied | Bryan Cruz | 7/1/2025 | 2 Bed/2 Bath | $2,250.00 |
| 48-107 | Occupied | Sherry Schlicher | 2/1/2023 | 1 Bed/1 Bath | $2,000.00 |
| 48-108 | Occupied | Joshua McLamb | 10/1/2022 | 1 Bed/1 Bath | $1,925.00 |
| 48-109 | Occupied | Muthukrishnan Krishnasamy Sundara | 10/1/2022 | 2 Bed/2 Bath | $2,175.00 |
| 48-110 | Occupied | Rebecca Bowling | 10/1/2022 | 2 Bed/2 Bath | $2,050.00 |
| 48-111 | Occupied | Jordan Gomes | 6/1/2024 | 1 Bed/1 Bath | $1,700.00 |
| 48-112 | Occupied | Fabializ Najera | 5/1/2024 | 2 Bed/2 Bath | $1,950.00 |
| 48-113 | Occupied | Breanna Macomber, Colin Dwyer | 10/1/2022 | 2 Bed/2 Bath | $1,875.00 |
| 48-114 | Occupied | Patrick Casey | 11/4/2022 | 2 Bed/2 Bath | $2,150.00 |
| 48-115* | Occupied | Jeffery Ivory | 12/16/2022 | 2 Bed/2 Bath | $1,950.00 |
| 48-116 | Occupied | Jennifer Gomez | 9/1/2023 | 2 Bed/2 Bath | $1,840.00 |
| 48-117 | Occupied | John Parent | 12/1/2022 | 2 Bed/2 Bath | $1,925.00 |
| 48-118 | Occupied | Joanne Madsen | 11/15/2022 | 1 Bed/1 Bath | $1,750.00 |

| Unit | Occupancy Status | Latest Occupant | Move In Date | Bed/Bath | Recurring Charges |
|------|------------------|-----------------|--------------|----------|-------------------|
| 48-119* | Occupied | Grace Wickstrom | 6/1/2023 | 3 Bed/2 Bath | $2,600.00 |
| 48-120 | Occupied | Michele Kyles | 7/1/2023 | 2 Bed/2 Bath | $2,025.00 |
| 48-121 | Occupied | Bijal Vohra | 7/1/2023 | 2 Bed/2 Bath | $2,200.00 |
| 48-201* | NOT OWNED | Condo | | 2 Bed/2 Bath | $2,250.00 |
| 48-202 | Occupied | Weiling Li | 2/1/2024 | 2 Bed/2 Bath | $2,075.00 |
| 48-203 | Occupied | Robin Lindsey | 10/1/2022 | 3 Bed/2 Bath | $2,275.00 |
| 48-204 | Occupied | Brij Raj Singh | 10/31/2024 | 1 Bed/1 Bath | $1,600.00 |
| 48-205 | Occupied | Kirby Huget | 10/1/2022 | 2 Bed/2 Bath | $2,100.00 |
| 48-206 | Occupied | Manickavel Ramar | 10/1/2022 | 2 Bed/2 Bath | $2,025.00 |
| 48-207 | Occupied | William Ryan | 7/1/2025 | 1 Bed/1 Bath | $1,900.00 |
| 48-208 | Occupied | John Pendleton | 10/1/2022 | 1 Bed/1 Bath | $1,600.00 |
| 48-209 | Occupied | Ricardo Ramirez | 11/1/2023 | 2 Bed/2 Bath | $2,125.00 |
| 48-210 | Occupied | Hal Sacks | 10/1/2022 | 2 Bed/2 Bath | $1,750.00 |
| 48-211 | Occupied | Yueling Zhang | 10/1/2022 | 1 Bed/1 Bath | $1,755.00 |
| 48-212 | Occupied | Cassondra Tinley | 12/1/2023 | 2 Bed/2 Bath | $2,200.00 |
| 48-213 | Occupied | Sergey Arzumanov | 6/1/2025 | 2 Bed/2 Bath | $2,250.00 |
| 48-214 | Occupied | Andrew Triggle | 10/1/2022 | 2 Bed/2 Bath | $2,000.00 |
| 48-215 | Occupied | Jamyra Alexander | 2/12/2024 | 2 Bed/2 Bath | $2,250.00 |
| 48-216 | Occupied | Elliot Pollock | 6/1/2023 | 2 Bed/2 Bath | $2,200.00 |
| 48-217 | Occupied | Abdullatif Althbyany | 8/1/2024 | 2 Bed/2 Bath | $2,050.00 |
| 48-218 | Occupied | Gayane Genov | 7/1/2024 | 1 Bed/1 Bath | $1,725.00 |
| 48-219 | Occupied | Rhonda Heard | 10/1/2022 | 3 Bed/2 Bath | $2,150.00 |
| 48-220 | Occupied | Jessica Funai | 10/1/2022 | 2 Bed/2 Bath | $2,225.00 |
| 48-221 | Occupied | Seenivasan Somasundaram | 10/1/2022 | 2 Bed/2 Bath | $1,650.00 |
| 48-301 | Occupied | Travis Horrigan | 10/1/2022 | 2 Bed/2 Bath | $1,850.00 |
| 48-302 | Occupied | Suresh Kumar | 10/1/2022 | 2 Bed/2 Bath | $1,930.00 |
| 48-303 | Occupied | Liyu Han | 5/1/2025 | 3 Bed/2 Bath | $2,500.00 |
| 48-304 | Occupied | Kristin Michanczyk | 10/27/2023 | 4 Bed/2 Bath | $3,200.00 |
| 48-305 | Occupied | Konstantia Papapateras | 10/1/2022 | 2 Bed/2 Bath | $1,800.00 |
| 48-306 | Occupied | Elijah Rosenthal | 10/1/2022 | 1 Bed/1 Bath | $1,650.00 |
| 48-307 | Occupied | Max Rook | 10/1/2022 | 1 Bed/1 Bath | $2,050.00 |
| 48-308 | Occupied | Sahirah Muhammad | 10/1/2022 | 2 Bed/2 Bath | $1,950.00 |
| 48-309* | Occupied | Eric Throndson | 5/4/2023 | 2 Bed/2 Bath | $2,050.00 |
| 48-310 | Occupied | Amanda Nowak | 10/1/2022 | 1 Bed/1 Bath | $1,700.00 |
| 48-311 | Occupied | Davien Barnes | 4/1/2024 | 2 Bed/2 Bath | $2,200.00 |
| 48-312 | Occupied | Sheldon Schwartz | 10/1/2022 | 2 Bed/2 Bath | $1,975.00 |
| 48-313 | Occupied | Waseem Islam | 6/1/2023 | 2 Bed/2 Bath | $2,075.00 |
| 48-314 | Occupied | Jeffrey Sherman | 10/1/2022 | 2 Bed/2 Bath | $1,850.00 |
| 48-315* | Occupied | Karen Bissett | 2/1/2023 | 2 Bed/2 Bath | $2,000.00 |
| 48-316 | Occupied | Tania Pimentel | 12/1/2024 | 2 Bed/2 Bath | $2,050.00 |
| 48-317 | Occupied | Michael Lauretti | 10/1/2022 | 1 Bed/1 Bath | $1,600.00 |
| 48-318 | Occupied | Jonathan Garza, Summer Garza | 10/1/2022 | 3 Bed/2 Bath | $2,320.00 |
| 48-319 | Occupied | Meaghan Engel, Christopher Cassis | 10/1/2022 | 2 Bed/2 Bath | $2,350.00 |
| 48-320 | Occupied | Bernie Hernandez, Rachel Hernande: | 4/28/2023 | 2 Bed/2 Bath | $2,150.00 |
| | | | | | **$389,646.00** |

## EXHIBIT "C"

## ASSIGNMENT OF LEASES AND SECURITY DEPOSITS

THIS ASSIGNMENT OF LEASES AND SECURITY DEPOSITS (this "Assignment") is made on _____, 20__, by and between _____, a _____ ("Assignor"), having an office at _____ and _____, a _____ ("Assignee"), having an office at _____.

FOR AND IN CONSIDERATION of the sum of Ten and 00/100 ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Assignor does hereby sell, assign, transfer and set over unto Assignee all of Assignor's right, title and interest as landlord in and to: (i) all written leases, licenses, concessions and other forms of agreement for occupancy of all or any portion of the buildings located on the land described on Schedule 1 annexed hereto and made a part hereof or of any portion of such land, and all renewals, modifications, amendments, guaranties, other security and other agreements affecting the same (collectively, the "Leases"), as more particularly set forth on Schedule 2 attached hereto and incorporated herein by reference; and (ii) all security deposits, prepaid rentals (if any) and other deposits, together in each case with all interest accrued thereon which is payable to tenants or occupants under Leases, paid or deposited by tenants or occupants under the Leases as set forth on Schedule 2, receipt of which hereby is acknowledged by Assignee (the items described in clauses (i) and (ii) above, collectively, the "Assigned Interest").

TO HAVE AND TO HOLD the Assigned Interest unto Assignee, its successors and assigns, forever.

Assignee accepts the foregoing assignment and assumes and shall pay, perform and discharge, as and when due, all of the agreements and obligations of Assignor under the Leases from and after the date hereof and agrees to be bound by all of the terms and conditions of the Leases, and Assignee further agrees that, as between Assignor and Assignee, Assignee shall be responsible for any brokerage commissions, fees or payments which may be due or payable hereafter or in connection with any extension or renewal of the term of any Lease or the expansion of the premises demised thereunder.

Assignee shall indemnify, protect, defend and hold Assignor harmless from and against any and all claims, demands, liabilities, losses, costs, damages or expenses (including, reasonable attorneys' fees and costs) arising out of or resulting from Assignee's acts or omissions under the terms of the Leases or any brokerage agreement arising on or after the date hereof, asserted by any tenant, broker or any person or persons claiming under any of them with respect to any such Leases or agreement, including the enforcement hereof.

This Assignment is made without any warranty or representation by, or recourse, against Assignor of any kind whatsoever except and to the extent expressly set forth in the Agreement of Sale, dated _____, 20___, between Assignor and Assignee.

The obligations of Assignor are intended to be binding only on the property of Assignor and shall not be personally binding upon, nor shall any resort be had to, the private properties of any of its trustees, officers, beneficiaries, directors, members, partners or shareholders, or the

C-1

1   general partners, officers, directors, members, or shareholders thereof, or any employees or agents
2   of Assignor.

3       To facilitate execution, this Assignment of Leases may be executed in as many counterparts
4   as may be required.  It shall not be necessary that the signatures on behalf of all parties appear on
5   each counterpart hereof.  All counterparts hereof shall collectively constitute a single agreement,
6   at such time as each party has executed and delivered a copy hereof to the other.

7       **IN WITNESS WHEREOF,** this Assignment of Leases has been executed and delivered
8   by duly authorized persons of Assignor and Assignee as of the _____ day of
9   _____, 20__.

10                                          ASSIGNOR:
11
12                                          _____,
13                                          a _____
14
15
16                                          By:_____
17                                          Name:
18                                          Title:

19                                          ASSIGNEE:
20
21                                          _____,
22                                          a _____
23
24
25                                          By:_____
26                                          Name:
27                                          Title:

28

C-2

ACKNOWLEDGEMENTS TO
ASSIGNMENT OF LEASES AND SECURITY DEPOSITS

STATE OF _____ )
                         : ss.:
COUNTY OF _____ )

       On this ____ day of _____, 20__, before me, the undersigned officer, personally appeared _____, who, I am satisfied, are the individuals named in the foregoing instrument as the authorized signatory of _____ and, on behalf of _____ did acknowledge that they signed, sealed and delivered the foregoing instrument as their voluntary act and deed and as the voluntary act and deed of said _____, for the purposes therein contained.

       WITNESS my hand and Notarial seal this ____ day of _____, 20__.

                                  _____
                                  Notary Public

STATE OF _____ )
                         : ss.:
COUNTY OF _____ )

       On this ____ day of _____, 20__, before me, the undersigned officer, personally appeared _____, who, I am satisfied, are the individuals named in the foregoing instrument as the authorized signatory of _____ and, on behalf of _____ did acknowledge that they signed, sealed and delivered the foregoing instrument as their voluntary act and deed and as the voluntary act and deed of said _____, for the purposes therein contained.

       WITNESS my hand and Notarial seal this ____ day of _____, 20__.

                                  _____
                                  Notary Public

C-3

1                              <u>SCHEDULE 1</u>
2                    To Assignment Of Leases and Security Deposits

3

1
2

<u>SCHEDULE 2</u>

To Assignment Of Leases and Security Deposits

58464/0003-43382861v5

1          **EXHIBIT "D"**

2          **BILL OF SALE**

3          KNOW ALL PERSONS BY THESE PRESENTS that on this ___ day of
4  _____ 20__, the undersigned, _____, a _____,
5  located at _____ ("Seller"), pursuant to the terms of that certain
6  Purchase and Sale Agreement, dated _____ (the "Agreement") between Seller and
7  _____, a _____, located at _____
8  ("Purchaser"), and in consideration for the Purchase Price set forth in the Agreement and other
9  good and valuable consideration all as more particularly set forth in the Agreement, the receipt
10 and sufficiency of which hereby are acknowledged, concurrently with the execution of this Bill of
11 Sale, has conveyed to Purchaser fee title in and to the property set forth on Exhibit A (the "Real
12 Property") and hereby sells, assigns, transfers, conveys and delivers unto Purchaser absolutely,
13 free and clear of any and all liens, encumbrances or security interests, all of Seller's right, title,
14 and interest in and to all fixtures, equipment and other articles of personal property attached to or
15 used in the operation of the Real Property, and any replacements or substitutions therefor (all such
16 fixtures, articles and personal property hereinafter being collectively referred to as the "Personal
17 Property").

18         TO HAVE AND TO HOLD the same unto said Purchaser, its successors and assigns,
19 forever.

20         Purchaser acknowledges and agrees that, except as expressly provided in, and subject to
21 the limitations contained in, the Purchase Agreement, Seller has not made, does not make and
22 specifically disclaims any representations, warranties, promises, covenants, agreements or
23 guaranties of any kind or character whatsoever, whether express or implied, oral or written, past,
24 present or future, of, as to, concerning or with respect to (a) the nature, quality or conditions of the
25 personal property, (b) the income to be derived from the Personal Property, (c) the suitability of
26 the personal property for any and all activities and uses which Assignee may conduct thereon, (d)
27 the compliance of or by the personal property or its operation with any laws, rules, ordinances or
28 regulations of any applicable governmental authority or body, (e) the quality, habitability,
29 merchantability or fitness for a particular purpose of any of the Personal Property, or (f) any other
30 matter with respect to the Personal Property.  Purchaser further acknowledges and agrees that,
31 having been given the opportunity to inspect the Personal Property, Purchaser is relying solely on
32 its own investigation of the Personal Property and not on any information provided or to be
33 provided by Assignor, except as specifically provided in the Purchase Agreement.  Purchaser
34 further acknowledges and agrees that (a) any information provided or to be provided with respect
35 to the Personal Property was obtained from a variety of sources and that Seller has not made any
36 independent investigation or verification of such information; and (b) the sale of the Personal
37 Property as provided for herein is made on an "as is, where is" condition and basis "with all faults,"
38 except as specifically provided in, and subject to the limitations contained in, the Purchase
39 Agreement.

40         The obligations of Seller are intended to be binding only on the property of Seller and shall
41 not be personally binding upon, nor shall any resort be had to, the private properties of any of its
42 trustees, officers, beneficiaries, directors, members, partners or shareholders, or the general

D-1

1   partners, officers, directors, members, or shareholders thereof, or any employees or agents of
2   Seller.

3         Seller hereby agrees to execute and deliver such further instruments of conveyance, transfer
4   and assignment reasonably acceptable to Purchaser, and to take such other and further action
5   without further consideration, as Purchaser reasonably may request, to evidence conveyance,
6   transfer and assignment of the Personal Property conveyed hereunder, and to assist Purchaser in
7   exercising all rights with regard thereto.

8         This Bill of Sale shall be binding upon the successors and assigns of Seller and shall inure
9   to the benefit of the successors and assigns of Purchaser.

10        **IN WITNESS WHEREOF,** Seller has caused this Bill of Sale to be executed and
11  delivered by duly authorized persons as of the date set forth above.

12                                          _____,
13                                          a _____
14
15
16                                          By:_____
17                                          Name:
18                                          Title:

19

D-2

**EXHIBIT "E"**

**ASSIGNMENT OF CONTRACTS AND INTANGIBLE PROPERTY**

     **THIS ASSIGNMENT OF CONTRACTS AND INTANGIBLE PROPERTY** (this "Assignment"), dated as of the _____ day of _____, 20__, between _____, a _____, having an office at _____ ("Assignor"), and _____, a _____, having an office at _____ ("Assignee").

**RECITALS:**

     Assignor, as seller, and _____ ("Assignee"), as purchaser, have entered into an [Purchase and Sale Agreement], dated _____ (the "Purchase and Sale Agreement"), whereby Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, certain real property with improvements known as _____ located in _____, _____ County, _____, and more fully described in Exhibit A, attached hereto (the "Property").

     NOW, THEREFORE, in consideration of the Purchase and Sale Agreement and other good and valuable consideration, the receipt and sufficiency or which hereby are acknowledged, Assignor and Assignee, intending to be legally bound hereby, hereby agree as follows:

     1.    **Assignment**.  Assignor hereby assigns and transfers unto Assignee, and its successors and assigns, all of Assignor's right, title and interest, if any, in and to:

     A.    all of Assignor's right, title and interest under certain maintenance, service and other contracts related to the operation of the Property which are listed on Exhibit B attached hereto and made a part hereof (collectively, the "Contracts").

     B.    all unexpired warranties and guaranties in favor of Assignor in effect as of the date hereof with respect to any part of the Property and/or any mechanical equipment on the Property to the extent assignable (except those warranties obtained directly by any tenant of the Property), if any;

     C.    all licenses and permits relating to the use, occupancy and operation of the Property to the extent assignable, if any; and

     2.    **Representations**.  This Assignment is made without any warranty or representation by, or recourse, against Assignor of any kind whatsoever except and to the extent expressly set forth herein and in the Purchase and Sale Agreement, to the extent applicable and subject to any limitations thereon as provided in the Purchase and Sale Agreement, which are hereby incorporated by reference.

     3.    **Further Acts**.  Assignor and Assignee agree to perform, execute and/or deliver or cause to be performed, executed and/or delivered any and all further acts, assurances and

F-1

documents as Assignee reasonably may require to perfect Assignee's interest in the property and rights assigned hereby.

4.    **Governing Law**.  This Assignment and all other instruments referred to herein shall be governed by, and shall be construed in accordance with, the substantive laws of the State of Connecticut and Title 11 of the United States Code (the "Bankruptcy Code").

5.    **Successors and Assigns**.  This Assignment and the terms and provisions hereof shall inure to the benefit of, and shall be binding upon Assignor and Assignee and their respective successors and assigns.

6.    **Limited Liability**.  The obligations of Assignor are intended to be binding only on the property of Assignor and shall not be personally binding upon, nor shall any resort be had to, the private properties of any of its trustees, officers, beneficiaries, directors, members, partners or shareholders, or the general partners, officers, directors, members, or shareholders thereof, or any employees or agents of Assignor.

7.    **Counterparts**.  To facilitate execution, this Assignment may be executed in as many counterparts as may be required. It shall not be necessary that the signatures on behalf of all parties appear on each counterpart hereof.  All counterparts hereof shall collectively constitute a single agreement at such time as each party has executed and delivered a copy thereof to the other.

**IN WITNESS WHEREOF,** Assignor and Assignee have caused this Assignment to be executed and delivered on its behalf by a duly authorized person as of the date first above written.

ASSIGNOR:

_____,
a _____

By:_____
Name:
Title:

ASSIGNEE:

_____,
a _____

By:_____
Name:
Title:

F-2

EXHIBIT A

DESCRIPTION OF THE REAL ESTATE

All that certain real property, situated in the Town of Avon, County of Hartford and State of Connecticut, being part of a Condominium known as AVON PLACE CONDOMINIUM and designated as Unit Nos. 101A, 102A, 103A, 104A, 105A, 106A, 107A, 108A, 109A, 110A, 111A, 112A, 113A, 114A, 115A, 116A, 117A, 118A, 119A, 120A, 121A, 202A, 203A, 204A, 205A, 206A, 207A, 208A, 209A, 210A, 211A, 212A, 213A, 214A, 215A, 216A, 217A, 218A, 219A, 220A, 221A, 301A, 302A, 303A, 304A, 305A, 306A, 307A, 308A, 309A, 310A, 311A, 312A, 313A, 314A, 315A, 316A, 317A, 318A, 319A, 320A, 101B, 102B, 103B, 104B, 105B, 106B, 107B, 108B, 109B, 110B, 111B, 112B, 113B, 114B, 115B, 116B, 117B, 118B, 119B, 120B, 121B, 201B, 202B, 203B, 204B, 205B, 206B, 207B, 208B, 209B, 210B, 211B, 212B, 213B, 214B, 215B, 216B, 217B, 218B, 219B, 220B, 221B, 301B, 302B, 303B, 304B, 305B, 306B, 307B, 308B, 309B, 310B, 311B, 312B, 313B, 314B, 315B, 316B, 317B, 318B, 319B, 320B, 101C, 102C, 103C, 104C, 105C, 106C, 107C, 108C, 109C, 110C, 111C, 112C, 113C, 114C, 115C, 116C, 117C, 118C, 119C, 120C, 121C, 201C, 202C, 204C, 205C, 206C, 207C, 208C, 209C, 210C, 211C, 212C, 213C, 214C, 215C, 216C, 217C, 218C, 219C, 220C, 221C, 301C, 303C, 304C, 305C, 306C, 307C, 308C, 309C, 310C, 311C, 313C, 314C, 316C, 317C, 318C, 319C, 320C, 101D and 102D.

TOGETHER WITH all appurtenances thereto, being more particularly set forth and described in a Declaration of Condominium dated November 12, 1979 and recorded in Volume 115 at Page 505; as amended by Amendment dated April 19, 1989 and recorded in Volume 221 at Page 144; as further amended by Amendment dated October 22, 1992 and recorded in Volume 267 at Page 726; as further amended by Amendment dated October 13, 1994 and recorded in Volume 301 at Page 446, all of the Avon Land Records.

Said Units are shown on a map entitled "Property of Arnold C. Greenberg, Trustee Waterville Road also known as Connecticut Route #10 Avon, Connecticut Scale 1" = 100' January 1974 Office of Sanderson and Washburn Simsbury, Connecticut" which map is on file in the Town Clerk's Office in Avon.

Said Units are also shown on a certain map entitled "Avonplace Associates Limited Partnership (A Connecticut Limited Parternship) Waterville Road – Conn. Route #10 Avon, Connecticut Scale 1" = 100' October 1992 Office of Sanderson and Washburn Simsbury, Connecticut", which map is on file in the Town Clerk's Office of Avon.

**END OF LEGAL DESCRIPTION**

1                                             <u>EXHIBIT B</u>

2        List of contracts**NONE**

1

**<u>EXHIBIT "F"</u>**

2

**<u>Tenant Notices</u>**

3

58464/0003-43382861v5

**EXHIBIT "G"**

**Permitted Exceptions, all provided same do not render title uninsurable**

1.      Building restrictions and zoning regulations and ordinances and amendments and additions thereto adopted by any governmental authority having or asserting jurisdiction thereover, affecting the Property at the date hereof.

2.      Any easement or right of use created in favor of any public utility corporation for electricity, steam, gas, telephone or other service in any street or avenue abutting the Property and the right of said utility companies to use and maintain cables, terminal boxes, lines, service connections, poles, mains and other facilities in, upon and across the Property, all provided same are of record.

3.      Covenants, restrictions, agreements and easements of record, affecting the Property.

4.      Any state of facts as an accurate survey may show, provided the same do not render title unmarketable.

5.      Taxes not yet due and payable.

6.      Existing leases.

7.      Any other matter disclosed by Purchaser's title commitment and not objected to by Purchaser.

8.      Applicable provisions of the Agreement of Sale.

9.      Any rights of the Condominium, the Declaration or any related rights.

10.     Littoral and riparian rights of others in and to the waters of the Farmington River.

11.     Restrictions as set forth in a Warranty Deed dated June 22, 1971 and recorded in Volume 71 at Page 602 of the Avon Land Records.

12.     Easement in favor of The Avon Water Company dated April 16, 1974 and recorded April 2, 1976 in Volume 92 at Page 42 of the Avon Land Records.

13.     Terms and provisions set forth in an Agreement by and between The Avon Water Company and Arnold Greenberg, Trustee dated April 16, 1974 and recorded April 6, 1981 in Volume 123 at Page 86 of the Avon Land Record.

14.     Easement in favor of The Avon Water Company dated April 16, 1974 and recorded in Volume 123 at Page 102 of the Avon Land Records.

15.     Easement for water Pipe line to the Avon Water Company dated October 2, 1979 and recorded in Volume 123 at Page 739 of the Avon Land Records.

G-1

16.    Easement in favor of The Avon Water Company dated October 2, 1979 and recorded in Volume 123 at Page 743 of the Avon Land Records.

17.    Easement in favor of Connecticut Natural Gas Corporation dated August 24, 1983 and recorded August 30, 1983 in Volume 139 at Page 751 of the Avon Land Records.

18.    Termination of Special Declarant Rights and Development Rights as set forth in deed dated October 22, 1992 recorded in Volume 267 at Page 735 of the Avon Land Records

19.    Stipulation of Judgment by and between Avon Place Associates Limited Partnership and the Town of Avon dated February 19, 1993 and recorded February 13, 1996 in Volume 315 at Page 1045 of the Avon Land Records.

20.    Terms and provisions set forth in a Letter Agreement by and among The Avon Water Company, Avon Place Associates, L.L.C. and Avon Place Condominium Association, Inc. dated April 24, 2003 and recorded in Volume 462 at Page 1101 of the Avon Land Records.

21.    Easement in favor of The Avon Water Company dated August 25, 2003 and recorded in Volume 479 at Page 6 of the Avon Land Records

22.    Easement in favor of The Avon Water Company dated August 25, 2003 and recorded in Volume 479 at Page 18 of the Avon Land Records

23.    Indemnification, covenants, conditions and restrictions as set forth in Warranty Deed dated December 20, 2012 and recorded in Volume 653 at Page 211 of the Avon Land Records.

24.    Sewer Permit Agreement dated April 22, 2013 and recorded in Volume 660 at Page 261 of the Avon Land Records.

25.    Sanitary Sewer Easement in favor of the Town of Avon dated February 17, 2016 and recorded in Volume 696 at Page 393 of the Avon Land Records

26.    Declaration of Avon Place Condominium dated November 12, 1979 and recorded in Volume 115 at Page 505; as amended by Amendment dated April 19, 1989 and recorded in Volume 221 at Page 144; as further amended by Amendment dated October 22, 1992 and recorded in Volume 267 at Page 726; as further amended by Amendment dated October 13, 1994 and recorded in Volume 301 at Page 446, as further amended by Amendment dated February 1, 2019 and recorded in Volume 726 at Page 469, all the Avon Land Records (including any matters set forth therein).

27. The Stipulated Court Judgment which shall be entered into and approved by the Hartford Superior Court relating to the maintenance of Avonwood Road.

58464/0003-43382861v5

**EXHIBIT "H"**

**Contract List**

NONE

H-2

## EXHIBIT "I"

## ESCROW AGREEMENT

On this _____ day of July, 2025, _____ ("Escrow Agent"), Avon Place, LLC ("Seller"), and _____ ("Buyer") agree that the agreement (the "Agreement") dated July __, 2025 between the Seller and the Buyer pertaining to one hundred eighty eight (188) condominium units in the condominium commonly known as the "Avon Place Apartments" (the "Condominium") and located in the Town of Avon, County of Hartford, Stated of Connecticut, Connecticut, are modified as follows:

1.      Escrow Agent shall hold and dispose of the escrowed funds and/or documents (the "Deposit") in accordance with the terms and provisions of the Agreement and the terms of that certain Agreement of Sale by and between Seller and Purchaser dated of even date herewith (the "PSA").

2.      We, the undersigned, do hereby jointly and severally agree that Escrow Agent shall incur no liability whatsoever in connection with its good faith performance under The Agreement, and do hereby jointly and severally release and waive any claims we may have against Escrow Agent, which may result from its performance in good faith of its function as Escrow Agent, including but not limited to, a delay in the transfer of funds.  Escrow Agent shall be liable only for the loss or damage caused directly by its acts of gross negligence or willful misconduct while performing as Escrow Agent under this Escrow Agreement.

3.      Escrow Agent shall be entitled to rely upon the authenticity of any signature and upon the genuineness and validity of any writing (including writings received by facsimile or electronic mail) received by Escrow Agent relating to this Escrow Agreement.  Escrow Agent may rely upon any oral identification of a party notifying Escrow Agent orally as to matters relating to this Agreement if such oral notification is permitted thereunder.  Escrow Agent is not responsible for the nature, content, validity or enforceability of any of the escrow documents.

4.      If Escrow Agent receives a request for the Deposit signed by Seller stating that Buyer has defaulted in the performance of its obligations under this Agreement, Escrow Agent shall submit (in the manner set forth in Paragraph 16 of the PSA) a copy of such request to Buyer.  If Escrow Agent shall not have received notice of objection from Buyer within five (5) business days after Escrow Agent has forwarded such request, Escrow Agent shall deliver the Deposit to Seller.  If Escrow Agent shall receive a timely notice of objection from Buyer as aforesaid, Escrow Agent promptly shall submit a copy thereof to Seller.

5.      If Escrow Agent receives a request signed by Buyer stating that this Agreement has been canceled or terminated, or that Seller has defaulted in the performance of its obligations hereunder, and that Buyer is entitled to the Deposit, Escrow Agent shall submit (in the manner set forth in Paragraph 16 of the PSA) a copy of such request to Seller.  If Escrow Agent shall not have received notice of objection from Seller within five (5) business days after Escrow Agent has forwarded such request, Escrow Agent shall deliver the Deposit to Buyer.  If Escrow Agent shall receive a timely notice of objection from Seller as aforesaid, Escrow Agent promptly shall submit a copy thereof to Buyer.

6.       If there is a disagreement between Buyer and Seller, or if in Escrow Agent's judgment the Agreement is unclear, Escrow Agent may refuse to comply with the parties' claims or demands.  In so refusing Escrow Agent shall make no delivery or other disposition of the Deposit, shall be liable to no one for such refusal, and shall be entitled to continue to refrain from acting until (i) the rights of the adverse claimants have been finally adjudicated in a court of competent jurisdiction, or (ii) Buyer and Seller have notified Escrow Agent in writing that they have come to an agreement.

7.       Escrow Agent may, at its sole discretion, resign by giving (30) days written notice hereof to the parties hereto.  The parties shall furnish to Escrow Agent written instructions for the release of the Deposit.  If Escrow Agent shall not have received such written instructions within the thirty (30) days, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor Escrow Agent and upon such appointment deliver the Deposit to such successor.  Costs and fees incurred by Escrow Agent may, at the option of Escrow Agent, be deducted from any funds held pursuant hereto.

8.       None of the provisions of this agreement shall prohibit Escrow Agent from bringing an interpleader action or from exercising any rights that might be afforded by statutory or common law to resolve any disagreements, uncertainties, conflicts or disputes as to the administration by Escrow Agent of its duties and obligations hereunder.

9.       The parties hereto do hereby agree that they are aware that the Federal Deposit Insurance Corporation (FDIC) coverage applies only to a maximum amount of $250,000 for each individual depositor and that they are aware that Escrow Agent assumes no responsibility for, nor will they hold Escrow Agent liable for any loss occurring which arises from the fact that the amount held by Escrow Agent in any account may cause the aggregate amount of any individual depositor's accounts to exceed $250,000 and that the excess amount is not insured by the FDIC.

10.      If the Deposit is to be invested, then the following shall apply:

Escrow Agent is authorized and directed to open an interest bearing account in the name of _____ by Escrow Agent as escrow agent at First American Trust, Santa Ana, California in the amount of the Deposit.  Interest from this investment shall be divided pursuant to the Agreement.  All interest will accrue and be reported to the Internal Revenue Service for the following account:

Name:       _____
Address:    _____
Phone:      _____
Tax ID#:    _____

A completed Form W-9 for taxpayer is attached hereto **(Escrow Agent is unable to open the interest bearing account until in receipt of such form).**

H-4

11.    The terms hereof shall not be modified or amended except by a writing signed by the Escrow Agent, Seller and Buyer.  If there is any conflict between the terms of the Agreement and this Addendum, then the terms of this Addendum shall prevail.  This Addendum shall be construed, enforced and governed in accordance with the internal laws of the State of Connecticut, without regard to principles of conflicts of laws, and shall be interpreted without regard to any presumption or other rule requiring construction against the party which drafted an agreement.  This Addendum may be executed in one or more counterparts, each of which shall be deemed to be one and the same agreement.

Dated this _____ day of _____, 2025.

SELLER:

AVON PLACE LLC

By:_____
Name:Ahron Rudich, Member


PURCHASER:
UP REALTY LLC


_____
Gershon Eichorn, Member


_____**Title Insurance Company**


By: _____
Name:
Its:

H-5

58464/0003-43382861v5

**EXHIBIT J**

SCHEDULE OF LIGHTLY DAMAGED UNITS

117
118
119
219
316
317
318

H-6

Exhibit K

Items for Purchaser Financing

# Addendum to LOI

As this transaction is non contingent it is understood that the Buyer will not have a due diligence period in which to gather and review information related to the property.

While this transaction is not contingent upon financing, Buyer intends to place debt financing on the properties. It is therefore required that the Seller provide reasonable access to the property for lender inspections and provide reasonable property financial information. The following is a list of items to the extent they are available to include but not be limited to;

Buyer is willing to go into a hard contract, However, The 60 DAYS countdown will not start until all this these items are provided (as our lender needs 60 days, and won't process until we provide all the Items).

o    Existing contract to the 3 units that are no owned yet and will be closed.

o    Profit and loss statements for three previous years printed by month.

o    Trailing 12-month profit and loss statement printed by month
   *(For P&L's please remove or note any non-property specific charges such as home office expenses charged to properties and please note any one time or non reoccurring expenses. Please note any non ordinary expenses as well, as all this affects our mortgage proceeds)*

o    Current detailed rent roll, showing any Gov Subsidized rents, lease begin and end dates, move in date.

o    Copies of ALL of leases and a blank sample lease.

o    Size of each unit/unit type.

o    Aged tenant receivables.

o    List of all Service contracts.

o    List of any Income Producing contracts.

o    Current Insurance policies and 5 year loss runs.

o    List of Significant Upgrades to the property since 2005

o    Site survey if available.

o    Certificated of occupancy from development if available, and any that were issues since then.

o    Past environmental reports & Past reports of any OIL tank tightness test and report above and below ground tanks, and.

o    If property has or has had a septic system in the past:
   Septic reports past 3 years. location map of leeching fields

o    Any third party reports you may have such as environmental and engineering.

o    Most recent Termite Inspection Report.

Exhibit L
List of 13 Down/Gutted Units

| | | |
|---|---|---|
| 44-115C | Gutted unit | 2 Bed/2 Bath |
| 44-116C | Gutted unit | 2 Bed/2 Bath |
| 44-120C | Gutted unit | 2 Bed/2 Bath |
| 44-121C | Gutted unit | 2 Bed/2 Bath |
| 44-215C | Gutted unit | 2 Bed/2 Bath |
| 44-216C | Gutted unit | 2 Bed/2 Bath |
| 44-217C | Gutted unit | 2 Bed/2 Bath |
| 44-218C | Gutted unit | 1 Bed/1.5 Bath |
| 44-220C | Gutted unit | 2 Bed/2 Bath |
| 44-221C | Gutted unit | 2 Bed/2 Bath |
| 44-314 C | Gutted unit | 2 Bed/2 Bath |
| 44-319C | Gutted unit | 2 Bed/2 Bath |
| 44-320C | Gutted unit | 2 Bed/2 Bath |

H-8

Exhibit B

[google.com]

[google.com]

[google.com]

500 Post Road East [google.com]

[google.com]

[google.com]

[google.com]

2nd Floor [google.com]

[google.com]

[google.com]

[google.com]

Westport, CT 06880 [google.com]

[google.com]

[google.com]

**Office: [google.com]** (203 [google.com]) 489-5969

**Mobile:** (203) 274-4102

**Fax:** (203) 441-7904

On Wed, Sep 11, 2024 at 4:54 PM Chivily, Christine <cchivily@mybankwell.com> wrote:

Kyle,

Hate to be a nudge, but we need to get back to the borrower about whether we're willing to give a short term forbearance so if you're not interested or your timing is different than we had discussed, please let me know.

AVON_PLACE_001445