Steven J. Mandelsberg, Esq.
Joseph Orbach, Esq.
**THOMPSON COBURN LLP**
488 Madison Avenue
New York, New York 10022
Telephone:    (212) 478-7200
E-mail:        smandelsberg@thompsoncoburn.com
               jorbach@thompsoncoburn.com

*Attorneys for Secured Creditor 44 Avonwood Road Credit LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:

AVON PLACE LLC,

                        Debtor.
------------------------------------------------------------X

Chapter 11

Case No. 25-41368 (JMM)

### SECURED CREDITOR 44 AVONWOOD ROAD CREDIT LLC'S OMNIBUS (I) RESPONSE TO DEBTOR'S OBJECTION TO CLAIM NUMBER 10 AND (II) SUPPLEMENT TO LIMITED OBJECTION TO PLAN

In accordance with the Court's *Pretrial Scheduling Order* [Docket No. 102] and the July 16, 2025 Status Conference, Secured Creditor 44 Avonwood Road Credit LLC (the "Secured Creditor" or "Avonwood Credit") hereby files this omnibus response ("Omnibus Response") to the Debtor's *Reply To Objection To Motion To Reduce Claim And To Plan Confirmation Objection* (the "Reply") [Docket No. 108, filed at 9:36 pm on Saturday, August 9, 2025] to augment Avonwood Credit's *Response* [Docket No. 90] (the "Response") to the *Objection to Claim 10 of Avonwood Credit* [Docket No. 72] (the "Claim Objection") filed by Avon Place LLC (the "Debtor") and supplement to Avonwood Credit's *Limited Objection* (the "Plan Objection") [Docket No. 93] to the Amended Plan (the "Plan") [Docket No. 77], and respectfully

represents as follows:[1]

## I.      SUMMARY OF OMNIBUS RESPONSE

A.      **Debtor's Key Factual Concessions**
B.      **Debtor's Unexcused and Unjustified Discovery Failures**
C.      **Secured Creditor's Rights to Enforce Debtor's Tax Payment Defaults**
D.      **Debtor's Payment Default was Self-Manufactured and Not Caused by the Secured Creditor**
E.      **No Authority Supports Permitting a Solvent Debtor to Avoid Paying Default Interest**
F.      **Applicable Connecticut Foreclosure Law Authorizes Secured Creditor's Enforcement of Loan Documents**
G.      **Secured Creditor's Rights to Enforce Debtor's Loan Payment Defaults**
H.      **No Equitable Considerations Justify Denial of Secured Creditor's Claim for Post-Petition Default Interest**
I.      **Other Noteworthy Discrepancies in Debtor's Reply**
J.      **Amounts Due to Secured Creditor as of Effective Date**

## II.      THE CRITICAL FLAWS IN DEBTOR'S SUBMISSIONS

1.      Although Secured Creditor's Response to the Objection and Plan Objection addressed many topics, we focus here upon (a) arguments raised for the first time by the Debtor in its Reply; (b) issues raised by the Court at the last status conference in this case on July 16, 2025; and (c) documents and deposition testimony since the Court's entry of its *Pretrial Scheduling Order,* and expressly incorporate by reference all prior arguments raised.

2.      Reduced to their essentials, the Debtor's Claim Objection and Reply would have this Court disregard clear and unequivocal provisions of admittedly signed and enforceable Loan Documents, as well as applicable Connecticut law, and instead decline to enforce those provisions based upon arguments supported by no evidence whatsoever.  These arguments squarely rest upon two theories:

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms as in the Response or Limited Objection, as applicable.

(a) that written notice, sent by a supposedly exclusive "mail-only" method with a thirty day opportunity to cure, was required before any declaration of any default for failure to pay property taxes –monetary amounts over ten months, or for failure to make principal and interest Loan payments, or the institution of foreclosure or other proceedings, and

(b) that application of a $474,000 fire-damage insurance remittance towards payment of pre-petition default interest rather than towards payment of Loan principal and interest was improper.

3.      The fatal problems with these theories, as detailed in the Response and below, are that the Loan Documents clearly authorize default interest upon the Debtor's now-acknowledged failure to timely pay their real estate taxes; the Loan Documents clearly spell out how the Insurance Proceeds were to be applied; and Avonwood Credit applied them exactly as set forth in the Loan Documents.  And, as summarized below, because the Debtor's pre- and post-petition actions have placed Avonwood Credit at heightened risk throughout this case, it is entitled to post-petition interest at the contracted for default rate.

4.      Perhaps recognizing the futility of their arguments based on the undisputed factual record, the Reply focuses upon purported equitable reasons that Avonwood Credit should not be paid all that it is entitled to under the Loan Documents.  This position basically asks this Court to ignore decades of precedent and practice, break with sister courts in this and neighboring districts, and adopt the rationale of a Ninth Circuit dissent despite the Second Circuit's recognition of the majority opinion in that very case.  The Debtor's desperate attempt also overlooks the fact that, assuming the Debtor can consummate the undated Agreement of Sale attached to the Reply, the Debtor is solvent, and no Court has disallowed default interest

due to a secured creditor for a payment default when the Debtor is solvent.

5.      In sum, despite multiple admitted breaches under the Loan Documents, and multiple failures to abide by the bankruptcy rules and disclosure requirements (including the unexcused and unjustified failure to produce even a single e-mail in response to Avonwood Credit's discovery requests and the Court's *Pretrial Scheduling Order*), the Debtor asks the Court to show it mercy because it made poor financial decisions and does not want to live with the consequences. But because the Bankruptcy Code contains specific protections for secured creditors, there simply is no authority to turn back the clock and undo the intentional defaults absent payment of what is required under the Loan Documents.

### III.     <u>OMNIBUS RESPONSE</u>

**A.     Debtor's Key Factual Concessions**

6.      As of the date of this Omnibus Response, the Debtor has conceded these important material facts:

(a) the Debtor did not pay the July 1, 2024 installments due on the Notes or make any other monthly payments due under the Notes. Reply, ¶¶18, 46.

(b) it received October 24, 2023 and April 24, 2024 emails from Bankwell advising of the Debtor's failure to make tax payments. Reply, ¶40.

(c) its failure to pay taxes for ten months was a default (although contending that the default was "cured"). Reply, ¶40.

(d) the Debtor was in "payment default". Reply, ¶47.

(e) the Debtor obtained a $3 million subordinate loan from Altbanq without consent of Bankwell, constituting a technical default under the Loan Documents. Reply, ¶96.

(f) The Debtor kept its security deposits at a bank other than Bankwell constituting a technical default under the Loan Documents. Reply, ¶96.

### B.    Debtor's Unexcused and Unjustified Discovery Failures

7.    Even though it received the Discovery Requests in early May, and even though the Court's July *Pretrial Discovery Order* required the complete production of documents, the Debtor has inexcusably failed to produce specifically requested, clearly relevant documents. This failure necessitated counsel's July 31, 2025 letter to the Court [Docket No. 106] about the Debtor's discovery lapses.   The Debtor never responded to this letter, but those still-uncured failures are summarized below:

(a)    The Debtor failed to produce any documentation "concerning the valuation, value or salability of the Property, including, but not limited to, any appraisals, offer letters, letters of intent, indications or expressions of interest, commitment letters, contracts and/or proposals to purchase or refinance the Property" other than the Sale Contract attached as Exhibit B to the Reply.

(b)    The Debtor produced a single spreadsheet (which its principal could not interpret as detailed below) in response to a request for "Documents concerning all insurance claims made on account of or related to the Fire, including information regarding any insurance proceeds received in connection with such claims, the date such insurance proceeds were received, and where such proceeds were deposited."

(c)    The Debtor did not produce documentation showing where the net Altbanq loan proceeds were received.

(d)    The Debtor did not produce its Buildium (software that manages and processes tenant payments) data as requested.

(e)    The Debtor did not identify any account holding tenant security deposits.

(f)    The Debtor did not produce check or deposit images for the Debtor's bank statements.

(g)    The Debtor did not produce a **<u>single</u>** email in response to **<u>any</u>** of the Discovery Requests.

**C.**     **Secured Creditor's Rights to Enforce Debtor's Tax Payment Defaults**

8.     The Mortgages imposed tax-related obligations upon the Debtor in no fewer than three ways:

>   (a) they required the Debtor to pay "before the same shall become delinquent, all taxes, assessments, sewer rents, water rates, and other charges" levied against the Property.  Tr. Ex. 3,[2]  §1.3; Tr. Ex. 4, §1.3;
>
>   (b) they provided that the Debtor "upon the request of the Mortgagee, Mortgagor shall exhibit to Mortgagee receipts for the payments of all Impositions prior to the date when the same shall become delinquent." Tr. Ex. 3, §1.3; Tr. Ex. 4, §1.3; **and**
>
>   (c) they required the debtor to "immediately give notice to Mortgagee of any material default under the terms of any Financing Agreements". Tr. Ex. 3, §5.1(c)(i); Tr. Ex. 4, §5.1(c)(i).

9.     As a result, the Debtor was obligated to: (i) timely pay its taxes; (ii) provide evidence to Bankwell that it had timely paid its taxes upon request of Bankwell; **and** (iii) to immediately give written notice to Bankwell if it did not timely pay its taxes.

10.     Under Connecticut law, a property owner is charged with knowledge of his requirement to pay real estate taxes.  That principle was applied in a recent case in which an appellate court affirmed a decision to allow a foreclosure to proceed based upon the property owner's failure to pay its real estate taxes, holding that:

>   a property owner knows that he is obligated pay his real estate taxes unless otherwise excused. The note and mortgage ... obligated the defendant to pay his real estate taxes as a condition of the note and mortgage. The defendant is charged with knowing and understanding his obligations under the note and mortgage, which he signed and executed.

*OneWest Bank, N.A. v. Ceslik,* 202 Conn.App. 445, 454-55 (2021).

---

[2] Tr. Ex. Refers to the Trial Exhibits submitted to the Court contemporaneously with the filing of this Omnibus Response.

11.     Accordingly, the Debtor was charged with knowledge that it must pay real estate taxes.  The failure to do so was a default under the Mortgages, as were the failures to inform Bankwell of this default and to provide Bankwell with evidence of timely payment following a request from Bankwell.

12.     The Mortgages defined "Event of Default" in several provisions.  Section 4.1(b) of both Mortgages provided but one (and not the only) basis for determining an Event of Default:

> the occurrence of any event or circumstance constituting a default or Event of Default after lapse of any applicable notice and cure period, if any, under any of the Financing Agreements including, without limitation, the Note, this Mortgage or the Commitment Letter, between the Mortgagee and the Mortgagor" constituted an Event of Default.

Section 4.1(c) of both Mortgages set forth as a *separate*, but not exclusive, basis for declaring an Event of Default:

> failure to promptly observe, perform or comply with any other material obligation, condition or covenant to be observed, performed or complied with by Mortgagor, the Note or any of the Financing Agreements and said failure continues for thirty (30) days after written notice thereof from Mortgagee…"

13.     The failure to pay taxes as required by section 1.3 of the Mortgage constituted a default under the Mortgage and therefore was an Event of Default under section 4.1(b) of the Mortgages.  Even if the Court were to determine that the failure to make the required tax payments did not constitute an Event of Default under section 4.1(b) but rather constituted an Event of Default under section 4.1(c) which required notice and an opportunity to cure, the failure to provide written notice of the tax default as required under section 5.1(c)(i) of the Mortgages constituted a separate default under section 4.1(b).  Since notice cannot be provided to a Mortgagor for an Event of Default based on its own failure to provide notice to the Mortgagee, section 4.1(b) of the Mortgages defines such failure as an Event of Default

without requiring a notice or cure period.  In the Reply, the Debtor attempts to interpret section 4.1(b) out of the Mortgages completely while also ignoring its obligations under section 1.3 and 5.1(c)(i).  Reply,¶¶ 36-38.  Yet, these sections of the Mortgage exist and must be enforced as written.

14.    Accordingly, an Event of Default occurred and was continuing from August 2, 2023 (when the taxes became delinquent pursuant to Conn. Gen. Stat. § 12-146) through May 31, 2024 (when payment was made ten months late), a period of 303 days.  Fixing the Default Rate at 18%, the Note provides that such Default Rate of interest is to accrue upon the occurrence and during the continuance of any Event of Default under the Loan Documents (which include the Mortgages). *See* Tr. Ex. 1, §7; Tr. Ex. 2, §6.

15.    Connecticut courts have consistently held borrowers in default on mortgages for failing to pay real estate taxes even when other principal and interest payments have been made.  *See OneWest Bank, N.A. v. Ceslik*, 202 Conn.App. at 454-55 (discussed above); *Fidelity Bank v. Krenisky*, 72 Conn.App. 700, 807 A.2d 968 (2002) (allowing a borrower to argue that they substantially performed under their mortgage when they failed to pay real estate taxes would unsettle the real estate market).

16.    The *per diem* default interest component on both Notes (13.05% interest, which is the difference between the base rate of 4.95% and 18%) equals $9,824.03.  Based on the continuing Event of Default for the failure to pay taxes and the failure to notify Bankwell of the failure to pay taxes for the 303 days this default existed results in default interest of $2,976,681.09.

17.    Even if the Court were to determine that both the breach of failing to pay taxes and the breach of failing to notify Bankwell of this failure only constitute breaches under

Mortgage section 4.1(c) so that notice was required, the undisputed evidence is that Bankwell delivered notice of this failure to pay taxes and a request for proof of the payment of taxes by an admittedly received e-mail on October 24, 2023.  Such notice was sufficient under the Mortgages because they provide that "notice to Mortgagor hereunder shall be deemed sufficient and commercially reasonable notice and shall be effective if deposited in the mail or sent by facsimile transmission or by a recognized overnight courier addressed to Mortgagor…or directed to the address at which Mortgagee customarily communicates with Mortgagor…" *See* Tr. Ex. 3, §5.1(a); Tr. Ex. 4, §5.1(a).

18.     This notice provision does not provide that mail notice exclusively is required, only that utilizing such methods would be deemed "sufficient and commercially reasonable". By contrast, the very next sentence of the Mortgages provides that: "Any notice *to Mortgagee* hereunder **shall only be effective** only upon its receipt by Mortgagee in writing at the following address…" *Id.* (emphasis added).   Thus, notice to the Mortgagor could be accomplished by other methods whereas notice to the Mortgagee could only be accomplished in the manner set forth in the Mortgages.  For this reason, the email notice sufficed to trigger an Event of Default after the expiration of the thirty-day cure period provided in section 4.1(c) of the Mortgages.

19.     Moreover, Connecticut applies the doctrine of substantial compliance to notice provisions including those in mortgage agreements. *See Mtge. Elec. Registration Sys., Inc. v Goduto*, 110 Conn App 367, 373 (2008).  "The modern approach to notice-giving attaches primary importance to actual notice and treats technical compliance with notice procedures as a secondary consideration . . . ***To invalidate the notice simply because it is irregular is to protect no worthwhile interest*** of the party who has raised the objection.  He has had his due.  An objection

to the notice on his part serves only to induce concern for punctilious adherence to formality . . ." *Twenty-Four Merrill St. Condominium Ass'n, Inc. v Murray*, 96 Conn App 616, 623, 902 A2d 24, 29 (2006) (internal brackets omitted) (emphasis added). "The plain intent of notification requirements set forth in [a] mortgage deed is to provide notice of a default to a mortgagor prior to the commencement of a foreclosure proceeding." *U.S. Bank, N.A. v Moncho*, 203 Conn App 28, 51 (2021) (internal brackets and ellipses omitted).

20.    Thus, in deciding whether proper notice is given, courts "look primarily to the actual notice received rather than asking whether there has been a 'punctilious adherence to formality'" and although generally contracts should be enforced as written, courts will not require "mechanistic compliance with the letter of notice provisions if the particular circumstances of a case show that the ***actual notice received resulted in no prejudice and fairly apprised the noticed party of its contractual rights***." *Goduto* 110 Conn App at 375 (emphasis added). Since the Debtor was, in fact, advised of its tax default and obligation to provide proof of tax payment on October 24, 2023, even if such default were regarded as only an Event of Default under section 4.1(c) of the Mortgages, default interest still accrued for the entire period of default from November 23, 2023 (thirty days after notice was received) until May 31, 2024 when the Debtor paid the taxes, or June 4, 2024 when the Debtor provided documentation to Bankwell showing that such taxes were paid.

21.    The Debtor also attempts to gloss over the October 24, 2023 notice by arguing that it was "informal" without offering a whit of supporting evidence from Bankwell or anyone else.  Reply, ¶40.  But, the Debtor **does not** contest receiving this notice.  Instead, the Debtor argues that since the default was cured in June 2024 there is "no factual or legal basis to impose an 18% default interest rate for the period of the cured tax delinquency." *Id.*  Yet

this argument inexcusably ignores the express terms of the Loan Documents which provide "upon the occurrence and **during the continuance** of any Event of Default (as hereinafter defined) … interest shall immediately accrue at a 'default rate' which means the rate of interest which is Eighteen (18%) percent per annum." (emphasis added) Tr. Ex. 1, §7, Tr. Ex. 2, §6. That the Debtor cured its tax default on May 31 or June 4, 2024, some ten months later, does not change the fact that the Loan Documents provided that the default rate of interest accrued **during the continuance of such event of default**.    Nor does the fact that Bankwell subsequently accepted monthly payments constitute a waiver of any of the rights under the Loan Documents since they unequivocally provide that "[a]ny failure by the Holder to exercise any right it may have under this Note is not a waiver of the Holder's right to exercise the same or any other right at any other time."). *See* Tr. Ex. 1, §11, Tr. Ex. 2, §10.

22.    In a similar situation where a borrower breached its obligation to keep a property free of liens and pay taxes when due, the district court enforced the remedies contained in the loan agreement. *See Trafalgar Power Inc. v Aetna Life Ins. Co.*, 2012 WL 1119533, at *2 (N.D.N.Y. Apr. 3, 2012), *aff'd sub nom. Trafalgar Power, Inc. v Algonquin Power Corp., Inc.*, 515 Fed Appx 57 (2d Cir 2013).  In rejecting the defendants' argument that it had cured the default by ultimately paying the taxes the Court held "[t]he later payment of the taxes to remove the lien was a specifically-provided remedy in the event that a default existed . . . properly exercised by [defendant] and the Security Trustee, which does not constitute a "cure" of [plaintiff's] default." *Id*. *See also T.D. Bank N.A. v Bristol Fields, LLC*, 2011 WL 782732, at *3 (Conn. Super. Ct ., Feb. 3, 2011) (noting that when defendant allowed its real estate taxes to become delinquent that constituted an event of default.").

23.     Finally, no valid dispute remains that the Debtor did not fully understand its obligation to pay its real estate taxes and provide evidence to Bankwell that such payments had been made.  On June 4, 2024, the Debtor emailed Bankwell to provide proof that Debtor had cured its tax default. *See* Tr. Ex. 17.  Having had knowledge of their tax default and affirmatively taking steps to cure and provide notice to Bankwell that the default had been cured, the Debtor is estopped from arguing that it was not aware of the default or its obligations. *See, e.g. Wells Fargo Bank, N.A. v. Fitzpatrick*, 190 Conn App 231, 243 (2019) ("defendants do not dispute that they received [notice], and they claim no prejudice from the manner in which they received it . . . Consequently, it is indisputable that they had actual notice of their default").

24.     Accordingly, even if notice of the tax default and a thirty-day cure period were required under the Mortgages, the Debtor was in default of its obligations from November 23, 2023 through at least May 31, 2024, a period comprising 190 days.  At the *per diem* default rate of interest, that default period interest equates to $1,866,565.70.

### D.     Debtor's Payment Default was Self-Manufactured and Not Caused by the Secured Creditor

25.     As detailed in the Claim and Response, and as acknowledged in the Reply, the Debtor failed to make its July 2024 (and every subsequent) payments due under the Loan Documents. See Tr. Exs. 15 and 16.  Discovery revealed that on July 29, 2024, the Debtor received $200,000 in its Bank of America account xxx9147. *See* Tr. Ex. 31.  This amount was sufficient to make the non-default monthly payments due under the Loan Documents for July 2024.  See Tr. Exs. 1-4. Rather than pay Bankwell, the next day the Debtor transferred the funds to Empire Realty account xxx1557. *See* Tr. Ex. 31.  Accordingly, this is not a case where the Debtor had insufficient funds to make the payments due under the Loan Documents.

Instead, the Debtor intentionally decided to stop making payments due under the Loan Documents. The Debtor's argument that "the payments were behind because the forbearance agreement discussions were terminated with no warning" (Reply, ¶49) is belied by the facts of Debtor's actual conduct.

26.    In a feeble attempt to distract the Court from its own intentional decision to default, the Debtor places all of its woes as a direct result of the proper application of the Insurance Proceeds and hopes that the Court cannot calculate basic math. But the relevant Mortgage provisions unambiguously state that the Secured Creditor may "apply the proceeds, at **Mortgagee's sole option**, as follows: (i) as a credit upon the Indebtedness secured hereby, whether or not the same shall then be due and payable, or (ii) to repairing or restoring the Mortgaged Property or any part thereof." Tr. Ex. 3, §1.4(a) (emphasis added). "Indebtedness" in turn, is defined as "[a]ll amounts due to Mortgagee under the Note, this Mortgage or any of the Loan Documents." *Id.*, §1.2. Additionally, the Notes both provide that:

> [p]ayments will be applied first to fully pay costs and expenses incurred by the Holder in collecting this Note or in sustaining and/or enforcing any security granted to secure this Note, if any, then to fully pay any outstanding late charges or prepayment fees, then to fully pay accrued interest and the remainder will applied to principal.

Tr. Ex. 1, §5, Tr. Ex. 2, §4. Accordingly, all accrued interest, including default interest constituted Indebtedness and Avonwood Credit was entitled to apply the Insurance Proceeds against the accrued default interest.

27.    Glossing over simple math, the Debtor matter-of-factly contends that had the Insurance Proceeds been applied differently, it "could have been applied to cure or reduce the ongoing payment default." Reply, ¶47. Yet, the Debtor admits that monthly non-default

payments of $136,233.42 were required under the $25,312,500 Note. Reply, ¶10.  The Debtor also concedes that it has not made a monthly payment since June 2024. Reply, ¶¶14, 18. Accordingly, when the Insurance Proceeds were placed in the escrow account by Bankwell in December 2024, even at the non-default rate six months of payments had not been made which totalled to $817,400.52.  How the Debtor believes $474,744 satisfies a liability of $817,400 is left unexplained.  Nor does the Debtor explain why default interest would not accrue following the *payment* default given that the Loan Documents expressly did not require notice for a payment default.

28.    Utilizing unbridled hubris, the Debtor even has the temerity to state that it had no notice that it was at risk of losing its favorable 4.95% interest rate.  Reply, ¶26.  But, the Debtor knew that it was not making the monthly payments required under the Loan Documents, and it also knew that it had not reached an agreement on a forebearance agreement with Bankwell.  What is surprising is that the Debtor believed it could ignore monthly payments under the loan documents indefinitely without facing any consequences. Also pointless is the Debtor's hyperbolic reliance upon Reply Exhibit B, since the fact that Bankwell in September 2024 was deciding what to do with the Debtor's loan which had been in payment default for three months simply means that Bankwell was aware of the payment default and the payment default is one of the reasons it chose to assign the Loan Documents to Avonwood Credit.

29.    While the Debtor multiple times emphasizes that Bankwell never gave them notice of the payment default (which is untrue (*see* Tr. Ex. 11)), there can be no genuine factual dispute that *notice was not required for a payment default.*  Section 7.A of the $25,312,500 Note and Section 6(i) of the $2,687,500 Note did not require that any notice of a payment default

be provided by Bankwell.  Additionally, Section 13 of the $25,312,500 Note and Section 12 of the $2,687,500 Note state in bold capital text:

> **MAKER AND ANY SUBSEQUENT ENDORSER, GUARANTOR OR OTHER ACCOMMODATION MAKER WAIVES PRESENTMENT, DEMAND FOR PAYMENT AND NOTICE OF DISHONOR.**

30.     Moreover, Section 4.1(a) of the Mortgages provide that "failure to pay within ten (10) days of when any installment of principal, interest or any other amount due with respect to any and all Indebtedness" constituted an Event of Default. Tr. Exs. 3 and 4. Accordingly, there can be no genuine dispute that:

(a) the failure to make any monthly payments from July 1, 2024 and onward constituted an Event of Default which triggered the 18% default interest rate;

(b) at the default interest rate, the Insurance Proceeds covered slightly more than one-month's worth of interest; and

(c)  the Debtor was not harmed by Bankwell's decision to hold the Insurance Proceeds in an escrow account for less than two months or by Avonwood Credit's decision to apply those Insurance Proceeds to the Indebtedness as provided for in the Loan Documents.

**E.     No Authority Supports Permitting a Solvent Debtor to Avoid Paying Default Interest**

31.     The crux of the Debtor's new legal argument is that despite proposing a Plan to effectuate a sale which leaves equity in the money, and despite admitting to **monetary defaults** of non-payment of monthly amounts due under the Loan Documents and admitting to failing to timely pay its tax obligations, the Debtor believes it can reinstate the loans by paying off the non-default contract amounts due under the Loan Documents and enjoy an equity windfall.  For at least four reasons, no authority supports such a reading of the Bankruptcy Code.

32.    *First*, counsel for the Debtor attempts to re-litigate the very issues previously (but unsuccessfully) litigated before Judge Stong in *In re Moshe*, 567 B.R. 438 (Bankr. E.D.N.Y. 2017). In that case, Judge Stong, in a well-reasoned opinion analyzed these exact same arguments and rejected them. Specifically, Judge Stong reasoned:

> [Debtor] argues that by paying the arrears at the non-default interest rate, it is "annulling" the event that triggered the default, and cites the Second Circuit's decision in *DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24 (2d Cir. 1982), to support this argument. In *In re Taddeo*, the Second Circuit held that a Chapter 13 debtor may "cure" a default under Bankruptcy Code Section 1322 by "taking care" of the triggering event, that is, by paying the arrears and non-default interest, thereby nullifying the contractual consequences of the default. *In re Taddeo*, 685 F.2d at 26. [Debtor] notes that the Ninth Circuit adopted *In re Taddeo's* definition of "cure" in the context of a Chapter 11 plan in *Great Western Bank & Trust v. Entz-White Lumber and Supply, Inc. (In re Entz-White Lumber and Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988). There, the court held that under certain circumstances, a Chapter 11 debtor may cure a default on a debt by paying the arrears at the non-default interest rate and by doing so, avoid the default interest rate. *In re Entz-White, 850 F.2d at 1342.*

> But the Ninth Circuit recently revisited this question and addressed "whether Entz-White's rule that a debtor may nullify a loan agreement's requirement of post-default interest remains good law in light of 11 U.S.C. § 1123(d) . . . ." *In re New Invs.*, 840 F.3d at 1139. The Ninth Circuit rejected the conclusion reached in *In re Entz-White* and found that Bankruptcy Code Section 1123(d) "renders void Entz-White's rule that a debtor who proposes to cure a default may avoid a higher, post-default interest rate in a loan agreement." *In re New Invs.*, 840 F.3d at 1140. The court found that Bankruptcy Code Section 1123(d) requires the parties to look to the underlying loan agreement and state law to determine how to cure a default. *Id.* And based on the loan agreement and Washington state law, the majority concluded that payment of the default rate of interest was required, and directed the repayment at that rate. Id. The dissent reasoned that neither the text nor the legislative history of Section 1123(d) supported the majority's view that the section displaced the ruling in In re Entz-White. Id. (Berzon, J., dissenting).

> [Debtor] invites this Court to follow the logic of the dissent in *In re New Investments*. The dissent in *In re New Investments* argued that Bankruptcy Code Section 1123(d) was enacted by Congress solely to overrule the Supreme Court's holding in *Rake v. Wade*, 508 U.S. 464, 113 S. Ct. 2187, 124 L. Ed. 2d 424 (1993), and that the amendment did not eliminate the definition of "cure" adopted by the Ninth Circuit in In re Entz-White. *In re New Invs.*, 840 F.3d at 1143-44 (Berzon, J., dissenting). In Rake, the Supreme Court held that in order

to cure a default under a Chapter 13 plan, oversecured creditors are entitled to pre-and post-confirmation interest on arrears, even if the underlying agreement and state law do not require such interest. *Rake*, 508 U.S. at 466. As the dissent argued, this allowed oversecured creditors to collect "interest on top of the interest payments paid by debtors under their mortgages." *In re New Invs.*, 840 F.3d at 1144 (citing Rake, 508 U.S. at 470-75).

But as the Ninth Circuit and other courts have held, the argument that Section 1123(d) is limited solely to abrogating the result in Rake conflicts with the text of the statute. As the majority held in *In re New Investments*, "[t]he plain language of [Section] 1123(d) compels the holding that a debtor cannot nullify a preexisting obligation in a loan agreement to pay post-default interest solely by proposing a cure." *In re New Invs.*, 840 F.3d at 1141. Viewed another way, the terms of Section 1123(d) are not as limited as [Debtor] suggests, and their consequences are broader than [Debtor] asserts. As one bankruptcy court observed, "Congress did not limit the cure to the narrow problem that Rake created." *In re Moody*, 426 B.R. at 674.

A review of the legislative history of Bankruptcy Code Section 1123(d) reinforces this conclusion. As the court in In re New Investments and others have recognized, the legislative history of Bankruptcy Code Section 1123(d) does not support the argument that the Section is limited solely to addressing the result in Rake. *See In re New Invs.*, 840 F.3d at 1141 (observing that "even if we were to read ambiguity into the statute, the legislative history would not help [the debtor]."); *In re Moody*, 426 B.R. at 674 (finding that Congress addressed the problem in Rake with a "broader declaration."). By enacting Bankruptcy Code Section 1123(d), Congress intended not only to supplant the ruling in Rake, but also to require that "all cures . . . be determined in accordance with state law and the underlying agreement." *In re Moody*, 426 B.R. at 674.

This means that in proposing a Chapter 11 plan, a debtor cannot disregard Section 1123(d) and cure a default under Section 1124(2) by paying the arrears at the non-default rate of interest. "Because the 'denial of a mortgagee's contractual right to interest at a default rate does 'alter' the secured creditor's contractual rights within the meaning of subsection (D) of Section 1124(2) . . . Section 1124(2) . . . does not provide a statutory basis for judicial nullification of a contract right to default rate interest.'" *In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004) (quoting *In re 139-141 Owners Corp.*, 306 B.R. 763, 768 (Bankr. S.D.N.Y. 2004)). Therefore, in order to determine whether [Secured Creditor] is entitled to the default interest rate, the Court must look to the underlying loan agreement and New York law in accordance with Section 1123(d).

Here, the underlying loan agreement requires — and New York State law permits — the payment of the default interest rate following a default. The loan

agreement provides that in the event [Debtor] fails to make payments towards the principal and interest prior to the Maturity Date, [Debtor] will pay "expenses, charges and damages . . . at a rate equal to the lesser of (i) twenty-four (24%) percent per annum or (ii) the maximum rate of interest permitted by applicable law on the principal sum to such date of actual payment." And under New York law, "[i]t is well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty." *Jamaica Sav. Bank FSB v. Ascot Owners, Inc.*, 245 A.D.2d 20, 20, 665 N.Y.S.2d 858 (N.Y. App. Div. 1st Dep't 1997). Courts have held that a contract term that provides for a default rate of 24 percent is enforceable under New York state law. *See Dominion Fin. Corp. v. Haimil Realty Corp.,* 546 B.R. 257, 265 (Bankr. S.D.N.Y. 2016) (awarding interest at the 24 percent default rate and stating that "New York courts have enforced agreements that provide for similar default rates.").

[Debtor's] proposed treatment does not provide the default rate of interest as required by the Loan Agreement and as permitted under New York law. For these reasons, the Amended Chapter 11 Plan does not comply with Bankruptcy Code Section 1123(d) and is therefore "patently unconfirmable."

*Id.* at 445-447 (internal citations to case record omitted).

33.    *Second*, the Debtor relies heavily on Judge Bentley's decision in *In re Golden Seahorse LLC* 652 B.R. 593 (Bankr. S.D.N.Y. 2023) except when it comes to the Court's ultimate conclusion.  Judge Bentley unequivocally held "the Court rules that, to cure and reinstate its loan under a plan of reorganization, the Debtor must pay default interest and fees to the extent required by its loan agreement and New York law." *Id.* at 616. To circumvent this inconvenience, the Debtor, after relying extensively on *Golden Seahorse*, states that it is only a single bankruptcy court decision. Reply, ¶74.  But the Debtor ignores the Second Circuit's approving citation to the long line of cases that held to reinstate a debt under Bankruptcy Code section 1124(2) the Debtor must comply with section 1123(d).  Specifically, in *TLA Claimholders Frp. v. LATAM Airlines Grp. S.A. (In re LATAM Airlines Grp. S.A.)* (2d Cir.

2022), the Second Circuit, in noting the multitude of cases which applied section 1123(d) to

the cure requirements in section 1124(2), cited approvingly to:

> *In re Depietto*, No. 20-CV-8043 (KMK), 2021 U.S. Dist. LEXIS 144001, 2021 WL 3287416, at *6 (S.D.N.Y. Aug. 2, 2021) ("A number of courts, including several within the Second Circuit, have concluded that § 1123(d) may require the debtor to pay a default interest rate in order to cure a default."); *In re New Invs., Inc.*, 840 F.3d 1137, 1142 (9th Cir. 2016) ("The parties bargained for a higher interest rate on the note in the event of default, and Pacifica is entitled to the benefit of that bargain under the terms of § 1123(d)."); *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) ("Courts interpreting Section 1123(d) have held that the underlying loan agreement and state law determine whether a debtor must cure using the default rate of interest in a Chapter 11 plan."); *In re Gen. Growth Properties, Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011) (holding that § 1123(d) compelled the payment of default interest at the contractual rate).

*Id.* at 385 n.5.  Simply put, there is **<u>no support</u>** for the Debtor's arguments in any Court within

this Circuit, and there are multiple courts which have expressly rejected the Debtor's

arguments (including the very case they rely so heavily upon).  Additionally, the fact that the

Second Circuit approvingly cited to this line of cases indicates that it is settled within the

Second Circuit that a debtor is required to pay default interest for monetary defaults in order

to reinstate a loan.

    34.    *Third*, the Debtor relies on an out-of-circuit dissent while ignoring the well-

reasoned majority opinion which was cited approvingly by the Second Circuit. *In re New Invst.,*

*Inc.* held that "[t]he plain language of § 1123(d) compels the holding that a debtor cannot

nullify a preexisting obligation in a loan agreement to pay post-default interest solely by

proposing a cure." *In re New Invst., Inc.*, 840 F.3d 1137, 1141 (9th Cir. 2016).  That court

further reasoned that requiring a debtor to pay default interest is "consistent with the intent

of § 1123(d) because it holds the parties to the benefit of their bargain." *Id.*

35.     The Debtor's reliance on *In re Phoenix Bus. Park Ltd. Pshp.* is also misplaced for

at least two reasons.  For one, the Ninth Circuit's decision in *In re New Invst.* has overruled

this holding which was predicated on the fact that the Ninth Circuit's *Entz-White* decision was

still binding after the enactment of Bankruptcy Code section 1123(d). 257 B.R. 517, 522

(Bankr. Az. 2001) ("The foregoing analysis compels the conclusion that Congress did not

legislatively overrule *Entz-White*, that *Entz-White* remains good law in the Ninth Circuit").

However, in *New Invst.* the Ninth Circuit expressly held that *Entz-White* holding was no longer

valid and had been legislatively overruled. *See New Invst.* 840 F.3d at 1139 ("We hold that

Entz-White's rule of allowing a curing debtor to avoid a contractual post-default interest rate

in a loan agreement is no longer valid in light of § 1123(d)").  Moreover, *Phoenix Bus. Park*

analysis turned on that court's determination that the default rate at issue (24%) constituted a

"penalty" under the relevant state law (without identifying the relevant state law). 257 B.R.

at 521.

36.     Here, Connecticut law allows mortgage rates of 18% and has regularly enforced

such rates.  *See Cheshire Mortg. Serv., Inc. v. Montes,* 223 Conn. 85, 94, 612 A.2d 1130 (1992),

(holding that a mortgage with an annual interest rate of 18 percent was neither procedurally

nor substantively unconscionable); *Emigrant Mortg., Co. v. D'Agostino*, 94 Conn. App. 793, 896

A.2d 814, 823 (2006) (holding that default interest rate of 18% was enforceable and rejecting

defense that such default rate was "unconscionable".); *Pierce v. Emigrant Mortg. Co.*, Docket

No. 3:04cv1767 (JCH), 2007 WL 4800725, *6 n.1 (D.Conn. December 27, 2007) ("the

Connecticut legislature's imposition of an 18 [percent] rate for unpaid taxes suggests that such

a rate is not unconscionable per se"); *see also* Conn. Gen. Stat. § 12-146 (providing for interest

to accrue at 18% on account of unpaid real estate taxes).

37.    *Fourth*, the Debtor makes a feeble attempt to ignore the solvent debtor exception set forth by the Second Circuit in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959) and reaffirmed more recently by the bankruptcy court in *In re General Growth Props.* 451 B.R. 323 (Bankr. S.D.N.Y. 2011).   As an initial matter, the Second Circuit's explanation of default interest is instructive:

> A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable. *Compare Union Estates Co. v. Adlon Const. Co.*, 1917, 221 N.Y. 183, 116 N.E. 984, 12 A.L.R. 363, with *Newburger-Morris Co. v. Talcott,* 1916, 219 N.Y. 505, 510, 114 N.E. 846, 3 A.L.R. 287. It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.

269 F.2d at 832.   Following that analysis, the Second Circuit held that it would be "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its [bankruptcy filing]".   *Id.*   While *Ruskin* was a pre-Code case, the Debtor has not pointed to any reason why its holding has been modified due to the adoption of the Bankruptcy Code. In fact, bankruptcy courts within this circuit and around the country have continued to apply its rationale.   Specifically, Judge Gropper held that "payment of a default interest would neither inflict harm on other unsecured creditors nor impair [debtor's] fresh start because [debtor] was exceedingly solvent when it emerged from bankruptcy." *In re General Growth Props.,* 451 B.R. at 328. He further cited to a plethora of cases holding the same. *See In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) (holding that "in solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the

debtor."); *see also In re 139-141 Owners Corp.*, 313 B.R. at 368; *In re Southland Corp.*, 160 F.3d at 1060; *In re Payless Cashways, Inc.,* 287 B.R. 482, 489 (Bankr. W.D. Mo. 2002); *cf. Matter of Chicago, Milwaukee, St. Paul and Pac. R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (holding that "if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights").

### F.    Applicable Connecticut Foreclosure Law Authorizes Secured Creditor's Enforcement of Loan Documents

38.    Connecticut law governs the Loan Documents. *See* Tr. Ex. 1, §14; Tr. Ex. 2, §13; Tr. Ex. 3, §5.1(f); Tr. Ex. 4, §5.1(f). Connecticut has recognized that "the institution of a foreclosure action is a valid exercise of a mortgagee's acceleration right." *Hartford Fed. Sav. & Loan Assoc. v. Tucker*, 196 Conn. 172, 180, 491 A.2d 1084 (1985).   Ownership of a note "imports *prima facie* that he acquired the note in good faith for value and in the course of business, before maturity and without notice of any circumstances impeaching its validity. The production of the note establishes his case *prima facie* against the makers and he may rest there ... It [is] for the defendant to set up and prove the facts which limit or change the plaintiff's rights." *RMS Residential Props., LLC v. Miller*, 303 Conn. 224, 232, 32 A.3d 307 (2011), quoting *Garris v. Calechman*, 118 Conn. 112, 115 (1934).

39.    The implied covenant of good faith and fair dealing "cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." *Magnan v. Anaconda Indus, Inc.*, 193 Conn. 558, 567, 479 A.2d 781 (1984).

40.    In *Southbridge Associates, LLC v. Garofalo*, the Connecticut appellate court, affirming the trial court, declined to find a breach of good faith and fair dealing when the original mortgagee sold its mortgage to a third party.  In doing so, the Court emphasized that

the defense of an alleged breach of good faith and fair dealing must "attack the making, validity or enforcement of the notes and mortgages." *Southbridge Assocs., LLC v. Garofalo,* 53 Conn.App. 11, 728 A.2d 1114 (1999). Asserting that the mortgagee sold the mortgage at a discount to a third party rather than to the mortgagor did not meet this requirement. *Id.* The Court likewise rejected an argument that a purchaser of a mortgage can only enforce its rights up to the amount it paid for such mortgage. *Id.*

41.    Other Connecticut courts have reached similar conclusions. "To reiterate, especially where the defendant is a sophisticated business party, it is not bad faith for the plaintiff to enforce its rights under a loan agreement and refuses to renegotiate the terms of that agreement." *Sovereign Bank v. Risdon Intern., Inc.*, 2014 WL 2257753 *15 (Conn. Super. Ct. April 28, 2014). Merely filing a foreclosure action and declaring defendant in default is pursuing actions under the terms of a loan agreement and such action "could not form the basis for a claim of bad faith or unfair dealings on the part of the plaintiff." *Ulster Sav. Bank v. 28 Brynwood Lane, Ltd.*, 134 Conn.App. 699, 41 A.3d 1077 (2012).

42.    In addressing a defense of a breach of implied covenant of good faith and fair dealing, one Connecticut trial court summed up the standard as follows:

> To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Renaissance Management. Co. v. Connecticut Housing Finance Authority*, *supra*, 281 Conn. at 240. "Bad faith has been defined in our jurisprudence in various ways. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive ... Bad faith means more than mere negligence; it involves a dishonest purpose ... Bad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain." (Citations omitted; internal quotation marks omitted.) *Landry v. Spitz*, *supra*,

102 Conn.App. at 47; *see also MacMillan v. Higgins*, 76 Conn.App. 261, 270, 822
A.2d 246, cert. denied, 264 Conn. 907, 826 A .2d 177 (2003).

*Homes of Westport, LLC v. Wilton Bank*, 2007 WL 3010796 (Conn. Super. Ct. October 2, 2007).

That court determined that there was no bad faith when the bank enforced its rights under the

loan agreement. *Id.*

43.    The Debtor seemingly implies that the assignment of the Loan Documents

from Bankwell to Avonwood Credit was somehow improper since the Debtor was not

notified in advance that the assignment would occur. Yet the Debtor cannot point to any

provision in the Loan Documents that requires advance notice of such assignment, and the

Mortgages plainly contemplate assignment (Tr. Exs. 3 and 4, §5.1(f)). Likewise, there is

nothing in the Loan Documents requiring Bankwell to enter into a forebearance agreement

with the Debtor.

44.    The Debtor also states that "Courts have routinely held that default interest is

not automatically enforceable, even-where allowed by contract." Reply, ¶42. Despite this

statement being "routine", the Debtor could only cite to two cases both of which actually

awarded the secured creditor default interest. *See Fannie Mae v. Bridgeport Portfolio, LLC*, 2013

Conn. Super. LEXIS 414, at *2–3 (Feb. 20, 2013) and *In re 785 Partners LLC*, 470 B.R. 126,

134 (Bankr. S.D.N.Y. 2012). In *Fannie Mae*, the Court's analysis of the equitable factors is

telling. Specifically, the court noted:

> This was a sophisticated commercial transaction between two limited liability
> companies. It appears from the documents that the parties were represented by
> counsel, as one would expect in a complex transaction involving a multi-
> million dollar commercial loan. The note provides for a default rate of interest
> and a prepayment premium. In the default rate provision, the defendants
> acknowledged that a default would cause the plaintiff to incur additional
> servicing and processing costs and loss of use of the money. The additional rate
> of interest represents an attempt to compensate the plaintiff "for the increased
> risks of nonpayment associated with a delinquent loan." In the prepayment

provision, the defendants acknowledge that as a result of default the plaintiff will incur reinvestment and other similar losses. The defendants also acknowledged in the note that the prepayment is a "material part of the consideration for the loan" and "that the terms of [the] [n]ote are in other respects more favorable to the [b]orrower as a result of the [b]orrower's voluntary agreement to the prepayment premium provisions."

In view of the foregoing, the court concludes that the default rate and prepayment premium provisions of the note are valid and enforceable against the defendants. Further, the court finds that the plaintiff has proven its debt by a preponderance of the evidence.

2013 Conn. Super. LEXIS 414 at *5-6.  In the present case, the Loan Documents reflect that Debtor was represented by counsel. Tr. Ex. 3-4. The occurrence of the Events of Default have harmed Avonwood Credit and the additional rate of interest represents an attempt to compensate Secured Creditor for the increased risks of nonpayment associated with a delinquent loan.  In fact, the Debtor's November 2024 loan with Altbanq shows that the market priced the appropriate rate of interest for this Debtor at 18%.[3]

45.    Likewise, in *785 Partners*, the bankruptcy court noted:

The power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty. *Urban Communicators*, 394 B.R. at 338; *General Growth*, 451 B.R. at 328; *In re P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998). The debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition. *See In re Southland Corp.*, 160 F.3d 1054, 1059-60 (5th Cir. 1998); *Urban Communicators*, 394 B.R. at 338; Vest Assocs., 217 B.R. at 702.

*785 Partners LLC*, 470 B.R. at 134.

46.    Here, the Debtor has not met its burden of rebutting the presumption that the contract rate of interest applies post-petition, as there has been no proven misconduct on the

---

[3] Even though Secured Creditor had a first lien position, Altbanq had the benefit of additional guarantors and a payment direction letter ensuring them at least $400,000 (see below).

part of Avonwood Credit. Additionally, the application of the default rate of interest does not harm unsecured creditors where the Debtor has proposed payment in full to such creditors under the Plan, the payment of default interest does not impair the Debtor's fresh start and the contract rate of interest does not constitute a penalty. Finally, the Debtor will be indisputably benefitting from the application of Bankruptcy Code Section 1124(2) in that as a result of the reinstatement of the Loan Documents the prepayment penalty will not be due.

### G.    Secured Creditor's Rights to Enforce Debtor's Loan Payment Defaults

47.    Connecticut law does not require a notice of default in advance of a foreclosure. Instead, "[w]hether a creditor is required to give notice of default as a condition precedent to foreclosure is controlled by the language of the note and mortgage." *New Haven Sav. Bank v. LaPlace*, 66 Conn. App. 1, 14 (2001) (affirming grant of summary judgment despite defendant's arguments about the notice of default because neither the note nor the mortgage required notice of default).

48.    Here, the Debtor expressly waived any notice of default. The Note provides that the Debtor "***waives presentment, demand for payment and notice of dishonor***." *See* Tr. Ex. 1, §13 (emphasis added). Similarly, the Mortgages provide that:

> If an Event of Default shall occur . . . Mortgagee may, at its sole election, also exercise any or all of the following rights, remedies and recourses: (a) Acceleration: Declare the principal balance on the Note, the accrued interest ***and any other accrued but unpaid portion of the Indebtedness to be immediately due and payable, without notice, presentment, protest; demand or action of any nature whatsoever (each of which hereby is expressly waived by Mortgagor),*** whereupon the same shall become immediately due and payable, time being of the essence in this Mortgage.

Tr. Ex. 3, Mortgage §4.2 (emphasis added). "Indebtedness" is defined as "all outstanding principal and the interest thereon . . . All amounts due to Mortgagee under the Note, **this Mortgage or any of the Loan Documents** . . ." *Id.*, §1.2 (emphasis added).

49.     When a borrower expressly waives presentment and demand, there is no requirement to inform a borrower of its default prior to commencing a foreclosure action, and the lack of notice is not a defense to such action. *See Fishman v. Conn. Suites, LLC*, 2004 WL 114455 (Conn. Super. Ct. January 8, 2004) (denying special defense where note at issue provided that the borrowers "waive diligence, demand, presentment for payment, notice of nonpayment…"); *MEB Loan Trust IV v. Moore,* 2024 WL 4025738, *4 (Conn. Super. Ct. August 29, 2024) (denying special defense where the mortgage did not require notice of default).

**H.     No Equitable Considerations Justify Denial of Secured Creditor's Claim for Post-Petition Default Interest**

50.     As detailed in the Plan Objection, none of the four factors bankruptcy courts consider in determining whether to award post-petition default interest weigh against awarding the parties' bargained-for contract rate of default interest. Nonetheless, the Debtor seeks to invoke the Court's equitable power in an effort to disallow post-petition default interest.

51.     Yet any consideration of the Debtor's conduct before and during this bankruptcy case weighs against awarding a windfall to the Debtor's principal at the expense of enforcing the Loan Documents as written. In the Plan Objection, Avonwood Credit detailed the Debtor's discovery failures, failure to timely obtain or furnish proof of insurance, and failure to abide by the terms of the Cash Collateral Order.

52.     As if these failures were not enough, Avonwood Credit has identified the following **fourteen categories** of conduct that the Court should consider if it believes an equitable determination is warranted before enforcing the Loan Documents as written. Although each of these categories also supports the pending Motion to Convert [Docket No. 63], Avonwood Credit

recognizes that the Debtor has a signed sale contract[4] which, if approved and such sale is consummated, would enable to the Debtor to effectuate the Plan thereby rending Avonwood Credit's conversion motion moot.  Nevertheless, if the Court intends to utilize any equitable discretion, the Court should consider the totality of the circumstances surrounding this case in the context of determining whether to award Avonwood Credit default interest, as an oversecured creditor, through the Effective Date of the Plan as set forth in the Loan Documents.

(i)    <strong>Discovery Failures</strong>

53.    As detailed in the Plan Objection, Avonwood Credit served its Discovery Requests on the Debtor on May 2, 2025.  On July 25, 2025, a full twelve weeks after being served with the Discovery Requests, the Debtor provided a written response and made a woefully deficient production.  Notably absent from the responses to the Discovery Requests were **<u>any</u>** emails between the Debtor and Bankwell.  Even Mr. Rudich, during his deposition, questioned why specific emails he allegedly sent to Bankwell were not being presented to him.  Tr. Ex. 22, 115:17-24; 119:21-22.  The answer to Mr. Rudich's question is that the Debtor failed to produce any such emails and significantly inhibited Avonwood Credit's ability to scrutinize the Debtor's claims and actions in this case.

54.    Underscoring its cavalier attitude in responding to discovery requests, the Debtor only produced a single spreadsheet regarding the insurance claim which their corporate representative could not explain at all.  *Id.*, 178:12-185:24. Nor was the Debtor able to quantify the amount of insurance proceeds it received (pre- or post-petition) or produce any filed insurance claim.  Nor did the Debtor produce any check or deposit images pertaining to any of their accounts.  And, as detailed below, the Debtor did not produce any information from the accounting software

---

[4] Tr. Ex. 36.  This contract was produced to Avonwood Credit on July 31, 2025, and is the same contract attached as Exhibit A to the Debtor's Reply.

Buildium that collects and remits the rental payments to the Debtor (or misappropriates those payments to related non-debtor entities). This material was all requested from the Debtor multiple times and no satisfactory explanation has been given for the failure to produce this highly relevant information.

(ii)    <strong>Deposition Testimony</strong>

55.    Despite being designated as the Fed. R. Civ. P. §30(b)(6) witness for a series of topics relating to the Debtor's operations, security deposits, the Altbanq loan, and the insurance claim (*see* Tr. Ex. 21), Mr. Rudich repeatedly deferred to others (namely Brett Hurst and Victoria (no last name)) or stated that he did not know or could not recall basic facts regarding the Property. Specifically, Mr. Rudich testified that he did not know how many units are rented at the Property (Tr. Ex. 22, 33:13-15), or how many units were impacted by the April 2024 fire (Tr. Ex. 22, 169:23-170:5), or if the Property was ever profitable (Tr. Ex. 22, 34:10-12), or how much income the Debtor generated (Tr. Ex. 22, 38:8-23), or whether the Debtor has been timely paying its post-petition water or sewer bills (Tr. Ex. 22, 75:3-24).

56.    Choosing to proceed with his July 31 virtual deposition via a phone from his car (and thereby causing continual audio and video cutoffs) (Tr. Ex. 22, 6:9-20), Mr. Rudich also provided testimony that was demonstrably false when, despite documents reflecting otherwise, he stated that he was never a party to a lawsuit, that he never sued anyone and was never sued by anyone. Tr. Ex. 22, 26:11-17. Yet, as the Court can judicially notice, Mr. Rudich has been sued in at least three separate New York State Supreme Court actions filed in Kings County under Index Nos. 523845/2023, 523847/2023, and 523851/2023. The Court can also take judicial notice that Mr. Rudich commenced an action on July 14, 2025 (less than 3 weeks before the deposition). *See* New York State Supreme Court Kings County Index No. 523267/2025.

57.    Mr. Rudich's testimony also provided clearly inconsistent accounts of how the Debtor was managed pre-petition. First, he testified that the Debtor was not managed by Empire Realty USA Corp. Tr. Ex. 22, 39:6-18. Moments later, he acknowledged that Empire collects the rents and pays the bills for the Debtor. Tr. Ex. 22, 40:10-12, 49:5-7, 51:19-21.  When asked who could accurately track rental receipts for the Debtor relating to the Property, Mr. Rudich testified that Empire YCR LLC ("Empire YCR") would have that information but refused to identify who at Empire YCR would have that information. Tr. Ex. 22, 61:22-63:8.  When asked if he was represented by counsel in the loan transaction with Bankwell, Mr. Rudich mused that it was "possible". Tr. Ex. 22, 83:11-14.

58.    When asked if he signed the Altbanq loan documents (reflecting additional financing that Bankwell was required to approve in the first instance), Mr. Rudich again said that it was "possible" despite being shown an image of his signature.  Tr. Ex. 22, 152:17-22; 153:4-6; 155:10-11.  Mr. Rudich also did not know if the proceeds of the Altbanq loan were ever received. Tr. Ex. 22, 157:7-23.  Nor did he know the terms of the Amended Plan (Tr. Ex. 22, 192:16-19), or that the Amended Plan required him to make an equity contribution or even why he would be doing so. Tr. Ex. 22, 193:2-23.  Mr. Rudich further was unable to quantify how much he had available to make an equity contribution under the Amended Plan. Tr. Ex. 22, 197:3-13.  And he would not definitively say whether he had signed a contract for the sale of the Property.[5] Tr. Ex. 22, 206:11-19.

(iii)    **Commingling of Debtor's Assets**

59.    At the very first hearing before the Court in this case, Avonwood Credit expressed

---

[5] Debtor's counsel provided a copy of an undated signed contract (Tr. Ex. 36) during the deposition.  Though undated, based upon an exhibit to the contract being dated July 25, 2025, the contract was likely signed sometime between July 25 and July 31.

concern that the Debtor was not properly segregating or depositing receipts from the Property in the Debtor's DIP account, even though those receipts constituted part of Avonwood Credit's cash collateral. *See* Tr. Ex. 18, 19:16-20:1. In response, the Debtor's Chief Restructuring Officer stated "[t]here's going to be no leakage. Everything is done through DIP accounts." *Id.*, 23:12-13. At the next hearing on June 11, after Avonwood Credit showed that the April MOR revealed that the Debtor was not, in fact, utilizing its DIP account, Debtor's counsel then stated "we're transitioning to the DIP accounts. I think it's all been transitioned now, but April and May was a transition period. And the bank accounts, the DIP accounts do not reflect all of the income because it was necessarily put into other accounts." Tr. Ex. 19, 9:11-15.

60.    Despite these assurances, a review of the June Monthly Operating Report [Docket No. 99] establishes that the bulk of the funds placed in the Debtor's DIP account is received from non-debtor affiliate Empire YCR. Moreover, the Empire YCR bank statement provided is redacted, supposedly to remove receipts and withdrawals that have nothing to do with the Debtor. However, the data produced shows that Empire YCR receives substantially more each month than is transferred to the DIP account. The chart below summarizes this data:

| Month | Empire YCR Receipts[6] | Transfers to DIP Account[7] |
|---|---|---|
| April 2025 | $264,241.77 | $0 |
| May 2025 | $283,276.26 | $192,724.86[8] |
| June 2025 | $268,816.21 | $259,642.36 |
| **Totals** | **$816,334.24** | **$452,367.22** |

---

[6] The Empire YCR Receipts are detailed in Tr. Ex. 23.
[7] The Transfers to DIP Account are detailed in Tr. Ex. 25-27.
[8] This amount was transferred into the DIP account from another non-debtor affiliate called Pleasant Valley Holdings NY LLC ("Pleasant Valley").

61.     Besides discrepancies regarding receipts and transfers (addressed further in the next section), the fact that the income generated by the Property is not placed directly into the DIP account puts such funds at risk.  Specifically, Empire YCR has its own creditors, and there are at least two creditors which have filed UCC-1 financing statements claiming a security interest in Empire YCR's assets. Tr. Ex. 28.  Likewise, Pleasant Valley has at least one creditor claiming a security interest in its assets. Tr. Ex. 29.

62.     While the Debtor's professionals have argued to the Court that it takes time to transfer accounts and have deposits directed directly to the DIP account, Empire YCR's statements make clear that the bulk of receipts relating to the Property are processed using a software called Buildium.  The Debtor's professionals could have easily directed the Buildium software to deposit rental receipts related to the Property directly into the DIP account without impacting the manner in which tenants pay their rents.  The fact that as of June 30, 2025 the bulk of the Debtor's rental receipts are still being received by a non-debtor affiliate despite multiple promises to the Court simply defies explanation.

### (iv)    MOR Discrepancies

63.     As an initial matter, the Debtor appears to have ignored all receipts in March 2025 following the Petition Date for reporting in its Monthly Operating Reports.  Specifically, the unredacted data in the YCR Empire March 2025 bank statement shows that $17,672.84 was received into the YCR account after the Petition Date, and upon information and belief, a significant percentage of that relates to the Property. Tr. Ex. 23.

64.     Each of the MORs includes a rent report provided by the non-Debtor affiliate Empire Realty USA Corp.  Specifically, the MOR includes both the rent reports showing what the Debtor received from tenants as well as a line item on the MOR showing what monthly receipts

into the Debtor's DIP account totalled.  This information taken from Tr. Exs. 25-27 is summarized below.

| Month | Property Receipts | Receipts per MOR |
|-------|-------------------|------------------|
| April 2025 | $192,714.86 | $3,918 |
| May 2025 | $194,290.45 | $196,186 |
| June 2025 | $162,319.45 | $288,299 |
| **Totals** | **$549,324.76** | **$488,403** |

65.     The Debtor has made no effort to explain the discrepancy between the receipts shown on its self-generated property reports and the receipts reflected in the DIP account contained in the MOR.  Nor, has the Debtor attempted to explain why the Property has generated $60,921 more than has been reflected as receipts in the MORs as of June 30, 2025.  The failure to have such funds immediately transferred to the Debtor's DIP account is also a breach of the Court's Cash Collateral Order.

66.     Additionally, Avonwood Credit questions whether the self-generated property reports accurately reflect all of the Debtor's receipts.  Specifically, there are eighteen (18) units for which the Debtor's sale contract lists as "occupied" for which there is no corresponding listing on the property report (even if such listing was to show rent was billed but not collected).[9]  The Debtor's June (and prior) Monthly Operating Reports should have reflected income relating to such units (or at the least shown that rent was billed but not collected).

---

[9] These units are identified on Exhibit B to the Sale Contract (Tr. Ex. 36) "Rent Roll" as 47-106, 47-113, 47-117, 47-121, 47-216, 47-217, 47-221, 47-311, 48-101, 48-102, 48-106, 48-107, 48-113, 48-115, 48-213, 48-214, 48-301 and 48-309.  Additionally, with respect to units 47-215, 47-218, 47-304, 47-308, 48-207 and 48-216 the Rent Roll or the Debtor's security deposit listing indicate that such units were leased as of July 1, 2025, so corresponding income should be reported in the July Monthly Operating Report.

### (v)    Pre-petition Insider Transfers

67.    As required of all Chapter 11 debtors, the Debtor identified its insider preference period transfers on its Statement of Financial Affairs (the "<u>SOFA</u>") [Docket No. 14, Tr. Ex. 24]. Yet the SOFA neglected to identify the date(s) or reasons for any payment(s) or transfer(s), and instead simply disclosed that Empire Realty USA Corp received $1,206,200 in the year prior to the Petition Date.

68.    In response to the Discovery Requests, the Debtor produced two documents addressing the issue of insider transfers.  In one of the documents the Debtor provided the dates that each of the transfers were made, and in the second document the Debtor provided a summary of insider transfers. Tr. Ex. 30.  However, the Debtor has still not explained why any such payments or transfers were made.  Additionally, the Debtor has not produced a management agreement or other document that would have required payments to be made to Empire Realty.  While insider preferences would become moot in a Plan that pays creditors 100%, the Debtor should not be permitted to evade the disclosures required in bankruptcy.

### (vi)    Post-petition Insider Transfers

69.    Besides the significant pre-petition insider transfers, there are also significant post-petition insider transfers.  As already explained all (or nearly all) of the Debtor's receipts are deposited into the Empire YCR account.  The account statements for Empire YCR (Tr. Ex. 23) show that the following amounts were transferred post-petition to non-Debtor affiliate Pleasant Valley.

| Month | Amount Transferred to Pleasant Valley |
|---|---|
| March 2025 | $9,000 |
| April 2025 | $229,000 |
| May 2025 | $242,000 |
| June 2025 | $264,000 |
| **Totals** | **$744,000**[10] |

70.     The Debtor has not explained or accounted for why nearly all the non-redacted funds received in the Empire YCR account, which is property of the estate, have been transferred to insider affiliate Pleasant Valley.  Although issues regarding post-petition insider transfers would become moot upon the effective date of a Plan paying 100% to creditors, the Debtor should not be allowed to continue its prepetition misconduct of treating the Debtor's funds as its own personal piggy bank and allowing transfers at will between non-debtor affiliates to continue post-petition.

### (vii)    Willful Nature of Payment Defaults

71.     As detailed above the failure to make monthly payments under the Loan Documents was wilful in nature.  Rather than pay its undisputed obligations under the Loan Documents, the Debtor choose to roll the dice in the hopes of obtaining a forebearance agreement.  This cavalier attitude towards its debts and its ongoing failure for a period of nine months to make any payments required by the Loan Documents was what led to the filing of the foreclosure action which precipitated the bankruptcy filing.  The Debtor cannot shift the blame for its actions to Avonwood Credit.  The forfeiture of a favorable interest rate was solely the consequences of the Debtor's

---

[10] Pleasant Valley has transferred only $192,724.86 to the Debtor's DIP account. Empire YCR, in turn, has transferred $259,642.36 to the Debtor's DIP account.

failure to make the required payments under the Loan Documents at a time when they had the funds needed to do so and were diverting such funds to non-debtor insiders.

### (viii)   Debtor's Inability to Account for Pre-Petition Rental Receipts

72.    The Debtor filed this bankruptcy case with almost no cash in its operating accounts. *See* Tr. Ex. 24 (detailing $9,653.02 in cash on the Petition Date).  Having not made any monthly payments required under the Loan Documents from July 2024 through March 2025 the Debtor should have accumulated a significant cash reserve.  The unredacted portions of the Empire YCR Chase statements (Tr. Ex. 23) reflect that Empire YCR received the following amounts from July 2024 through the Petition Date, the bulk of which relate to rental payments made on account of tenants at the Property:

| Month | Receipts |
|---|---|
| July 2024 | $303,103.60 |
| August 2024 | $306,916.72 |
| September 2024 | $301,679.78 |
| October 2024 | $323,716.90 |
| November 2024 | $296,173.80 |
| December 2024 | $290,118.59[11] |
| January 2025 | $288,906.64 |
| February 2025 | $289,377.26 |
| March 2025 (through Petition Date) | $263,202.51 |
| **Totals** | **$2,663,195.80** |

---

[11] There are two online deposits dated December 5, 2024 in the amount of $125,000 and $44,000, respectively, which do not appear to be rental payments.  For purposes of this analysis those deposits have been excluded.

73.     Additionally, the Debtor's SOFAs reveals that the Debtor took in $2,984,439.26 in receipts for 2024 and $601,622.63 in 2025 through the Petition Date. Tr. Ex. 24, SOFA question 1.  The Debtors has not explained where this income has gone, other than to detail the preferential transfers made to non-Debtor affiliates.

### (ix)     Debtor's Unexplained Altbanq Loan

74.     Class 3 of the Plan relates to a $3 million loan advanced by Altbanq Lending LLC ("Altbanq") in November 2024.   Avonwood Credit's Discovery Requests sought information regarding this loan.   While the Debtor produced the underlying loan documents and a closing statement showing that net proceeds received under the loan (after payment of various fees, expenses and real estate taxes) was $2,342,784.05, the Debtor did not produce any documentation showing the account these funds were received into (or if the Debtor even received such funds). Tr. Ex. 32.

75.     Following the receipt of the document production, counsel for Avonwood Credit specifically asked Debtor's counsel to provide this information.   Avonwood Credit has not received this information and seriously questions whether the full amount of the Altbanq claim is properly included as a debt of the Debtor.  Avonwood Credit notes that Altbanq has not appeared in this case or asserted any rights in connection with this case despite allegedly having a junior secured claim in the principal amount of $3,000,000 on a loan which has now matured by its terms.

76.     Avonwood Credit also notes that Altbanq received guarantees and security pledges from certain non-debtor entities and Mr. Rudich, and that Altbanq's claim, to the extent valid, may have been satisfied, in whole or in part, by non-Debtors. *See* Tr. Ex. 33 (loan documents including payment guarantees and confessions of judgment for Empire Realty USA Corp., WP Florida LLC

and Ahron Rudich).[12]  The Debtor and/or Altbanq should be required to introduce evidence of the validity and amount of the Class 3 claim before the Court considers the claim valid for purposes of analyzing the Plan.

77.      Finally, we note that the non-default interest rate for the Altbanq loan issued in November 2024 was 18%. Tr. Ex. 33.  Additionally, the loan contained default provisions that entitled Altbanq to 24% default interest, a default fee of $100,000 and legal fees equating to 25% of the loan balance, as well as a prepayment penalty of $210,000.  Tr. Ex. 33, Promissory Note at §§1, 6, 7.  In the face of these terms, the Debtor's assertion that an 18% default interest rate plus actual fees and expenses incurred in collecting the amounts owed which is provided for under the Avonwood Credit Loan Documents constitutes a penalty is an exemplar of hypocrisy.[13]  Moreover, the Debtor has stated that it intends to honor the terms of the Altbanq loan documents at the same time it is vigorously contesting 18% default interest due to Avonwood Credit. Reply, ¶¶ 32, 99.

### (x)      Debtor's Continuing Failure to Maintain Rental Security Deposits in Segregated Escrow Account

78.      Connecticut law requires that the Debtor maintain security deposits in a segregated escrow account. *See* Conn. Gen. Stat. § 47a-21(h).  To date, the Debtor has not been able to identify the location of a segregated escrow account holding security deposits.  In addition, the Debtor has apparently continued to violate this law **post-petition**.  The Debtor's security deposit schedule reveals that since the Petition Date nine (9) new tenants have given security deposits.  Tr. Ex. 34.

---

[12] Additionally, the Altbanq loan documents included an irrevocable direction of payment directing $400,000 held in an escrow account for the benefit of non-debtor affiliate WP Florida LLC to be paid over to Altbanq in addition to other funds received at closing of a contemplated transaction of real estate owned by Mr. Rudich in Florida. *See* Trial Ex. 33, p. 26.  When questioned about this payment direction and WP Florida LLC, Mr. Rudich could not explain why the payment direction was included in the loan documents or whether the deposit was paid over to Altbanq. See Tr. Ex. 22, 165:14-167:10.

[13] Also noteworthy is that the Altbanq loan documents included a Collateral Assignment of Leases and Rents even though those same leases and rents were already assigned to Avonwood Credit (Tr. Ex. 5) and Mr. Rudich  falsely represented that the leases and rents had not been previously assigned.  Tr. Ex. 33, Collateral Assignment of Leases and Rents, §18.

However, the Debtor has not accounted for this or any of the $135,608.53 in security deposit liability reflected in its records, and such funds are believed to have been commingled with other funds in the Empire YCR account. At his deposition, Mr. Rudich was unable to identify the account that the Debtor kept the tenant security deposits in. Tr. Ex. 22, 126:12-17; 129:4-14. The Debtor acknowledges that it breached the Loan Document covenants by not keeping these funds at Bankwell. Reply, ¶ 96. However, the Debtor continues to refuse to identify the account where such funds are held, and until proven otherwise Avonwood Credit believes that the Debtor has commingled and spent these security deposits in violation of state law and continues to violate this law with every new security deposit received post-petition.[14]

### (xi) Debtor Provided Fake Certificates of Insurance to Bankwell and Intentionally Utilized a Wrong Address for Avonwood Credit on its Post-Petition Policies

79.     Avonwood Credit has been attempting to ascertain the status of the Debtor's insurance claim since taking assignment of the Bankwell loans to the Debtor. On May 21, 2025, Avonwood Credit learned, for the first time, through correspondence with counsel for McLaren's (the third party-administrator of the insurance claim), that the Debtor was not a named insured on any policy for which a claim was submitted in relation to the April 2024 fire, (Tr. Ex. 37) *even though* Avonwood Credit received Certificates of Insurance from Bankwell indicating that the Debtor had property insurance in its own name.

80.     To make matters worse, when the Debtor finally produced certificates of insurance to Avonwood Credit thirteen days after the prior policy had expired, the Certificates of Insurance contained an address for Avonwood Credit that was plainly wrong. Tr. Ex. 38. The Debtor knows

---

[14] The Sale Contract presented to the Court seems to confirm this fact by providing that the Debtor either (a) deliver all security deposits to the purchaser or (b) credit the purchase price against the amount of the security deposits. Tr. Ex. 36, §15(d). If the funds were held in a segregated escrow account as required by state law the contract would just provide for the transfer of such account or the proceeds thereof.

exactly what Avonwood Credit's business address is as indicated in the SOFAs, the Claim and the fact that the Debtor correctly listed that business address in the Adversary Proceeding commenced by the Debtor against Avonwood Credit. Yet, when listing a notice address for Avonwood Credit in the Certificates of Insurance, the Debtor somehow came up with an erroneous office park address in New Jersey. Avonwood Credit believes this error was intentional so in the event future insurance claims arose during the bankruptcy the Debtor would be able to obtain insurance proceeds without notice to Avonwood Credit despite listing Avonwood Credit as an additional named insured. For these reasons Avonwood Credit has maintained the forced placement policy it purchased at significant out of pocket cost. Tr. Ex. 41.

### (xii)   Failure to Pay Post-Petition Taxes

81.    Besides being chronically late in paying its pre-petition taxes, the Debtor appears to have completely ignored its tax obligations post-petition. Taxes due to the Town of Avon come due on July 1st each year and are delinquent if not paid by August 1st. Despite having a line item in the Budget approved by the Cash Collateral Order for taxes which provided for $176,750 for taxes between the Petition Date and the end of June [Docket No. 49-1], the Debtor has failed to pay the Town of Avon Taxes which came due on July 1, 2025 and are now delinquent. *See* https://www.avonct.gov/departments/collector_of_revenue/index.php (noting that taxes are billed and collected semi-annually on July 1 and Jan. 1 for real estate); Conn. Gen. Stat. § 12-146 (noting that taxes are delinquent if not paid by the first of the month following when payable); Tr. Ex. 39.[15] When specifically asked if the Debtor paid the Town of Avon taxes due on July 1,

---

[15] Tr. Ex. 39 is a representative sample of six of the one hundred and eighty separate tax lots relating to Avonwood Credit's collateral that have delinquent taxes. Given that the tax records of the Town of Avon are public records and are voluminous, Avonwood Credit has not included all such tax records. Avonwood Credit is not aware of post-petition payments made by the Debtor on account of any tax lots associated with its collateral.

2025, Mr. Rudich testified that "all of the taxes has been paid." Tr. Ex. 22, 124:12-15. But the Town of Avon's public records show that is not the case. Tr. Ex. 39. Avonwood Credit remains concerned that its secured position is continuing to be primed by taxes that are budgeted for payment but inexplicably are not being paid. While the Debtor states that "[a]ll past due amounts (taxes, insurance, etc.) have been paid or will be paid by the Effective Date" the Debtor ignores the fact that at the present moment Avonwood Credit continues to be harmed by the ongoing tax defaults which remain uncured. Avonwood Credit's position is materially harmed through the ongoing non-payment of taxes and the accrual of interest to taxing authorities in the amount of 18%.

### (xiii)   Failure to Disclose Material Contracts

82.    Prior to the Petition Date the Debtor entered into three separate contracts to purchase units located at the Property not owned by the Debtor. See Tr. Ex. 35 (complaint re: breach of contract for failure to close on pending contracts), Tr. Ex. 36 (addendum to LOI listing "existing contract to the 3 units that are no owned yet and will be closed.").[16] However, the Debtor failed to disclose these contracts on its Exhibit G listing of executory contracts. These contracts constituted assets of the estate and should have been disclosed with other executory contracts.

### (xiv)   Failure to Disclose Retention of Broker to Market and Sell Property

83.    The Debtor continues to operate as if it is not under the supervision of this Court. Notably, the Debtor apparently retained a broker to market and sell the Property. Tr. Ex. 36, §14 (identifying Tzvee Rotberg and Marcus & Millichap as brokers of the Debtor "pursuant to a separate agreement."). The Debtor has not filed a retention application for this broker or disclosed

---

[16] From the terms of the sale contract, it is unclear if the intent is for the Debtor to close on these contracts prior to the contemplated closing on the $40.7 million contract. In any event, the Debtor has not requested authority to purchase additional units, and it is not permitted to use Avonwood Capital's cash collateral to do so.

to the Court the fee it intends on paying the broker (if any).  It is also worth noting that the Debtor did not share any other proposed sale contracts or offers with Avonwood Credit despite specific discovery requests demanding that such information be turned over.

## I.    Other Noteworthy Discrepancies in Debtor's Reply

84.    The Reply includes several other inaccuracies or discrepancies which undercut certain of the Debtor's arguments:

a.  The Debtor owns 183 of the 188 units in the Avonwood Condominiums. *See* Tr. Ex. 36.  180 of these units are secured by the Mortgages.  Tr. Exs. 3-4 and amendments to recorded mortgages. The Debtor incorrectly stated it owed 164 units. Reply, ¶5.

b.  Pullman & Comley is counsel to the Town of Avon.  The Debtor incorrectly stated they are counsel to the Debtor.  Reply, ¶16.

c.  Debtor maintains that Mr. O'Hehir was advised in advance of the Insurance Proceeds being placed into a suspense escrow account (Reply at ¶22) but Mr. O'Hehir testified that Bankwell only advised him that it put the Insurance Proceeds in the suspense escrow account after it had done so without consulting in advance with him. *See* Exhibit A, Excerpts of O'Hehir deposition transcript, 45:7-11.

d.  The Debtor maintains that Bankwell acknowledged the tax default was cured in June 2024.  Reply at ¶40. The Debtor has not produced any evidence to this effect, and chose to withdraw depositions it issued to, and not to depose, any Bankwell representatives.

e.  The Debtor maintains that its property taxes were current in January 2025 when Avonwood took assignment of the Loan from Bankwell. Reply, ¶40.  However, the Debtor was in default of its tax obligations on January 30, 2025.  *See* Town of Avon Claim number 6 asserting Grandlist 2024 real estate taxes assessed 10/1/24 which came due on 1/1/25 currently remains unpaid.

f.  The Debtor maintains that operations post-petition have been stable (Reply, ¶58), but the MORs reveal that the Debtor has significantly missed budgeted revenues for each month that it has reported results.

g.  The Debtor maintains Avonwood Credit purchased the Loan at a discount knowing it was in default (Reply, ¶59), but the Debtor has not introduced any evidence as to what Avonwood Credit paid for the loan,

and such amount is irrelevant.[17]

### J.    Amounts Due to Secured Creditor as of Effective Date

85.    As detailed in the Claim, the Claim Response, the Plan Objection and this Omnibus Response, as an oversecured creditor, Avonwood Credit is entitled to receive **$35,987,065.81** on account of its Claim on the Effective Date of the Plan.[18]  The Claim calculation is set forth on the table that follows:

| Loan Name | Mortgage | LOC | Total of Both Mortgages |
|---|---|---|---|
| Original Principal Balance | $25,312,500.00 | $2,687,500.00 | $28,000,000.00 |
| Principal Balance | $25,068,659.73 | $2,032,125.00 | $27,100,784.73 |
| Contract Rate | 4.95% | 4.95% | |
| Contract Rate Per Diem | 3,446.94 | 279.42 | $3,726.36 |
| Default Rate | 18.00% | 18.00% | |
| Default Rate Per Diem | 12,534.33 | 1,016.06 | $13,550.39 |
| Payment Event of Default | 7/1/2024 | 7/1/2024 | |
| Petition Date | 3/21/2025 | 3/21/2025 | |
| Days in Default until Petition Date | 263 | 263 | |
| Default Interest to Petition Date for Payment Default | $3,296,528.79 | $267,223.78 | $3,563,752.57 |
| Tax Date Event of Default | 8/2/2023 | 8/2/2023 | |
| Date of Tax Payment | 5/31/2024 | 5/31/2024 | |
| Days of Tax Default | 303 | 303 | |
| Per Diem Default Amount for Tax Default | $    9,087.39 | $    736.64 | $9,824.03 |
| Tax Default Interest | 2,753,479.17 | 223,201.92 | $2,976,681.09 |
| Less Insurance Proceeds | $474,744.98 | | |
| **Claim as of Bankruptcy Filing** | **$33,166,473.41** | | |
| Assumed Effective Date | 9/15/2025 | | |
| Days In Bankruptcy | 178 | | |
| Default Interest during Bankruptcy | $    2,231,110.74 | $    180,858.68 | $2,411,969.42 |
| Forced Place Insurance | $170,639.73 | | |
| Appraisals | $4,500.00 | | |
| Chapter 11 Legal Fees (estimated) | $800,000.00 | | |
| Post-Petition Interest, Fees and Expenses | $3,387,309.35 | | |
| Adequate Protection Payment Amount | $113,343.39 | | |
| Months Payments made (assumes 1 more made between now and Effective Date) | 5 | | |
| Less Total Adequate Protection Payments | $566,716.95 | | |
| **Net Post Petition Interest, Fees and Expenses** | **$2,820,592.40** | | |
| **Payoff on Plan Effective Date** | **$35,987,065.81** | | |

---

[17]Avonwood Credit deposition testimony establishes that it purchased the loan for the "unpaid principal balance, plus accrued contract interest from the payment default." Ex. A, at 28:2-7.  The "discount" the Debtor is apparently referring to is the very default interest it is seeking to avoid paying.

[18] This calculation does not include any payments on account of any "Prepayment Penalty" or "Late Fees." In the absence of a confirmed Plan, Avonwood Credit is entitled to the Prepayment Penalty upon the acceleration of the Mortgages under the Loan Documents. Tr. Exs. 3-4. Additionally, Avonwood Credit is entitled to the "Late Fees" if it is not awarded default interest.  The assumed September 15, 2025 Effective Date is based on the contemplated closing date contained in the signed contract.  Per diem default interest of $13,550.39 will continue to accrue until Avonwood Credit's Claim is paid.  Details regarding: (i) the Appraisal cost is at Tr. Ex. 40; (ii) Forced Placement Insurance is at Tr. Ex. 41; and (iii) Legal fees incurred in this bankruptcy proceeding is at Tr. Ex. 42.  Avonwood Credit has estimated approximately $250,000 in legal fees from August 1, 2025 through the Trial and Plan Effective Date.

86.     The Debtor has argued, without any evidentiary support, that Avonwood Credit has enjoyed a large equity cushion throughout this case.   While Avonwood Credit certainly supports a sale of the Property for $40.7 million, prior to July 31, 2025 there was no evidence presented showing that the Debtor had equity in the Property.   In fact, the only evidence before the Court was in the form of the CBRE appraisal submitted by Avonwood Credit which did not show any equity. Tr. Ex. 40.   Additionally, the Plan presented to the Court prior to the Reply was premised on a $31 million refinancing of the Property and required several million dollars in an equity contribution from Mr. Rudich.

87.     Accordingly, while Avonwood Credit hopes that the Debtor can close on the sale as soon as possible and strongly supports the Debtor's efforts to do so, payment in full on Avonwood Credit's claim has been anything from assured throughout this case.   Coupled with the Debtor's extreme lack of cooperation throughout this case, its abuse of the bankruptcy system, its discovery abuses, as well as its cavalier attitude that as long as payments are made nothing else matters, strongly supports enforcing the Loan Documents as written and allowing the Claim as set forth above and allowing post-petition default interest, costs and fees incurred in this bankruptcy proceeding.

## CONCLUSION

WHEREFORE, this Court should enter an Order that (1) overrules the Objection, (2) allows the Claim in the amount of $33,166,473.41, and (3) conditions approval of the Plan upon payment to Avonwood Credit in the amount of $35,987,065.81.

Dated: New York, New York
       August 11, 2025

**THOMPSON COBURN LLP**

By: */s/ Joseph Orbach*
    Steven J. Mandelsberg
    Joseph Orbach
    488 Madison Avenue
    New York, NY 10022
    Telephone: 212-478-7200
    Fax: 212-478-7400
    smandelsberg@thompsoncoburn.com
    jorbach@thompsoncoburn.com

    *Attorneys for Secured Creditor 44 Avonwood Road Credit LLC*

**EXHIBIT A**

**EXCERPTS OF O'HEHIR DEPOSITION TRANSCRIPT**

1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x
IN RE:

                                 Chapter 11

        AVON PLACE LLC

                Debtor.      Case No.
                              25-41368
-------------------------------------x
AVON PLACE LLC

                Plaintiff,    Adv.
                              Proc.
                              25-01062

            v.

44 AVONWOOD ROAD CREDIT LLC

                Defendant.
-------------------------------------x

                August 4, 2025
                12:04 p.m.

     DEPOSITION of 44 AVONWOOD ROAD CREDIT

LLC, by KYLE O'HEHIR, taken by the attorney

for the Debtor, pursuant to Notice, held via

web conference, before Karen Viggiano, a

Notary Public within and for the State of

New York at the above date and time.

```
 1

 2    A P P E A R A N C E S:

 3

 4    SCHWARTZ SLADKUS REICH GREENBERG ATLAS LLP
      Attorneys for Debtor/Plaintiff
 5          444 Madison Avenue
            New York, New York 10022
 6
      BY:    ANDREA J. CARUSO, ESQ.
 7

 8

 9    THOMPSON COBURN LLP
      Attorneys for Defendant
10          488 Madison Avenue, 14th Floor
            New York, New York 10022
11
      BY:    STEVEN J. MANDELSBERG, ESQ.
12          smandelsberg@thompsoncoburn.com
            JOSEPH ORBACH, ESQ.
13

14

15    ALSO PRESENT:

16          ALEX BYRNE

17

18

19

20

21

22

23

24

25
```

3

1

2                    STIPULATIONS

3

4      IT IS HEREBY STIPULATED AND AGREED by

5   and between the attorneys for the respective

6   parties herein that the filing, sealing and

7   certification of the within deposition be

8   waived.

9      That such deposition may be signed

10  and sworn to before any officer authorized to

11  administer an oath with the same force and

12  effect as if signed and sworn to before the

13  officer before whom said deposition was taken.

14     IT IS FURTHER STIPULATED AND AGREED that

15  all objections except as to form are reserved

16  for the time of trial.

17

18

19

20

21

22

23

24

25

4

1

2              (Whereupon the witness presented a

3         Connecticut driver's license.)

4   K Y L E   O' H E H I R, having been first duly

5   sworn by a Notary Public within and for the

6   State of New York, was examined and testified

7   under oath as follows:

8

9   EXAMINATION BY

10  MS. CARUSO:

11       Q    State your name for the record.

12       A    Kyle O'Hehir.

13       Q    State your address for the record.

14       A    200 Pemberwick Road, Greenwich,

15  Connecticut 07831.

16       Q    Good afternoon, Mr. O'Hehir.  My

17  name is Andrea Caruso.  I'm the Proposed

18  Special Litigation Counsel for the debtor, Avon

19  Place LLC in this action.

20              I'm going to be asking you a

21  series of questions today.  If at any point you

22  do not understand my question, please let me

23  know and I will do the best to rephrase it.

24              There are a few rules that I ask

25  that you follow today.  The first being is that

1                    K. O'Hehir

2    price set or was that something that occurred

3    after diligent material was exchanged to you?

4         A    That occurred after.

5         Q    Who did the first price proposal

6    come from, you or Bankwell?

7         A    In this particular case, I don't

8    recall.  I would say generally most lenders

9    tell you that they would be happy accepting,

10   you know, the PAR.

11        Q    Do you know sitting here today,

12   what PAR was on the Bankwell loan at the time

13   you were just discussing you believe Bankwell

14   gave you that?

15             MR. MANDELSBERG:  You mean in

16        August of 2024?

17             MS. CARUSO:  Well, it wasn't in

18        August I don't think based on his

19        testimony.

20        A    August, September time frame,

21   yeah.  I do not -- I don't recall what that

22   number would have been at that time.

23        Q    Did you negotiate the price at all

24   with Bankwell?

25        A    Yes.

                              K. O'Hehir

1

2       Q     What number did you ultimately

3    decide on with Bankwell to be the purchase

4    price of this loan?

5       A     The unpaid principal balance, plus

6    the accrued contract interest from the payment

7    default.

8       Q     You said it was the UPB, unpaid

9    principal balance, plus the accrued interest

10   on the payment default, so my question what's

11   your understanding of what the date was on that

12   that the accrued interest started to accrue --

13   contract interested started to accrue, sorry.

14      A     There were two notes of this

15   mortgage secured.  I believe one of them with

16   respect to the payment default, one of them

17   went into payment default in May or June.  And

18   then the other one went into payment default in

19   June or July.

20      Q     Who did you negotiate the purchase

21   price with on behalf of Bankwell?

22      A     I don't know that there was one

23   individual in particular but Chris and

24   Constantine.

25      Q     Did you sign a contract to

44

                              K. O'Hehir

1

2          A     No.

3          Q     As of your date of closing, what

4     was your understanding as to the application of

5     the 474,000 that had been received from the

6     insurance proceeds?

7          A     Bankwell had that in a suspense

8     escrow account.

9          Q     Did you have any discussions with

10    anyone at Bankwell regarding that account?

11         A     Only that its contents would be

12    turned over to me in conjunction with the note

13    purchase.

14         Q     Did you ask anyone why it was in

15    an escrow account as opposed to applied to the

16    open debt?

17              MR. MANDELSBERG:  Objection.

18              At any time before the closing,

19         after the closing?

20              MS. CARUSO:  At any time.

21         A     Bankwell advised me that they felt

22    better if I applied it.

23         Q     Did you request for that money to

24    go into a suspense escrow account?

25         A     I did not request for it but I did

45

```
 1                    K. O'Hehir
 2   chat with Constantine about the application of
 3   it and he advised me that they would be putting
 4   it into a suspense account and that it would be
 5   my responsibility, I suppose, post-closing to
 6   apply it.
 7        Q    Is it fair to assume based on that
 8   testimony you just gave that this conversation
 9   occurred before the check was actually
10   deposited into the escrow suspense account?
11        A    I believe it was after.
12        Q    At the time in which you had this
13   conversation with Constantine, was your LOI
14   already signed?
15        A    I believe so.
16        Q    Is there a reason for the length
17   of time between the LOI being executed and the
18   closing in February of 2025?
19        A    A reason just in terms of -- what
20   do you mean by reason?
21        Q    Is there a reason it took that
22   many months?
23             MR. MANDELSBERG:  Objection.
24        A    No.  Real estate is not that fast.
25   Pretty normal time frame I think.  I think it's
```

1

2                    I N D E X

3

4   WITNESS                                    PAGE

5   KYLE O'HEHIR

6        EXAMINATION BY:

7        MS. CARUSO                            4

8

9                 E X H I B I T S

10  DEBTOR'S        DESCRIPTION              PAGE

11  Exhibit A      Proof of claim           63

12  Exhibit B      Proof of claim           78

13

14

15

    DOCUMENTS AND/OR INFORMATION REQUESTED
16
    DESCRIPTION                            PAGE
17
    Proper spelling of Leo Kosevich's name   38
18
    Production of email with loss run        38
19  showing insurance proceeds been
    disbursed
20
    Title search that showed open taxes as   42
21  of date of closing

22  Forced placed insurance policy and       60
    cost of policy from 5/30/25 to present
23
    Name of Indian gentleman tenant          89
24

25

107

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK    )
                          ) ss:
5    COUNTY OF BRONX      )

6

7         I, KAREN VIGGIANO, a Shorthand

8    Reporter and Notary Public within and for

9    the State of New York, do hereby certify:

10        That KYLE O'HEHIR, the witness whose

11   examination is hereinbefore set forth, was duly

12   sworn by me and that this transcript of such

13   examination is a true record of the testimony

14   given by such witness.

15        I further certify that I am not related

16   to any of the parties to this action by blood

17   or marriage and that I am in no way interested

18   in the outcome of this matter.

19

20   IN WITNESS WHEREOF, I have hereunto set my hand

21   this 5th day of August, 2025.

22

23        *Karen S. Viggiano*

24   _____
                KAREN VIGGIANO
25