UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:                                                          Chapter 11

AVON PLACE LLC,                                          Case No. 25-41368 (JMM)

                              Debtor.
------------------------------------------------------------------X

## PROPOSED FACTS WHICH DEBTOR HAS UNJUSTIFIABLY REFUSED TO STIPULATE TO OR OTHERWISE ADMIT

Pursuant to the Court's *Pretrial Scheduling Order*, dated July 22, 2025 [ECF 102], in advance of the August 18, 2025 evidentiary hearing and trial of Debtor Avon Place LLC's (the "Debtor") objection to Claim No. 10 filed by Secured Creditor 44 Avonwood Road Credit LLC ("Avonwood Credit") and of the confirmation of the Debtor's proposed *Amended Chapter 11 Plan* [ECF 77], dated June 12, 2025, the Debtor and Avonwood Credit have submitted a Stipulation of Uncontested Facts (the "Stipulation of Uncontested Facts") [ECF 111]. Avonwood Credit requested that the Debtor stipulate to the following additional facts supported by Avonwood Credit's Trial Exhibits, the Debtor's own bankruptcy filings or facts acknowledged during discovery, but, except as noted below, the Debtor has contended that the statements below are "allegations, not facts." Because Avonwood Credit disagrees, is prepared to prove all of the statements listed below, and believes that their acknowledgment will facilitate and streamline the upcoming Trial, Avonwood Credit is filing this listing of proposed facts, none of which is intended to be proposed as conclusions of law.

### A.    The Pertinent Loan Documents[1]

1.    The Bankwell Assignment was properly executed, and is valid and

---

[1] Capitalized terms not defined herein shall have the same meaning as stated in the Stipulation of Uncontested Facts.

enforceable.[2]

**B.    The Foreclosure Action and Debtor's Bankruptcy**

2.       On April 4, 2025, the Debtor filed its *Statement of Financial Affairs* (the "SOFA") [ECF 14]. Tr. Ex. 24.[3]

3.        Part 1 of the SOFA states that the Debtor received $2,984,439.26 in gross revenue in from January 1, 2024 through December 31, 2024.

4.       Part 1 of the SOFA states that the Debtor received $601,622.63 in gross revenue from January 1, 2025 through the Petition Date.

5.       Part 2 of the SOFA states that the Debtor transferred $1,206,200 to an insider entity—Empire Realty USA Corp. —in the year prior to the Petition Date (the "Empire Realty Transfer(s)").

6.       The SOFA does not state the reason for the Empire Realty Transfer(s).

7.       The SOFA does not identify the date(s) of the Empire Realty Transfer(s).

8.       The SOFA does not provide any further information concerning the Empire Realty Transfer(s).

**C.    Avonwood Credit's Proof of Claim**

9.       Avonwood Credit's claim is comprised of the following five (5) components: (a) principal in the aggregate amount of $27,100,784.73 (the "Principal"); (b) default interest following the non-payment tax default in the aggregate amount of $2,830,377.34 (the "Tax Default Interest"); (c) default interest following the payment default in the aggregate amount

---

[2] The Debtor objected to this fact despite stipulating that the Bankwell Assignment was filed and recorded because the Debtor does "not have the ability to concede that the assignment was proper. The documents do not necessarily prove that."

[3] References to Tr. Ex. are to the Trial Exhibits submitted to the Court by Avonwood Credit on August 11, 2025.

of $4,454,031.25 (the "<u>Payment Default Interest</u>"); (d) prepayment penalty in the aggregate amount of $840,000 (the "<u>Prepayment Penalty</u>"); and (e) late fees in the aggregate amount of $406,220.43 (the "<u>Late Fees</u>"). Tr. Ex. 8.

10.     The Loan Documents authorize Avonwood Credit to recover its attorneys' fees and expenses in enforcing the Debtor's obligations thereunder. Tr. Exs. 1-4.

D.    **Further Breakdown of Avonwood Credit's Claim**

(i)    **Principal**

11.     As of the Petition Date, $25,068,569.73 in Principal remained unpaid on the $25,312,500 Note. Tr. Ex. 15.

12.     As of the Petition Date, $2,032,125.00 in Principal remained unpaid on the $2,687,500 Note. Tr. Ex. 16.

(ii)    **Tax Default Interest**

13.     Section 1.3 of the Mortgages (Tr. Exs. 3-4) states that the Debtor "shall pay and discharge promptly, before the same shall become delinquent, all taxes, assessments, sewer rents, water rates, and other charges of any kind now or hereafter levied or assessed upon the [] Property."

14.     General taxes due to the Town of Avon are deemed delinquent if not paid by the first day of the month following when the taxes come due.  Conn. Gen. Stat. § 12-146.

15.     Delinquent general taxes due to the Town of Avon accrue interest at a rate of 1.5% per month (18% annually). Conn. Gen. Stat. § 12-146

16.     General taxes due to the Town of Avon for 2022 were due on July 1, 2023 and January 1, 2024.  *https://www.avonct.gov/departments/collector_of_revenue/index.php*

17.     On October 24, 2023, Bankwell sent the Debtor an e-mail stating (Tr. Ex. 10),[4]
in part,

> Our vendor has notified us that taxes for Avon are delinquent.  Please provide
> us proof of tax payment ASAP.

18.     On April 24, 2024, Bankwell sent the Debtor an e-mail stating (Tr. Ex. 10), in
part,

> … we received notice that there are past due taxes on Avon Place.  Please
> advise regarding the payment of these.  Given the size of the delinquency this
> will likely draw some attention so it would be helpful to have some background
> and understand the timeframe for resolution.

19.     On May 31, 2024 or June 4, 2024, the Debtor paid its 2022 general taxes due
to the Town of Avon.  Tr. Ex. 17.

20.     The Debtor's 2022 general taxes due to the town of Avon on July 1, 2023 were
delinquent from August 2, 2023 through at least May 31, 2024 for a period of three hundred
and three (303) days.

21.     General taxes due to the Town of Avon for 2023 were due on July 1, 2024 and
January 1, 2025.

22.     On November 22, 2024, the Debtor paid its 2023 general taxes due to the Town
of Avon on July 1, 2024.

23.     Section 4.1 of the Mortgages (Tr. Exs. 3-4) states, in part, that

> … the following events shall be deemed to be an "Event of Default" hereunder:
> (a) failure to pay within ten (10) days of when due any installment of principal,
> interest or other amount due with respect to any and all Indebtedness; (b) the
> occurrence of any event or circumstance constituting an event of default or
> Event of Default after lapse of any applicable notice and cure period, if any,

---

[4] Konstantin Grinberg, a Senior Vice President of Bankwell Bank has executed a business records affidavit as to the documents produced by Bankwell in discovery including the emails contained in Tr. Ex. 10.  Additionally, the Debtor conceded to receiving these emails in their Reply (ECF No. 108) at ¶40. Moreover, at his deposition Mr. Rudich did not contest the validity of these emails or that he received them when sent but rather he believed that he responded to such emails. Tr. Ex. 22, 114:18-117:7.

under any of the Financing Agreements including, without limitation, the Note, this Mortgage or the Commitment Letter, between the Mortgagee and the Mortgagor; or (c) failure to promptly observe, perform or comply with any other material obligation, condition or covenant to be observed, performed or complied with by Mortgagor, the Note or any Financing Agreements and said failure continues for thirty (30) days after written notice thereof from Mortgagee …."

24.    Section 5.1(c) of the Mortgages (Tr. Exs. 3-4) states that the Debtor "shall immediately give notice to Mortgagee of any material default under the terms of the Financing Agreements."

25.    The Debtor failed to immediately give notice to Bankwell of its failure to timely pay its 2022 and 2023 taxes.

26.    Section 7 of the $25,312,500 Note (Tr. Ex. 1) states, in part, that

[u]pon the occurrence and during the continuance of any Event of Default (as hereinafter defined) … interest shall immediately accrue at a "default rate" which means the rate of interest which is Eighteen (18%) percent per annum, but in no event to exceed the maximum rate allowed by law.

27.    Section 6 of the $2,687,500 Note (Tr. Ex. 2) states, in part, that

[u]pon the occurrence and during the continuance of any Event of Default (as hereinafter defined) beyond the expiration of any applicable notice and cure periods … interest shall immediately accrue at a "default rate" which means the rate of interest which is Eighteen (18%) percent per annum, but in no event to exceed the maximum rate allowed by law.

28.    The difference between the contract rate of 4.95% and the default rate of 18% equates to a *per diem* interest of $9,824.03 based on the principal amount of the loans.

**(iii)    Payment of Default Interest**

29.    Section 2 of the $25,312,500 Note (Tr. Ex. 1) and Section 2.1 of the $2,687,500 Note (Tr. Ex. 2) state, in part, that "Interest only … shall be due and payable in arrears commencing November 1, 2022 and on the first day of each month thereafter …. "

30.    Section 2 of the $25,312,500 Note (Tr. Ex. 1) also states, in part, that "principal

and interest shall be payable in arrears in equal consecutive monthly installments of One Hundred Thirty Six Thousand Two Hundred Thirty Three and 42/100 Dolars ($236,233.42), which payments are based on a hypothetical thirty (30) year term, commencing November 1, 2023, and continuing on the same day of each month thereafter …."

31.    Section 12 of the $25,312,500 Note (Tr. Ex. 1) states that "[n]o agreement by the Holder to change, waive or release the terms of this Note will be valid unless it is in writing and signed by Maker and the Holder."

32.    Section 11 of the $2,687,500 Note (Tr. Ex. 2) states that "[n]o agreement by the Lender to change, waive or release the terms of this Note will be valid unless it is in writing and signed by Maker and the Lender."

33.    Section 11 of the $25,312,500 Note (Tr. Ex. 1) and Section 10 of the $2,687,500 Note (Tr. Ex. 2) state, in part, that "[a]ny failure by the Holder to exercise any right it may have under this Note is not a waiver of the Holder's right to exercise the same or any other right at any other time.

34.    Section 1 of the $25,312,500 Note (Tr. Ex. 1) and Section 1.1 of the $2,687,500 Note (Tr. Ex. 2) state, in part, that the contract rate of interest is "4.95%".

35.    Section 7 of the $25,312,500 Note (Tr. Ex. 1) states, in part, that

[a]n "Event of Default" is defined as … A. … the failure to pay any other installment of principal and/or interest … within ten (10) days from the date when such installment is otherwise due and payable ...."

36.    Section 2.1 of the $2,687,500 Note (Tr. Ex. 2) states, in part, that

[a]n "Event of Default" is defined as … (i) default in the payment of any interest, principal or other amounts due hereunder during the term of this Note and such default continuing for a period of ten (10) days after the due date hereof ….

37.    The Notes (Tr. Ex. 1-2) state that upon the occurrence of an "Event of Default"

interest accrues at the "default rate" of 18% "without notice or demand."

38.     Section 7.A of the $25,312,500 Note (Tr. Ex. 1) and Section 6(i) of the $2,687,500 Note (Tr. Ex. 2) did not require that any notice of a payment default be provided by Bankwell.

39.     Section 13 of the $25,312,500 Note (Tr. Ex. 1) and Section 12 of the $2,687,500 Note (Tr. Ex. 2) state in bold capital text:

> **MAKER AND ANY SUBSEQUENT ENDORSER, GUARANTOR OR OTHER ACCOMMODATION MAKER WAIVES PRESENTMENT, DEMAND FOR PAYMENT AND NOTICE OF DISHONOR.**

40.     The last payment received on account of the $25,312,500 Note was received on June 27, 2024 on account of the payment due June 1, 2024. Tr. Ex. 15.

41.     The last payment received on account of the $2,687,500 Note was received on June 3, 2024 on account of the payment due June 1, 2024. Tr. Ex. 16.

42.     On July 29, 2024, Bankwell sent the Debtor an email stating "Just a reminder we have not yet received the July 1 loan payment.  Please forward prior to month end." Tr. Ex. 11.

43.     The *per diem* interest on the Notes at the default rate of 18% is $13,550.39.

44.     On December 5, 2024, Bankwell received the proceeds of an insurance check in the amount of $474,744.98 on account of the Property (the "Insurance Proceeds"). Tr. Ex. 12.

45.     As of October 1, 2024, $544,933.68 was due and owing in non-default rate principal and interest payments under the $25,312,500 Note. Tr. Ex. 1.

46.     The Insurance Proceeds were insufficient to cure the Debtor's payment default on the non-default rate principal and interest payments under the $25,312,500 Note.

47.     Section 5 of the $25,312,500 Note (Tr. Ex. 1) states that

[p]ayments will be applied first to fully pay costs and expenses incurred by the Holder in collecting this Note or in sustaining and/or enforcing any security granted to secure this Note, if any, then to fully pay any outstanding late charges or prepayment fees, then to fully pay accrued interest and the remainder will applied to principal.

48.     Section 4 of the $2,687,500 Note (Tr. Ex. 2) states

[p]ayments will be applied first to fully pay costs and expenses incurred by the Lender in collecting this Note or in sustaining and/or enforcing any security granted to secure this Note, if any, then to fully pay any outstanding late charges or prepayment fees, then to fully pay accrued interest and the remainder will applied to principal.

49.     Section 1.4 of the Mortgages (Tr. Exs. 3-4), in part, state

(a) Hazard Insurance. … after deducting the costs of collection, to apply the proceeds, at Mortgagee's sole option, as follows:  (i) as a credit upon the Indebtedness secured hereby, whether or not the same shall be then due and payable, or (ii) to repairing or restoring the Mortgaged Property or any part thereof ….

50.     On January 30, 2025, Avonwood Credit applied the Insurance Proceeds against accrued interest then due and owing under the $25,312,500 Note at the default rate of interest. Tr. Ex. 8.

51.     Other than the Insurance Proceeds no other funds were paid by the Debtor from June 27, 2024 through the Petition Date on account of the Loan Documents. Tr. Exs. 15-16.

52.     July 1, 2024 through the Petition Date is a period of two hundred and sixty three (263) days.

**(iv)    Prepayment Penalty**

53.     Section 2 of the $25,312,500 Note (Tr. Ex. 1) and Section 2.1 of the $2,687,500 Note (Tr. Ex. 2) define "Maturity Date" as "October 1, 2025".

54.     Section 8 of the $25,312,500 Note (Tr. Ex. 1) states, in part, that

The Borrower may prepay the Loan in full at any time upon payment of a prepayment fee … (ii) commencing on the first (1st) Anniversary Date and continuing until the Maturity Date, the prepayment fee shall be one percent (1%) of the principal prepayment.  Notwithstanding the foregoing, there shall be no prepayment fee due on any principal prepayments made within the ninety (90) day period prior to the Maturity Date.   As used herein, the term "Anniversary Date shall mean October 1, 2022.

55.     Section 7 of the $2,687,500 Note (Tr. Ex. 2) states, in part, that

The outstanding balance under the Loan may be prepaid in full at any time upon payment of a prepayment fee as follows:  from the date hereof and continuing until (but not including) the first (1st) Anniversary Date, the prepayment fee shall be three percent (3%) of the principal repayment. Thereafter, until the Maturity Date, the prepayment fee shall be one percent (1%) of the principal prepayment.  Notwithstanding the foregoing, there shall be no prepayment fee due on any principal prepayments made within the ninety (90) day period prior to the Maturity Date.  The term "Anniversary Date" shall as used herein shall mean October 1, 2022.

### (v)     Late Fee

56.     Section 6 of the $25,312,500 Note (Tr. Ex. 1) states that

Maker shall pay the Holder a late charge of five percent (5%) of any monthly installment not received by the Holder within ten (10) days after the installment is due, to cover the additional expenses involved in handling such overdue installment.  This charge shall be in addition to, and not in lieu of, any other remedy the Holder may have and is in addition to any reasonable fees and documented charges of any agents or attorneys which the Holder is entitled to employ in the event of default hereunder, whether authorized herein or by law. Maker will pay this late charge promptly but only once for each late payment.

57.     Section 5 of the $2,687,500 Note (Tr. Ex. 2) states that

Maker shall pay the Holder a late charge of five percent (5%) of any monthly installment not received by the Holder within ten (10) days after the installment is due, to cover the additional expenses involved in handling such overdue installment.  This charge shall be in addition to, and not in lieu of, any other remedy the Lender may have and is in addition to any reasonable fees and documented charges of any agents or attorneys which the Lender is entitled to employ in the event of default hereunder, whether authorized herein or by law. Maker will pay this late charge promptly but only once for each late payment.

### E.     Other Defaults Under the Loan Documents

### (i)     Unauthorized Subordinate Financing

58.     Section 4.B of the $25,312,500 Note (Tr. Ex. 1) states "Subordinate Financing: No other financing will be permitted trough the term of the Loan without Lender's prior consent."

59.     Section 3(iii) of the $2,687,500 Note (Tr. Ex. 2) states "Subordinate Financing: No other financing, will be permitted as long as any portion of the Loan remains unpaid without prior Lender's consent, other than indebtedness in the ordinary course of business."

60.     On or about November 20, 2024, the Debtor executed a *Promissory Note* in favor of Altbanq Lending LLC ("Altbanq") in the original principal amount of $3,000,000.00 (the "Altbanq Note"). Tr. Ex. 33.

61.     As security for the Altbanq Note, on or about November 20, 2024, the Debtor granted an *Open-End Mortgage Deed and Security Agreement* of the Property in favor of Altbanq. Tr. Ex. 33.

62.     Paragraph 5 of the Amended Plan classifies Avonwood Credit's claim as a "Class 2" claim and states

> Allowed Secured Claims of the Mortgagee.  The Debtor estimates that principal, non-default contract rate of interest, amortization, advances and other charges total approximately $28,100,785 as of the Petition Date.  The Mortgagee has filed a proof of claim asserting $35,156,668.77.

63.     Paragraph 8 of the Amended Plan classifies the claim of Altbanq Lending LLC ("Altbanq") as a "Class 3" claim and states

> Allowed Secured Claim of Altbanq Lending LLC.  The Debtor estimates that $3,000,000 is due as of the Petition Date secured by a mortgage on the Property.

### (ii)     Failure to Maintain an Operating Account with Bankwell

64.     Connecticut General Statute 47a-21(h) states

Escrow deposit. (1) Each landlord shall immediately deposit the entire amount of any security deposit received by such landlord from each tenant into one or more escrow accounts established or maintained in a financial institution for the benefit of each tenant. Each landlord shall maintain each such account as escrow agent and shall not withdraw funds from such account except as provided in subdivision (2) of this subsection.

65.     Connecticut General Statute 47a-21(k) states

Penalties. (1) Any person who is a landlord at the time of termination of a tenancy and who knowingly and wilfully fails to pay all or any part of a security deposit when due shall be subject to a fine of not more than two hundred fifty dollars for each offense, provided it shall be an affirmative defense under this subdivision that such failure was caused by such landlord's good faith belief that he was entitled to deduct the value of damages he has suffered as a result of such tenant's failure to comply with such tenant's obligations.

66.     Section 4.C of the $25,312,500 Note (Tr. Ex. 1) states

Operating Account:  The Borrower shall be required to maintain its operating account for the Property and tenant security deposits with the Lender for the term of the Loan.   The Borrower's failure to establish and maintain the operating account shall constitute an Event of Default under the Loan.

67.     Section 3(iv) of the $2,687,500 Note (Tr. Ex. 2) states

Operating Account:  The Borrower will be required to maintain its operating account for the Property and the security deposit account for the Property with the Lender throughout the term of the Loan.

68.     On January 24, 2024, Bankwell sent an email to the Debtor (Tr. Ex. 13) stating,

in part, that

It was also noted Avon is not keeping their operating account at Bankwell per the terms of their Note:

C.     Operating Account:  The Borrower shall be required to maintain its operating account for the Property and tenant security deposits with the Lender for the term of the Loan.  The Borrower's failure ot establish and maintain the operating account shall constitute an Event of Default under the Loan.

These must be brought over to the Bank as agreed.

**(iii)     <u>Failure to Properly Maintain Tenant Security Deposits</u>**

69.     The SOFA does not account for any of the Debtor's tenant security deposits as of the Petition Date. Tr. Ex. 24.

70.     The Debtor's April 2025 Monthly Operating Report [ECF 53] does not account for any tenant security deposits. Tr. Ex. 25.

71.     The Debtor's May 2025 Monthly Operating Report [ECF 86] does not account for any tenant security deposits. Tr. Ex. 26.

72.     The Debtor's June 2025 Monthly Operating Report [ECF 99] does not account for any tenant security deposits. Tr. Ex. 27.

73.     On April 24, 2025, Michelle Traub filed a letter with the Court [ECF 31] stating, in part, "My story most recently ends with my move-out and trying to get my security deposit back.".

74.     On April 25, 2025, Heinrich and Elisabeth filed a letter with the Court [ECF 35] stating, in part, "Lastly, we have NO documentation that 'our' $1,500. Security Deposit is in an Escrow account."

75.     On April 28, 2025, John Hassan filed a letter with the Court [ECF 37] stating, in part, "After a disappointing year, I moved out at the end of July of 2024.  I never missed a rent payment.  Yet, Empire kept my security deposit of $1,900."

76.     On June 8, 2025, Dinesh Kumar filed a letter with the Court [ECF 70] stating, in part, "Since no refund has been issued and no response has been received to my inquiries, I formally demand the full return of my security deposit amounting to $1,850."

77.     On June 16, 2025, Kenneth E. Heyne filed a claim,  designated as claim number 13 on the Debtor's claim registry, in the amount of $1,307.60 on account of the "Rental Security Deposit."

78.     On June 16, 2025, Joanne H. Madsen filed a claim, designated as claim number 14 on the Debtor's claim registry, in the amount of $1,567.86 on account of the "Rental Security Deposit."

79.     On June 17, 2025, Ashish Sinha filed a claim,  designated as claim number 17 on the Debtor's claim registry, in the amount of $2,375.00, in part, on account of the "Deposit."

80.     On June 18, 2025, Naveen Arya filed a claim, designated as claim number 21 on the Debtor's claim registry, in the amount of $2,350.00, in part, on account of the "Deposit."

81.     On June 19, 2025, Andrew Triggle filed a claim, designated as claim number 24 on the Debtor's claim registry, in the amount of $1,488.00 on account of the "Security Deposit."

82.     On June 19, 2025, David Osssorio filed a claim, designated as claim number 26 on the Debtor's claim registry, in the amount of $4,350.00, in part, on account of the "Security Deposit."

83.     On June 19, 2025, Jiji Murikkoli Puthanpurayil filed a claim, designated as claim number 27 on the Debtor's claim registry, in the amount of $3,000.00, in part, on account of the "Security Deposit."

84.     On June 19, 2025, Neeraj Gupta filed a claim, designated as claim number 28 on the Debtor's claim registry, in the amount of $3,275.00, in part, on account of the "Security Deposit."

85.     On June 19, 2025, Mukund Palsikar filed a claim, designated as claim number 29 on the Debtor's claim registry, in the amount of $2,450.00, in part, on account of the

"Security Deposit."

86.     On June 20, 2025, Judith McNally and Kathryn A. Rickson-McNally filed a claim, designated as claim number 30 on the Debtor's claim registry, in the amount of $1,600.00 on account of the "Security Deposit."

87.     On July 1, 2025, Sumesh Kumar Thattarambath Naripettil filed a claim, designated as claim number 31 on the Debtor's claim registry in the amount of $1,659.00, in part, on account of the "Security Deposit."

88.     The Debtor's failure to maintain an operating account for the Property and tenant security deposits constituted an Event of Default under the Loan Documents. Tr. Exs. 1-4.

Dated:  New York, New York
        August 12, 2025

<div style="margin-left:50%; border:1px solid;">

**THOMPSON COBURN LLP**


By:  /s/ Joseph Orbach
Steven J. Mandelsberg
Joseph Orbach
488 Madison Avenue (14th Floor)
New York, NY  10022
Telephone: (212) 478-7200
Fax: (212) 478-7400
smandelsberg@thompsoncoburn.com
jorbach@thompsoncoburn.com

*Attorneys for Secured Creditor 44 Avonwood Road Credit LLC*

</div>